**OPPENHEIM + ZEBRAK, LLP**
Matthew J. Oppenheim
Nicholas C. Hailey
Corey Miller
(admitted *pro hac vice*)
4530 Wisconsin Ave., NW, 5th Floor
Washington, DC 20016
Telephone: (202) 480-2999
matt@oandzlaw.com
nick@oandzlaw.com
corey@oandzlaw.com

Jennifer L. Pariser
Andrew Guerra
Bret Matera
Timothy Chung
Michelle Gomez-Reichman
(admitted *pro hac vice*)
461 5th Avenue, 19th Floor
New York, NY 10017
Telephone: (212) 951-1156
jpariser@oandzlaw.com
andrew@oandzlaw.com
bmatera@oandzlaw.com
tchung@oandzlaw.com
mgomez-reichman@oandzlaw.com

*Attorneys for Plaintiffs*

**COBLENTZ PATCH DUFFY & BASS LLP**
Jeffrey G. Knowles (SBN 129754)
Thomas A. Harvey (SBN 235342)
Bina G. Patel (SBN 315352)
One Montgomery Street, Suite 3000
San Francisco, California 94104-5500
Telephone: (415) 391-4800
ef-jgk@cpdb.com
ef-tah@cpdb.com
ef-bgp@cpdb.com

**COWAN, LIEBOWITZ & LATMAN, P.C.**
Richard S. Mandel
Jonathan Z. King
Richard Dannay
(admitted *pro hac vice*)
114 West 47th Street
New York, NY 10036-1525
Telephone: (212) 790-9200
rsm@cll.com
jzk@cll.com
rxd@cll.com

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

CONCORD MUSIC GROUP, INC.; CAPITOL CMG, INC. D/B/A ARIOSE MUSIC, D/B/A CAPITOL CMG GENESIS, D/B/A CAPITOL CMG PARAGON, D/B/A GREG NELSON MUSIC, D/B/A MEADOWGREEN MUSIC COMPANY, D/B/A MEAUX MERCY, D/B/A SPARROW SONG, D/B/A WORSHIPTOGETHER.COM SONGS, D/B/A WORSHIP TOGETHER MUSIC; UNIVERSAL MUSIC CORP. D/B/A ALMO MUSIC CORP., D/B/A CRITERION MUSIC CORP., D/B/A GRANITE MUSIC CORP., D/B/A IRVING MUSIC, INC., D/B/A MICHAEL H. GOLDSEN, INC., D/B/A UNIVERSAL – GEFFEN MUSIC, D/B/A UNIVERSAL MUSIC WORKS; SONGS OF UNIVERSAL, INC. D/B/A UNIVERSAL – GEFFEN AGAIN MUSIC, D/B/A UNIVERSAL TUNES; UNIVERSAL MUSIC – MGB NA LLC D/B/A MULTISONGS, D/B/A UNIVERSAL MUSIC – CAREERS, D/B/A UNIVERSAL MUSIC – MGB SONGS; POLYGRAM

Case No. 5:26-cv-00880-EKL

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

Judge Eumi K. Lee
Magistrate Judge Susan van Keulen

PUBLISHING, INC. D/B/A UNIVERSAL – POLYGRAM INTERNATIONAL TUNES, INC., D/B/A UNIVERSAL – POLYGRAM INTERNATIONAL PUBLISHING, INC., D/B/A UNIVERSAL – SONGS OF POLYGRAM INTERNATIONAL, INC.; UNIVERSAL MUSIC – Z TUNES LLC D/B/A NEW SPRING PUBLISHING, D/B/A UNIVERSAL MUSIC – BRENTWOOD BENSON PUBLISHING, D/B/A UNIVERSAL MUSIC – BRENTWOOD BENSON SONGS, D/B/A UNIVERSAL MUSIC – BRENTWOOD BENSON TUNES, D/B/A UNIVERSAL MUSIC – Z MELODIES, D/B/A UNIVERSAL MUSIC – Z SONGS; UNIVERSAL MUSICA, INC. D/B/A UNIVERSAL MUSIC WORKS; UNIVERSAL MUSIC PUBLISHING LTD.; UNIVERSAL MUSIC PUBLISHING BL LTD.; UNIVERSAL MUSIC PUBLISHING MGB LTD.; UNIVERSAL MUSIC PUBLISHING INTERNATIONAL LTD.; UNIVERSAL MUSIC PUBLISHING INTERNATIONAL MGB LTD.; UNIVERSAL/DICK JAMES MUSIC LIMITED; UNIVERSAL/ISLAND MUSIC LTD.; UNIVERSAL/MCA MUSIC LTD.; UNIVERSAL MUSIC PUBLISHING AB; ABKCO MUSIC, INC.; and ABKCO LEGS MUSIC, INC.,

     Plaintiffs,

     v.

ANTHROPIC PBC, DARIO AMODEI, and BENJAMIN MANN,

     Defendants.

Plaintiffs Concord Music Group, Inc.; Capitol CMG, Inc. d/b/a Ariose Music, d/b/a Capitol CMG Genesis, d/b/a Capitol CMG Paragon, d/b/a Greg Nelson Music, d/b/a Meadowgreen Music Company, d/b/a Meaux Mercy, d/b/a Sparrow Song, d/b/a Worshiptogether.com Songs, d/b/a Worship Together Music; Universal Music Corp. d/b/a Almo Music Corp., d/b/a Criterion Music Corp., d/b/a Granite Music Corp., d/b/a Irving Music, Inc., d/b/a Michael H. Goldsen, Inc., d/b/a Universal – Geffen Music, d/b/a Universal Music Works; Songs of Universal, Inc. d/b/a Universal – Geffen Again Music, d/b/a Universal Tunes; Universal Music – MGB NA LLC d/b/a Multisongs,

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · Fax 415.989.1663

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · Fax 415.989.1663

d/b/a Universal Music – Careers, d/b/a Universal Music – MGB Songs; Polygram Publishing, Inc. d/b/a Universal – Polygram International Tunes, Inc., d/b/a Universal – Polygram International Publishing, Inc., d/b/a Universal – Songs of Polygram International, Inc.; Universal Music – Z Tunes LLC d/b/a New Spring Publishing, d/b/a Universal Music – Brentwood Benson Publishing, d/b/a Universal Music – Brentwood Benson Songs, d/b/a Universal Music – Brentwood Benson Tunes, d/b/a Universal Music – Z Melodies, d/b/a Universal Music – Z Songs; Universal Musica, Inc. d/b/a Universal Music Works; Universal Music Publishing Ltd.; Universal Music Publishing BL Ltd.; Universal Music Publishing International Ltd.; Universal Music Publishing International MGB Ltd.; Universal/Dick James Music Limited; Universal/Island Music Ltd.; Universal Music Publishing AB; ABKCO Music, Inc.; and ABKCO LEGS Music, Inc. (collectively, "Publishers"), for their complaint against Defendants Anthropic PBC ("Anthropic"), Dario Amodei, and Benjamin Mann (collectively, "Defendants"), allege, on personal knowledge as to matters relating to themselves and on information and belief as to all other matters, as set forth below.

## NATURE OF THE CASE

1. Publishers, a group of the world's most prominent music publishers, bring this second action against Anthropic, Dario Amodei, and Benjamin Mann to address Defendants' brazen and ongoing mass infringement of Publishers' copyrighted musical compositions in ways that are distinct and separate from the infringements alleged in Publishers' earlier case against Anthropic.

2. First, Publishers bring this suit to address Defendants' flagrant piracy of their musical compositions by downloading those works from infamous pirate library websites using BitTorrent, a file-sharing technology widely used for mass copyright infringement. Publishers recently discovered that Defendants downloaded by torrenting an enormous number of unauthorized copies of Publishers' works from illegal shadow libraries to avoid paying for those works, while at the same time uploading via torrenting unlawful copies of the same works, all in blatant violation of Publishers' copyrights. While Anthropic misleadingly claims to be an AI "safety and research" company, its record of illegal torrenting of copyrighted works makes clear that its multibillion-dollar business empire has in fact been built on piracy.

3. Defendants unlawfully torrented Publishers' works to amass a vast central library of

written texts Anthropic would maintain forever. To the extent Defendants now try to absolve themselves of liability for this blatant theft by claiming that Anthropic later used some subset of these stolen works for AI training, any such claimed use is irrelevant (and would not in any case qualify as fair use). Defendants' piracy of each of Publishers' musical compositions via torrenting was a standalone act of unmistakable, irredeemable infringement.

4.      Publishers previously brought suit against Anthropic for copyright infringement arising from Anthropic's exploitation of 499 of Publishers' musical compositions without permission as the input and output of certain of Anthropic's Claude AI models. *See Concord Music Group, Inc., et al. v. Anthropic PBC*, 5:24-cv-03811-EKL-SVK (N.D. Cal., filed Oct. 18, 2023) ("*Concord I*"). However, Anthropic concealed during discovery in *Concord I* that it had separately torrented millions of copyrighted books—including hundreds or more books that plainly contain Publishers' musical compositions—from pirate library websites. As a result, Publishers did not learn of Defendants' illegal torrenting of their works in this manner until July 2025, when Judge Alsup issued a ruling as part of a separate copyright infringement case against Anthropic that publicly revealed Defendants' brazen torrenting violations for the first time. *See Bartz v. Anthropic PBC*, 791 F. Supp. 3d 1038 (N.D. Cal. 2025).

5.      Following this ruling by Judge Alsup and other rulings and briefing in the *Bartz* case, there is now no question that Defendants exploited BitTorrent, a filesharing program synonymous with internet piracy, to access Library Genesis ("LibGen") and Pirate Library Mirror ("PiLiMi"), illegal websites infamous for housing pirated content, to download millions of unauthorized copies of books. Evidence made public as part of the *Bartz* case reveals that at least one of Anthropic's founders, Benjamin Mann, personally engaged in this illegal torrenting. What's more, other members of Anthropic's senior leadership, including founder and Chief Executive Officer Dario Amodei, personally discussed, directed, and authorized this illegal torrenting. All the while, Defendants knew that the millions of books that they were torrenting were pirated and that the websites from which they were torrenting them were illegal.

6.      Among the books Defendants illegally downloaded in this manner were many hundreds of books containing Publishers' musical compositions, in clear violation of Publishers'

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · Fax 415.989.1663

copyrights. Indeed, Publishers already license their musical compositions to publishers of sheet music and songbooks, such as Hal Leonard and Alfred Music, thereby offering consumers a variety of authorized means to enjoy Publishers' musical compositions. Defendants torrented countless pirated copies of these books containing hundreds or thousands of Publishers' works, including the 714 works identified in **Exhibit A**. Those works include "Wild Horses," "Sweet Caroline," "Bennie and the Jets," "Eye of the Tiger," "Have You Ever Seen The Rain," "Bittersweet Symphony," "She Will Be Loved," "Viva La Vida," "California Gurls," and "Radioactive."

7.      Further, when Defendants used BitTorrent to download Publishers' works via torrenting, they simultaneously uploaded to the public at large unauthorized copies of the same works, separately violating Publishers' exclusive right of distribution and encouraging further infringement of their copyrighted works.

8.      Defendants' use of BitTorrent caused extensive harm to Publishers. Each pirated work Defendants torrented was likely shared thousands if not tens of thousands of times, depriving Publishers of substantial revenue. Defendants also contributed to the continued viability of BitTorrent and pirate libraries as tools for infringement that only exist as long as they have users.

9.      Although Publishers previously moved to amend their complaint in *Concord I* to address this newly discovered evidence of Anthropic's illegal torrenting as soon as it was revealed, Anthropic successfully opposed that amendment. But Anthropic never denied having torrented pirated copies of Publishers' works. Instead, it argued that its torrenting was entirely unrelated to Publishers' claims in *Concord I*, and that amending the complaint to address torrenting claims would "fundamentally transform" that case. Publishers therefore bring this separate action to address Defendants' egregious and willful infringement by downloading and uploading via torrenting unauthorized copies of Publishers' works from illegal websites.

10.      Second, despite Publishers' having previously sued Anthropic in *Concord I* for violating their copyrights by copying 499 of their works as the input to train certain of its Claude AI models and in the output those models generate, Anthropic has chosen to double down on its illegal conduct. Anthropic has once again chosen to purloin Publishers' copyrighted works by scraping data from sources on the internet, copying the contents of physical books, and exploiting other datasets

020382.0001 4938-3535-9390.1                                                           5                       Case No. 5:26-cv-00880-EKL

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · FAX 415.989.1663

containing unauthorized copies of Publishers' works so that Anthropic can use those copies to train Anthropic's new AI models on an even more massive scale. Because Anthropic trains its AI models to memorize Publishers' works, those models generate outputs copying Publishers' works in a variety of ways, in plain violation of Publishers' rights. What's more, Anthropic's AI models also output endless quantities of "new" AI-generated song lyrics, which are based on Anthropic's unauthorized inclusion of Publishers' works in its training data, and which compete with Publishers' legitimate copyrighted works and further harm Publishers and their songwriters. Accordingly, Publishers bring this action to address Anthropic's extensive and ongoing infringement of their works in the training and output of its AI models that has occurred since *Concord I*, including with respect to the 20,517 works identified in Exhibit B.

11.    Anthropic knows that it is using Plaintiffs' works without permission, training and publicly releasing multiple new versions of Claude since Publishers filed their First Amended Complaint in *Concord I*—including, most recently, Claude 4.5 Sonnet (released to the public on September 29, 2025), Claude 4.5 Haiku (released on October 15, 2025), Claude 4.5 Opus (released on November 24, 2025), Claude 4.6 Opus (released on February 5, 2026), and Claude 4.6 Sonnet (released on February 17, 2026), among others.

12.    Anthropic copies Publishers' works without authorization to train these new AI models and, despite Anthropic's purported adoption of so-called "guardrails," the models still generate output infringing Publishers' works and are also easily jailbroken to output Publishers' lyrics and other copyrighted content, as has been reported in the scientific literature. Discovery will reveal that countless third-party users have similarly prompted these AI models for lyrics and songs, and the AI models have likewise generated output copying Publishers' works in the same manner.

13.    By copying Publishers' lyrics in this manner in AI training and output, Anthropic directly infringes Publishers' exclusive rights as copyright holders, including the rights of reproduction, preparation of derivative works, distribution, and public display. In addition, because Anthropic unlawfully profits from massive copyright infringement by its users, it is secondarily liable for the infringing acts of its users under the well-established theory of vicarious infringement.

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · FAX 415.989.1663

14.     These acts of infringement have caused Publishers substantial harm. Anthropic's use of Publishers' works without a license obviously deprives Publishers of that license fee. But Anthropic's acts have much more far-reaching consequences. By taking Publishers' works without a license, Anthropic undercuts the entire licensing market, lowering the value of Publishers' works overall. Moreover, Anthropic has created a tool, trained on unauthorized copies of Publishers' works, that permits users to generate vast quantities of AI-generated lyrics and songs that compete with Publishers' legitimate copyrighted works and harm the market for and value of those works.

15.     Publishers recognize the great potential of ethical AI as a powerful tool for the future, and have already begun to explore and enter into licenses permitting authorized uses of their musical compositions in connection with AI. However, it remains crucial that AI technology be developed and employed ethically and responsibly, in a manner that protects the rights of Publishers and songwriters, their livelihoods, and the creative ecosystem as a whole. Doing so will ensure that AI enhances—rather than imperils—human creativity.

## JURISDICTION AND VENUE

16.     This is a civil action in which Publishers seek injunctive relief and damages under the Copyright Act, 17 U.S.C. § 101, *et seq*. Accordingly, the Court has original subject matter jurisdiction over Publishers' copyright infringement claims pursuant to 28 U.S.C. §§ 1331 and 1338(a).

17.     The Court has personal jurisdiction over Anthropic because Anthropic is headquartered in this District, does systematic and continuous business in this District, and has committed acts of infringement—including the reproduction of Publishers' copyrighted lyrics and the distribution of Publishers' lyrics to California citizens—within this District.

18.     The Court has personal jurisdiction over Dario Amodei and Benjamin Mann because they reside and work in this District and have committed acts of infringement in this District.

19.     Venue is proper in this District in accordance with 28 U.S.C. §§ 1391(b) and 1400(a) because Anthropic, Dr. Amodei and Mr. Mann reside or may be found in this District; all Defendants conduct, transact, and solicit business in this District; and because a substantial portion of the events and omissions giving rise to the claims asserted herein occurred in this District.

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · FAX 415.989.1663

**THE PARTIES**

**Plaintiff Concord**

20.    Plaintiff Concord Music Group, Inc. ("Concord") is a Delaware corporation with its principal place of business in Nashville, Tennessee.

21.    Concord is a global, independent music publisher with rights in hundreds of thousands of copyrighted musical works by some of the world's most celebrated songwriters, composers, and lyricists.

**Plaintiff Universal**

22.    Plaintiff Capitol CMG, Inc. d/b/a Ariose Music, d/b/a Capitol CMG Genesis, d/b/a Capitol CMG Paragon, d/b/a Greg Nelson Music, d/b/a Meadowgreen Music Company, d/b/a Meaux Mercy, d/b/a Sparrow Song, d/b/a Worshiptogether.com Songs, d/b/a Worship Together Music is a California corporation with its principal place of business in Santa Monica, California.

23.    Plaintiff Universal Music Corp. d/b/a Almo Music Corp., d/b/a Criterion Music Corp., d/b/a Granite Music Corp., d/b/a Irving Music, Inc., d/b/a Michael H. Goldsen, Inc., d/b/a Universal – Geffen Music, d/b/a Universal Music Works is a Delaware corporation with its principal place of business in Santa Monica, California.

24.    Plaintiff Songs of Universal, Inc. d/b/a Universal – Geffen Again Music, d/b/a Universal Tunes is a California corporation with its principal place of business in Santa Monica, California.

25.    Plaintiff Universal Music – MGB NA LLC d/b/a Multisongs, d/b/a Universal Music – Careers, d/b/a Universal Music – MGB Songs is a California limited liability company with its principal place of business in Santa Monica, California.

26.    Plaintiff Polygram Publishing, Inc. d/b/a Universal – Polygram International Tunes, Inc., d/b/a Universal – Polygram International Publishing, Inc., d/b/a Universal – Songs of Polygram International Inc. is a Delaware corporation with its principal place of business in Santa Monica, California.

27.    Plaintiff Universal Music – Z Tunes LLC d/b/a New Spring Publishing, d/b/a Universal Music – Brentwood Benson Publishing, d/b/a Universal Music – Brentwood Benson

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · FAX 415.989.1663

Songs, d/b/a Universal Music – Brentwood Benson Tunes, d/b/a Universal Music – Z Melodies, d/b/a Universal Music – Z Songs is a New York limited liability company with its principal place of business in Santa Monica, California.

28.    Plaintiff Universal Musica, Inc. d/b/a Universal Music Works is a Florida corporation with its principal place of business in Santa Monica, California.

29.    Plaintiff Universal Music Publishing Ltd. is a limited company incorporated under the laws of England and Wales with its principal place of business in London, England.

30.    Plaintiff Universal Music Publishing BL Ltd. is a limited company incorporated under the laws of England and Wales with its principal place of business in London, England.

31.    Plaintiff Universal Music Publishing MGB Ltd. is a limited company incorporated under the laws of England and Wales with its principal place of business in London, England.

32.    Plaintiff Universal Music Publishing International Ltd. is a limited company incorporated under the laws of England and Wales with its principal place of business in London, England.

33.    Plaintiff Universal Music Publishing International MGB Ltd. is a limited company incorporated under the laws of England and Wales with its principal place of business in London, England.

34.    Plaintiff Universal/Dick James Music Limited is a limited company incorporated under the laws of England and Wales with its principal place of business in London, England.

35.    Plaintiff Universal/Island Music Ltd. is a limited company incorporated under the laws of England and Wales with its principal place of business in London, England.

36.    Plaintiff Universal/MCA Music Ltd. is a limited company incorporated under the laws of England and Wales with its principal place of business in London, England.

37.    Plaintiff Universal Music Publishing AB is a limited company incorporated under the laws of Sweden with its principal place of business in Stockholm, Sweden.

38.    Plaintiffs Capitol CMG, Inc. d/b/a Ariose Music, d/b/a Capitol CMG Genesis, d/b/a Capitol CMG Paragon, d/b/a Greg Nelson Music, d/b/a Meadowgreen Music Company, d/b/a Meaux Mercy, d/b/a Sparrow Song, d/b/a Worshiptogether.com Songs, d/b/a Worship Together

Coblentz Patch Duffy & Bass LLP
One Montgomery Street, Suite 3000, San Francisco, California 94104-5500
415.391.4800 · Fax 415.989.1663

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · FAX 415.989.1663

Music; Universal Music Corp. d/b/a Almo Music Corp., d/b/a Criterion Music Corp., d/b/a Granite Music Corp., d/b/a Irving Music, Inc., d/b/a Michael H. Goldsen, Inc., d/b/a Universal – Geffen Music, d/b/a Universal Music Works; Songs of Universal, Inc. d/b/a Universal – Geffen Again Music, d/b/a Universal Tunes; Universal Music – MGB NA LLC d/b/a Multisongs, d/b/a Universal Music – Careers, d/b/a Universal Music – MGB Songs; Polygram Publishing, Inc. d/b/a Universal – Polygram International Tunes, Inc., d/b/a Universal – Polygram International Publishing, Inc., d/b/a Universal – Songs of Polygram International, Inc.; Universal Music – Z Tunes LLC d/b/a New Spring Publishing, d/b/a Universal Music – Brentwood Benson Publishing, d/b/a Universal Music – Brentwood Benson Songs, d/b/a Universal Music – Brentwood Benson Tunes, d/b/a Universal Music – Z Melodies, d/b/a Universal Music – Z Songs; Universal Musica, Inc. d/b/a Universal Music Works; Universal Music Publishing Ltd.; Universal Music Publishing BL Ltd.; Universal Music Publishing MGB Ltd.; Universal Music Publishing International Ltd.; Universal Music Publishing International MGB Ltd.; Universal/Dick James Music Limited; Universal/Island Music Ltd.; Universal/MCA Music Ltd.; and Universal Music Publishing AB are referred to herein collectively as "Universal."

39.     The entities comprising Universal are part of Universal Music Publishing Group ("UMPG"), one of the largest music publishers in the world, with rights to an extensive music catalog, representing iconic standards and hit pop songs alike.

**Plaintiff ABKCO**

40.     Plaintiff ABKCO Music, Inc. is a New York corporation with its principal place of business in New York, New York.

41.     Plaintiff ABKCO LEGS Music, Inc. is a New York corporation with its principal place of business in New York, New York.

42.     ABKCO Music, Inc. and ABKCO LEGS Music, Inc. (collectively, "ABKCO") are leading independent music publishers. Founded over 60 years ago, ABKCO holds rights in the catalogs of countless iconic songwriters.

**Defendant Anthropic**

43.     Defendant Anthropic PBC is a Delaware corporation with its principal place of

business at 548 Market Street, San Francisco, CA 94104.

44.    Defendant Dario Amodei is an individual residing in San Anselmo, California. He is a founder and Chief Executive Officer of Anthropic.

45.    Defendant Benjamin Mann is an individual residing in or around San Francisco, California. He is a founder and Member of the Technical Staff of Anthropic.

## PUBLISHERS AND THEIR COPYRIGHTS

46.    Publishers are among the world's leading music publishing companies. They own or control the copyrights to millions of the most well-known and beloved musical compositions of all time, including the music and lyrics contained therein.

47.    As music publishers, Publishers represent and advocate for thousands of talented and creative songwriters, lyricists, and composers who have written many of the most popular and cherished songs of all time. Publishers foster the creation and lawful exploitation and license of musical compositions, including the music and lyrics contained therein.

48.    It takes enormous talent, energy, and resources for songwriters to create the songs enjoyed by music-lovers throughout the world. Publishers' songwriter-clients pour their hearts and souls into the musical compositions they create, including the music and lyrics contained therein. Lyrics are essential to providing narrative, expressing emotion, and, ultimately, creating meaning in music. Publishers serve the songwriters who create these musical compositions by supporting them in their creative process and promoting their works to record companies and recording artists.

49.    Publishers routinely enter into licenses and agreements relating to the musical compositions in their catalogs, collect the income arising from such transactions, and compensate their songwriters with their applicable share of the income. Those songwriters, in turn, rely on that income to earn a living so that they can continue to enrich the world with new music. Indeed, the music publishing industry is based on a model of licensing, permission, and authorization, which ensures that songwriters and publishers are appropriately compensated for authorized uses of their works, retain control over the exploitation of their works, and are able to maintain the artistic integrity of those works.

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · FAX 415.989.1663

50.     Publishers have also embraced technological innovation and provide their songs and catalogs across an ever-evolving variety of formats, distribution, and access models. Today, Publishers and their partners offer consumers a variety of authorized means to enjoy Publishers' musical compositions—including through licensed print and digital books containing sheet music and lyrics, as well as through licensed lyrics aggregators, lyrics websites, social media platforms and a host of other online platforms. Through these and other licensed uses, Publishers ensure that consumers can access and appreciate genuine, authorized copies of the music and lyrics to their favorite songs.

51.     Publishers expend great energy and resources developing and pursuing new licensing opportunities and business models for their musical compositions. In particular, Publishers help songwriters exploit their works by assisting them in licensing musical compositions for sound recordings, public performances, print and digital books of sheet music and lyrics, commercials, advertisements, motion pictures, television shows, various digital services, lyrics aggregators, and lyrics websites, among other uses.

52.     Publishers have also embraced licenses with AI developers who wish to use their works in AI training with permission and to develop new authorized works. For example, UMPG recently entered into agreements with AI music generator Udio and AI music technology company KLAY to license certain of its works in connection with AI training. Other large music publishers have similarly licensed AI companies to use their works in training. Publishers are eager to develop this market further.

53.     When Publishers license their compositions, such as to authorized lyrics aggregators and websites, the licensees are typically required to identify such lyrics with the song title, songwriter name(s), and other important identifying information, all of which constitutes what is referred to in the Copyright Act as "Copyright Management Information." This information is vital to consumers, who want to know the authors of these musical compositions, and to songwriters and Publishers, who correspondingly want to ensure that the creative minds behind these works and the owners of those works are properly credited, and that the public is informed that these works are protected by copyright. Publishers therefore require licensees to display Copyright Management

Information, and its removal by unlicensed third parties invades Publishers' rights and harms their interests and those of their songwriters.

54.     Publishers own and/or control, in whole or in part, the exclusive rights to millions of valuable musical compositions, including the compositions listed on Exhibits A and B, pursuant to contracts with songwriters and other rightsholders. The works listed on Exhibits A and B are illustrative and non-exhaustive lists of the musical compositions owned by Publishers that Defendants infringed.

55.     All the musical compositions listed on Exhibits A and B constitute original works and copyrightable subject matter pursuant to the Copyright Act, 17 U.S.C. § 101, *et seq.*, and have been duly registered with the U.S. Copyright Office. The copyrights in the musical compositions set forth in Exhibits A and B remain valid and subsisting and have been owned and/or controlled by Publishers at all times relevant to the allegations in this Complaint.

## ANTHROPIC AND ITS INFRINGING CONDUCT

### A.    *Anthropic and Its Business*

56.     Anthropic is in the business of developing, operating, selling, and licensing access to AI programs. Founded in 2021 by Dario Amodei, Benjamin Mann, and a group of other individuals who had defected from OpenAI, Anthropic has rapidly grown into an AI colossus that is today valued at $380 billion or more. Despite its multibillion-dollar valuation, Anthropic refuses to pay a cent for the vast amounts of copyrighted content—including Publishers' musical compositions—it takes without permission or credit to build its business. Anthropic's refusal to compensate the owners of the content on which it trains its models is unlike its approach to other business costs such as power, hardware, software and labor, all of which Anthropic pays for.

57.     Anthropic's signature product is a series of commercial general-purpose large language models ("LLMs") referred to as "Claude." Anthropic "trains" these AI models by feeding them massive collections of text—including countless copyrighted works—totaling billions or trillions of words. As a result of this training, Anthropic's AI models provide text-based responses to user queries in a seemingly human-like manner.

58.     Anthropic has collected and stockpiled this enormous amount of material in a vast

020382.0001 4938-3535-9390.1                    13                    Case No. 5:26-cv-00880-EKL

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · Fax 415.989.1663

central library that it maintains and exploits for a range of different purposes including but not limited to AI training. Anthropic compiled this central library by copying and ingesting text from the internet and other sources via a range of different means, including by employing BitTorrent to download and copy text from illegal pirate library websites. The text that Anthropic copies to fuel its AI models and to maintain in its central library for other purposes includes the lyrics to innumerable musical compositions for which Publishers own or control the copyrights, among countless other copyrighted works harvested from illegal pirate libraries, other internet sources, and elsewhere. Anthropic has never sought or secured Publishers' permission to use their valuable copyrighted works in this way.

### B.    *Pirate Libraries and BitTorrent*

59.    From the very beginning, Anthropic has built its multibillion-dollar business on piracy. Before Dario Amodei and Benjamin Mann founded Anthropic, they led OpenAI's effort between 2019 and 2020 to torrent books from known collections of pirated books available on illegal websites.[1]

60.    Large collections of pirated texts can be found on the internet for those who seek unlawful copies of those texts. As Defendants know well, these pirate library websites do not acquire works through lawful channels that compensate creators, publishers, and other rightsholders. Rather, these infringing websites make illicit digital copies of works that are available for purchase or rental or by subscription; actively encourage their users to upload the same; and make these pirated copies available for free to those willing to risk infringement themselves. These pirate libraries contain every genre of book imaginable, including songbooks, sheet music collections, and other books of song lyrics, containing copyrighted musical compositions owned and controlled by Publishers and others. Two of the largest and most infamous of these illegal libraries are LibGen and PiLiMi.

61.    LibGen is one of the world's biggest and most notorious online infringement operations. Controlled by anonymous overseas pirates, reportedly from Russia, LibGen maintains an enormous collection of stolen books and other written works. At least two U.S. federal courts

---

[1] *See* B. Mann Dep. Tr. at 94:5-96:6, 349:21-23 (Aug. 15 and 18, 2025), *Bartz v. Anthropic PBC*, Case No. 3:24-cv-05417-WHA (N.D. Cal.), ECF No. 337-1.

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · Fax 415.989.1663

have found LibGen liable for willful copyright infringement and issued broad permanent injunctions against the website. It has been listed on the Office of the U.S. Trade Representative's Review of Notorious Markets for Counterfeiting and Piracy since at least 2016. LibGen's illegal conduct is widely known and has been broadly publicized online.

62.    As the U.S. government began to shut down pirate libraries such as LibGen for violating the law, third-party actors copied LibGen to create a "shadow" version known as "Z-Library." Although the FBI subsequently shuttered Z-Library as well, that shadow library was itself copied or "mirrored" to create yet another illegal library called PiLiMi. The operators of PiLiMi have proudly declared "We deliberately violate the copyright law in most countries."[2]

63.    Rather than steer clear of this infamously pirated content, Dario Amodei and Benjamin Mann sought out these pirate libraries as sources of material when employed at OpenAI. Indeed, Mr. Mann was personally involved in downloading a portion of LibGen to be used in AI training at OpenAI, and he discussed downloading datasets from LibGen and exploiting those datasets for AI training during that time with both Dr. Amodei and another future Anthropic founder, Tom Brown.[3]

64.    In order to obtain the contents of these pirate libraries, Mr. Mann, with Dr. Amodei's knowledge and participation, used BitTorrent, a peer-to-peer ("P2P") filesharing protocol infamously used for widespread unauthorized reproduction and distribution of copyrighted materials.[4]

65.    P2P filesharing has evolved since the days of Napster, allowing users to distribute infringing files directly and evade detection. Rather than uploading and downloading files through a central repository, P2P protocols like BitTorrent break files into pieces and distribute the pieces between and amongst multiple users (*i.e.*, "peers") simultaneously and instantaneously. Once a user

[2] Ernesto Van der Sar, *"Anna's Archive" Opens the Door to Z-Library and Other Pirate Libraries*, TORRENTFREAK (Nov. 19, 2022), https://torrentfreak.com/annas-archive-opens-the-door-to-z-library-and-other-pirate-libraries-221118/.

[3] *See supra* note 1, at 396:3-398:13.

[4] *See, e.g.*, *id.*

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · FAX 415.989.1663

downloads a piece of a file, the user immediately becomes a distributor of the file to others, creating a "swarm" where everyone downloading the file also acts as a distributor of the file to others. Files on BitTorrent are shared simultaneously with thousands of other users; unlike old-fashioned cassette-copying or even Napster-era P2P systems, copying is no longer one-to-one but thousands-to-thousands. Thus, as users join the BitTorrent network, instead of slowing down file-transfer speed, downloads get faster and far more numerous. In addition, once an infringing file is distributed on BitTorrent, there is no containing it, as the viral nature of online infringement enables massive rapid proliferation across a limitless universe of users. Indeed, a single file can be distributed thousands of times in mere hours.

66.     Today, BitTorrent has become synonymous with copyright infringement, as pirated copies of books, other written works, sound recordings, movies, and other copyrighted works proliferate on the network.

C.     *Anthropic's Illegal Torrenting of Publishers' Works*

67.     As Publishers only learned through the orders and public filings in *Bartz*, when Dr. Amodei, Mr. Mann, and a faction of other senior OpenAI employees splintered from the company to form Anthropic in 2021, they continued to illegally torrent copyrighted works from multiple pirate libraries—including hundreds or more books containing Publishers' copyrighted musical compositions. As Dr. Amodei wrote in one internal document (recently unsealed in *Bartz*), Defendants stole books rather than "buy" them to avoid "a huge legal/practice/business slog."

68.     The record of Defendants' illegal torrenting, although only recently revealed, is now well established. Indeed, it has been described in detail in multiple written opinions by Judge Alsup in the *Bartz* case and in the parties' public filings in that case. Until the revelations in those opinions and filings, Publishers did not know that their works were being copied by Defendants from some of the most notorious pirated sources in the world. A trove of recently unsealed documents from the *Bartz* case further confirms Defendants' illegal torrenting.

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · FAX 415.989.1663

69.     For instance, in early 2021, as several pirate libraries were being shut down by U.S. legal authorities, Anthropic founder Benjamin Mann turned to LibGen to illegally torrent millions of books,[5] including those containing Publishers' musical compositions.

70.     In June 2021, Mr. Mann personally used BitTorrent to download via torrenting from LibGen approximately five million copies of pirated books,[6] including myriad books containing Publishers' copyrighted musical compositions, for warehousing and use by Anthropic. For example, in one unsealed internal Anthropic Slack message from June 7, 2021, Mr. Mann wrote that he was "[c]urrently pulling libgen" via torrenting, and Anthropic likewise confirmed in recently unsealed interrogatory responses in *Bartz* that Mr. Mann himself torrented the LibGen datasets.

71.     Mr. Mann did not act alone. Before proceeding, he discussed with Dario Amodei, Anthropic founder and Chief Science Officer Jared Kaplan, and other Anthropic senior leadership whether to download these works via torrenting from LibGen. At this time, Dr. Amodei played a hands-on role in the development of the company's AI models, and Anthropic's policy formally required approval from senior leadership—which included Dr. Amodei and Dr. Kaplan—before obtaining or using new datasets such as LibGen. Anthropic's own Archive Team had deemed LibGen to constitute a "blatant violation of copyright," and Dr. Amodei himself had described LibGen as "sketchy."[7] In a separate unsealed internal exchange, Dr. Amodei and Anthropic's Head of Pretraining specifically discussed Anthropic's exploitation of LibGen, including estimating the "cost to buy all the books in libgen." Yet Dr. Amodei and others approved the torrenting of those books from LibGen instead without payment, and, at their direction, Mr. Mann personally engaged in the torrenting of these millions of books.[8] Dr. Amodei, Mr. Mann, and their Anthropic colleagues understood at this time that LibGen was an illegal pirate library and that the files that Mr. Mann torrented were pirated copies of copyrighted works.

---

[5] *See, e.g.*, *Bartz*, 791 F. Supp. 3d at 1046; *Bartz*, 787 F. Supp. 3d at 1015.

[6] *See, e.g.*, *id.*

[7] *See supra* note 1, at 144:4-13, 396:3-13.

[8] *See, e.g.*, *id.* at 396:3-398:13.

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · FAX 415.989.1663

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · FAX 415.989.1663

72. When Mr. Mann discovered that he could torrent additional copyrighted works from PiLiMi (which mirrored the contents of the shuttered Z-Library), he shared the link to PiLiMi and messaged his Anthropic colleagues, "[J]ust in time!"[9] Another Anthropic employee responded, "zlibrary my beloved."[10]

73. Consequently, in July 2022, two Anthropic employees acting at Mr. Mann and Dr. Amodei's direction and with their approval downloaded via torrenting millions of additional copies of pirated books, including books containing Publishers' copyrighted musical compositions, from distributed copies of PiLiMi.[11] Again, Dr. Amodei, Mr. Mann, and other Anthropic leadership discussed whether or not to torrent these files from PiLiMi, and they authorized the decision to proceed with the torrenting. Dr. Amodei, Mr. Mann, and their Anthropic colleagues understood that the files Anthropic was torrenting were pirated. For example, in one unsealed Slack conversation between Mr. Mann and other Anthropic employees, an Anthropic employee who torrented PiLiMi described PiLiMi's contents as being sourced from "a popular (and illegal) library." Defendants proceeded with the torrenting anyway.

74. Dr. Amodei and Mr. Mann were primary participants and moving forces behind this illegal torrenting of millions of books—including Publishers' works—from LibGen and PiLiMi by Defendants. At Dr. Amodei's direction and with Dr. Amodei's express approval, Mr. Mann personally engaged in the illegal torrenting, and both Dr. Amodei and Mr. Mann personally directed, approved, and controlled this torrenting activity.

75. Because LibGen and PiLiMi had a common lineage, the two pirate libraries shared many books in common. Understanding this overlap, about one month prior to torrenting PiLiMi, Anthropic engineers compared the five million copies of pirated books Anthropic had torrented from LibGen against the seven million copies of pirated books available to torrent through PiLiMi.

---

[9] *Bartz*, 791 F. Supp. at 1046.

[10] *Id.*

[11] *Id.*

Ultimately, Anthropic chose to torrent only the additional two million copies of pirated books "that [we]re not in Lib[G]en," according to one of Anthropic's founders.[12]

76.    Defendants downloaded these pirated books from LibGen and PiLiMi as .epub, .pdf, and .txt files of digital books.[13] Although Anthropic refers to what it illegally downloaded and copied from these shadow libraries as data or datasets, the files Defendants torrented in this manner contained full-text digital books—"ebooks or scans of books" saved in individual files in formats like .pdf, .txt, and .epub.[14]

77.    In total, Defendants torrented at least five million copies of pirated books from LibGen in 2021, and at least another two million copies of pirated books from PiLiMi in 2022.[15] In addition, for LibGen and PiLiMi, Defendants downloaded a separate catalog of bibliographic metadata for each collection, with fields like title, author, and ISBN.[16]

78.    Those catalogs of LibGen and PiLiMi bibliographic metadata, which were downloaded from the pirate libraries and are not confidential, reveal that among the millions of books that Defendants illegally downloaded in this manner were many hundreds of books containing sheet music and song lyrics to musical compositions owned by Publishers, as well as standalone copies of sheet music and other texts containing Publishers' musical compositions, including but not limited to the works identified in **Exhibit A**. These include large numbers of books published by Publishers' sheet music licensees Hal Leonard, Alfred Music, and others, such as *The Best Songs Ever* (featuring "Candle in the Wind," "Every Breath You Take," and other works); *VH1's 100 Greatest Songs of Rock & Roll (Songbook)* (featuring "All Along the Watchtower," "Good Vibrations," and other works); *Rolling Stones—Let It Bleed: Authentic Guitar TAB* (featuring "Gimme Shelter" and other works), *Elton John—Greatest Hits Songbook* (featuring "Rocket Man" and other works); *Creedence Clearwater Revival: Easy Guitar* (featuring "Have You Ever Seen The

---

[12] *Id.*

[13] *Id.*

[14] *Bartz*, 787 F. Supp. 3d at 1015.

[15] *Bartz*, 791 F. Supp. at 1055, 1057-58.

[16] *Id.* at 1055, 1058.

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · FAX 415.989.1663

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · FAX 415.989.1663

Rain" and other works), and *Harry Styles Songbook* (featuring "Sign of the Times" and other works). These books contain properly licensed copies of Publishers' sheet music and song lyrics, and include relevant copyright management information alongside the specific works. These books also typically state on their face that unauthorized copying of the works contained therein constitutes copyright infringement.

79.    When Defendants downloaded copies of these pirated books via torrenting, they violated Publishers' exclusive right of reproduction in these works. And to make matters worse, because of the two-way nature of the BitTorrent protocol, when Defendants downloaded copies of these pirated books via torrenting, they simultaneously uploaded to the public unauthorized copies of the same books, thereby infringing Publishers' exclusive right of distribution in these works and contributing to further infringement of Publishers' works as well.

80.    Defendants copied these books—including those containing Publishers' works—via torrenting in order to amass a vast, general-purpose central library of copyrighted works and other written text that Anthropic could keep forever and use for whatever purpose it wished.[17] Defendants maintained and stored copies of these files in the same format as they had originally torrented them. Anthropic exploited the mass collection of works in this central library for numerous uses, including to develop its commercial products. Anthropic never paid a cent for the copyrighted works it stole to build this sprawling database.

81.    Anthropic selected certain subsets of written text from its central library to include in the training data for various of its AI models. But Anthropic also chose not to use much of the text it copied for its central library for any AI training purposes. Regardless of whether specific text was utilized for AI training or not, Anthropic maintained unlawful copies of the text as part of its central library, with the goal of storing these copies "forever."[18] That copying is an undisputed act of infringement with no plausible defense of any kind.

---

[17] *Bartz*, 791 F. Supp. 3d at 1047.

[18] *Bartz*, 787 F. Supp. 3d at 1016.

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · FAX 415.989.1663

82.     With respect to the millions of books that Defendants illegally torrented from LibGen and PiLiMi, Anthropic now disclaims having used any of those books to train any of its commercial Claude AI models. However, to the extent Anthropic made additional copies of any of these illegally torrented books in order to exploit those works for any other purposes, making those copies would constitute additional acts of infringement. Moreover, Anthropic maintained copies of these illegally torrented files as part of its central library regardless of whether or not it employed them for AI training.[19]

83.     Regardless of Anthropic's later use, its piracy of these books via BitTorrent was unquestionably infringing. Even if some subset of the books Defendants illegally torrented were sometimes used for AI training, that cannot excuse their mass torrenting of millions of pirated books without paying for them—including books containing Publishers' musical compositions.

84.     The files on BitTorrent are of course not limited to books. The most commonly traded files on BitTorrent are audiovisual works such as movies and television shows, many of which include sound recordings (which incorporate musical compositions), followed by sound recordings. Given their extensive and long-standing use of BitTorrent, it is likely Defendants used that protocol to download movies and music as well as books to include in Anthropic's data library or other purposes. These files also represent unauthorized reproductions of Publishers' works.

85.     Defendants made the deliberate decision to exploit BitTorrent to obtain a vast trove of copyrighted material, even knowing that that the works they were torrenting were pirated. They did so to catch up with Anthropic's already entrenched AI competitors, including OpenAI. Defendants wanted to amass enormous collections of copyrighted works, including Publishers' works, as quickly as possible without having to pay for them. Dr. Amodei himself admitted at the time Anthropic "ha[d] many places from which" it could have legally purchased these copyrighted works for training, but Defendants chose to illegally torrent them instead, because it was faster and

---

[19] *Id.*

free.[20] In Dr. Amodei's own words, they did so to avoid a "legal/practice/business slog."[21]

86.     Defendants knew that these pirate libraries were not legal sources of copyrighted works. For example, one unsealed Anthropic memo describes how "books published after 1929 found on the Web" are often "pirated and posted illegally." Defendants made the deliberate choice to prioritize Anthropic's competitive and financial interests over copyright holders' rights and then took multiple steps to conceal their infringing activity. Even after Anthropic became "not so gung ho about" training AI models using pirated books "for legal reasons," it maintained copies of these pirated files in its central library anyway.[22]

87.     After Judge Alsup's rulings in *Bartz*, Publishers moved to amend their complaint in *Concord I* to address Anthropic's newly revealed illegal torrenting. Anthropic successfully opposed that amendment on the grounds that its torrenting was entirely unrelated to Publishers' claims in *Concord I*, and that amending the complaint to address its torrenting activity would "fundamentally transform" that case. Publishers have thus filed this separate action to address Defendants' egregious and willful infringement by downloading via torrenting unauthorized copies of their works from illegal websites.

### D.     *Anthropic's Ongoing Copying of Publishers' Works in Scraping, Copying Physical Books, and AI Training*

88.     Anthropic began developing and training its AI models as soon as the company was founded in January 2021, and began training Claude—its series of commercial AI models—in February 2021 or earlier. In rapid succession, Anthropic subsequently released newer and ever-more powerful Claude models, all of which Anthropic trained using unauthorized copies of Publishers' lyrics and other copyrighted works. Anthropic releases new versions of Claude regularly, and each new AI model is trained anew and from scratch, using a newly copied training corpus, including Publishers' copyrighted works.

89.     Publishers previously sued Anthropic in *Concord I* for its unauthorized copying of

---

[20] *Bartz*, 787 F. Supp. 3d at 1015.

[21] *Id.*

[22] *Id.*

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · FAX 415.989.1663

499 of their musical compositions in training certain Claude AI models. But Anthropic has continued to copy Publishers' works on a massive scale for AI training, in violation of Publishers' rights, even after Publishers' prior suit. Accordingly, Publishers have brought this second action to address Anthropic's continued infringement of their copyrighted works in AI training and output arising since *Concord I*.

90. In addition to the torrenting claims against Defendants alleged above, the present action alleges that Anthropic has infringed Publishers' copyrights in their musical compositions by copying those works for training Claude AI models that Anthropic released after Publishers filed their First Amended Complaint in *Concord I*—including, most recently, Claude 4.5 Sonnet (released to the public on September 29, 2025), Claude 4.5 Haiku (released to the public on October 15, 2025), Claude 4.5 Opus (released to the public on November 24, 2025), Claude 4.6 Opus (released to the public on February 5, 2026), Claude 4.6 Sonnet (released to the public on February 17, 2026), and any models Anthropic is currently training but has not yet released to the public[23]—as well as any other uses Anthropic has made of Publishers' works not encompassed in *Concord I*.

91. Notably, Anthropic does not use all the text in its central library for AI training. Nor does it use all the works that it illegally torrented from pirate libraries to train its AI models. Instead, Anthropic selects specific texts from its central library to train each of its AI models. Regardless of whether specific works in its central library are used for AI training, Anthropic continues to keep copies of those works in its library and intends to maintain those copies forever.

92. The text that Anthropic copies for its central library and to fuel its AI models includes the lyrics to innumerable musical compositions for which Publishers own or control the copyrights, among countless other copyrighted works harvested from illegal pirate libraries, other internet sources, and elsewhere. Anthropic has never sought or secured Publishers' permission to use their valuable copyrighted works in this way.

93. Anthropic hides the specific sources of text that it exploits to train specific AI models. With respect to Claude 4.5 Sonnet (released on September 29, 2025), Anthropic has disclosed only

---

[23] Anthropic's infringement of Publishers' works by copying those works for training earlier Claude AI models is the subject of *Concord I*.

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

that the model was "was trained on a proprietary mix of publicly available information on the Internet as of July 2025, as well as non-public data from third parties, data provided by data-labeling services and paid contractors, data from Claude users who have opted in to have their data used for training, and data we generated internally at Anthropic."[24] Anthropic has made similarly opaque disclosures regarding its training of Claude 4.5 Haiku (released on October 15, 2025), Claude 4.5 Opus (released on November 24, 2025), and other recent models.[25]

94.    Despite Anthropic's refusal to reveal its specific training data sources, its limited disclosures nevertheless make clear that it has relied heavily on datasets that include vast troves of Publishers' copyrighted works to train its AI models, all without authorization. This includes content that Anthropic itself has scraped from the internet on a massive scale and without permission, as well as datasets that Anthropic has obtained from third parties and elsewhere. Anthropic copies and downloads these vast amounts of text from these sources onto its own servers, downloading and maintaining "raw data cop[ies]" of this scraped text according to one unsealed Anthropic memo, and subsequently curates these datasets to develop and train its AI models. Discovery will reveal the full scope of Anthropic's copying of Publishers' works during this AI training process, which facts are in the possession and control of Anthropic.

95.    For example, the datasets Anthropic has copied and filtered to train its Claude AI models include a well-known dataset called "The Pile," which Anthropic has admitted to exploiting

---

[24] *System Card: Claude Sonnet 4.5*, ANTHROPIC (Dec. 3, 2025), https://assets.anthropic.com/m/12f214efcc2f457a/original/Claude-Sonnet-4-5-System-Card.pdf.

[25] *System Card: Claude Haiku 4.5*, ANTHROPIC (Oct. 2025), https://assets.anthropic.com/m/99128ddd009bdcb/Claude-Haiku-4-5-System-Card.pdf ("Claude Haiku 4.5 was trained on a proprietary mix of publicly available information from the internet up to February 2025, non-public data from third parties, data provided by data-labeling services and paid contractors, data from Claude users who have opted in to have their data used for training, and data we generated internally at Anthropic."); *System Card: Claude Opus 4.5*, ANTHROPIC (Dec. 5, 2025), https://assets.anthropic.com/m/64823ba7485345a7/Claude-Opus-4-5-System-Card.pdf ("Claude Opus 4.5 was trained on a proprietary mix of publicly available information from the internet up to May 2025, non-public data from third parties, data provided by data-labeling services and paid contractors, data from Claude users who have opted in to have their data used for training, and data generated internally at Anthropic.").

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · FAX 415.989.1663

to train its models, and which includes countless unauthorized copies of Publishers' lyrics.[26] The Pile incorporates several preexisting text sources, with greater weight placed on "certain high-quality datasets."[27] Among those "high-quality datasets" is the "Books3" dataset, a notorious collection of hundreds of thousands of pirated copies of books, similar to LibGen and PiLiMi, including many books containing Publishers' musical compositions.[28] Anthropic has admitted to using Books3 for AI training, despite the fact that one unsealed internal Anthropic memo described Books3 as a set of "183k pirated books," with a plus sign next to "high quality" but a minus sign next to "legal status." Also included in The Pile is the "YouTube Subtitles" dataset, which consists of the "human generated closed captions" for 173,651 YouTube videos that hit on certain identified search terms,[29] including those that target official music videos and lyric videos for compositions owned and controlled by Publishers and that otherwise capture the lyrics to Publishers' musical compositions. Anthropic has admitted to using "YouTube transcripts from the Pile" for AI training, despite the fact that the same internal Anthropic memo noted the questionable "legal status" of "[t]ranscribing the audio from scraped Youtube videos." Anthropic continues to employ The Pile to train its most recent Claude models.

96. Anthropic also exploits a dataset known as the "Common Crawl" for its ongoing AI training.[30] The Common Crawl dataset, which Anthropic has admitted to using for AI training, contains a vast trove of Publishers' copyrighted lyrics scraped without permission from the websites of Publishers' licensees and other entities that Publishers have authorized to reproduce their

---

[26] Amanda Askell et al., *A General Language Assistant as a Laboratory for Alignment*, 27, ANTHROPIC (Dec. 9, 2021), https://arxiv.org/pdf/2112.00861; *see* Samuel Axon, *YouTube Creators Surprised to Find Apple and Others Trained AI on Their Videos*, ARS TECHNICA (July 16, 2024, 5:23 pm), https://arstechnica.com/ai/2024/07/apple-was-among-the-companies-that-trained-its-ai-on-youtube-videos.

[27] Leo Gao et al., *The Pile: An 800GB Dataset of Diverse Text for Language Modeling,* 2, ARXIV (Dec. 31, 2020), https://arxiv.org/pdf/2101.00027.

[28] *Id.* at 2-4.

[29] *Id.* at 5.

[30] Askell, *supra* note 26, at 8, 27.

copyrighted lyrics, including MusixMatch, LyricFind, and Genius.[31]

97.    Anthropic has also commenced an unauthorized scanning and digitization program based on the Google Books model to acquire "all the books in the world" while avoiding as much "legal/practice/business slog" as possible.[32] In other words, Anthropic has engaged in a practice of purchasing physical books, reproducing them as digital files without authorization, and adding those copies to its central library. As with the millions of pirated books Defendants torrented from LibGen and PiLiMi, these millions of books Anthropic scanned and digitized without authorization include hundreds or more songbooks and sheet music collections, containing copyrighted musical compositions owned and controlled by Publishers and others. For example, one unsealed Anthropic memo notes that the books that Anthropic scanned and digitized in this manner without authorization include "music" books. Unlike the Google Books endeavor, however, Anthropic does not use these copies to provide a nonprofit searchable database that allows the public to search for free for terms appearing in books to assist readers in discovering books of interest. Rather, Anthropic has undertaken this massive unauthorized scanning project solely to copy and extract the text and keep it for its own purposes,[33] including to enable its AI models to respond to user queries regarding song lyrics and generate infringing copies of lyrics.

98.    Discovery will reveal the full extent of Publishers' copyrighted works copied and included in Anthropic's training data based on these and other datasets.

99.    Once Anthropic has amassed this vast collection of text—including Publishers' copyrighted works—Anthropic then uses a subset of that data to train its AI models. During this training process Anthropic engages in additional acts of unauthorized copying, including:

a.    Anthropic "cleans" the copied text to remove material it perceives as inconsistent with its business model, whether technical or subjective in nature (such as

---

[31] Kevin Schaul et al., *Inside the Secret List of Websites That Make AI Like ChatGPT Sound Smart*, WASHINGTON POST (Apr. 19, 2023, 6:00 am), https://www.washingtonpost.com/technology/interactive/2023/ai-chatbot-learning.

[32] *Bartz*, 787 F. Supp. 3d at 1015-16.

[33] *Id.* at 1016.

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · FAX 415.989.1663

deduplication or removal of offensive language), or for other reasons. This "cleaning" process conspicuously does not remove unauthorized copyrighted content, such as Publishers' lyrics, from the training corpus. At the same time, Anthropic utilizes extractor tools to remove copyright notices and other Copyright Management Information embodied in the copied text, including Publishers' lyrics, that would identify these copies as infringements.

b. Anthropic copies this massive corpus of previously copied text into computer memory and processes this data in multiple ways to train its AI models. That includes copying, dividing, and converting the collected text into units known as "tokens," which are words or parts of words and punctuation, for storage.

c. Anthropic processes this copied text further as it "finetunes" the model and engages in "reinforcement learning," based both on human and AI feedback, all of which may require additional copying of the collected text. As part of this finetuning process, humans hired and guided by Anthropic prompt the model and reward the model for responding in ways that best align with Anthropic's predefined objectives for how outputs correspond to user prompts, including based on prompts and output relating to Publishers' lyrics specifically.

100. With every new Claude AI model that Anthropic trains and launches to the public, Anthropic undertakes a process of text collection (although it may start with data already collected), training, and finetuning anew, engaging in independent and separate infringements of Publishers' musical compositions on a massive scale. Anthropic is well aware that its training data contains unauthorized copies of Publishers' musical compositions and countless other copyrighted works. Anthropic has the ability to exclude Publishers' works from its training corpus but has chosen not to respect third-party copyrights in this way.

**E.   *Anthropic's Removal of Copyright Management Information During Training***

101. Anthropic's leadership has a long history of exploiting datasets from which Copyright Management Information has been stripped for AI training, and Anthropic continues to

COBLENTZ PATCH DUFFY & BASS LLP

ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · FAX 415.989.1663

deliberately extract such information from its AI training data and the output its models generate today.

102.    Prior to founding Anthropic, Anthropic's Chief Executive Officer Dario Amodei worked as Vice President of Research at OpenAI and was closely involved in training that company's AI models through 2020. While at OpenAI, Dr. Amodei and his team utilized The Pile, WebText, and WebText2 datasets for AI training—each of which is known to include full-text copies of copyrighted works stripped of their Copyright Management Information using extraction tools. Dr. Amodei and his colleagues created the WebText database by first "scrap[ing] all outbound links from Reddit, a social media platform," then "extract[ing] the text" using "a combination of the Dragnet and Newspaper content extractors."[34] Likewise, Dr. Amodei and several future Anthropic founders and employees—including Benjamin Mann, Jared Kaplan, Tom Brown, Jack Clark, and Amanda Askell—developed the WebText2 dataset "by scraping links over a long[] period of time" and extracting their text with the Newspaper extractor.[35]

103.    Today, Anthropic continues to train its Claude AI models by deliberately using these same datasets it knows were systematically stripped of Copyright Management Information. For example, Anthropic understood that The Pile dataset upon which it trained its AI models contained unauthorized copies of Publishers' copyrighted works from which copyright notices and ownership information had already been removed. In published papers widely read within the industry, and of which Anthropic was aware, The Pile's creators disclosed that the YouTube Subtitles dataset was "not collected and distributed in a ToS [terms of service] compliant fashion" and that "the authors had no ability to consent to their data being used."[36] Likewise, the compilers of The Pile further

---

[34] Alec Radford et al., *Language Models Are Unsupervised Multitask Learners,* 3, OPENAI (2019), https://cdn.openai.com/better-language-models/language_models_are_unsupervised_multitask_learners.pdf.

[35] Tom B. Brown et al., *Language Models Are Few-Shot Learners,* 8–9, ARXIV (July 22, 2020), https://arxiv.org/pdf/2005.14165; Jared Kaplan et al., *Scaling Laws for Neural Language Models,* 7, ARXIV (Jan. 23, 2020), https://arxiv.org/pdf/2001.08361.

[36] Gao, *supra* note 27, at 14.

disclosed their use of the Newspaper and Dragnet content extraction tools,[37] which are widely known within the AI community, including by Anthropic, to remove Copyright Management Information as part of the process of extracting the text content of a website. The developers of Claude cited this paper[38] and were certainly aware of the use of these tools in The Pile. Dragnet's algorithms, in particular, are designed to separate the main website content, such as lyrics to Publishers' works, from other parts of the website, including footers and copyright notices, and to allow the extractor to make further copies only of the main website content.

104.    Anthropic also intentionally takes steps to affirmatively remove Copyright Management Information from the text it uses for AI training. Indeed, Anthropic has used and continues to use the same extraction tools to remove copyright notices from texts that Anthropic scraped from the internet and to "clean" Copyright Management Information from works contained in third-party datasets, such as The Pile and Common Crawl. Anthropic's senior-most employees—including several of its founders—have been involved in these decisions to remove Copyright Management Information from Anthropic's training data.

105.    As early as May 2021, high-ranking Anthropic employees, including Anthropic founders Benjamin Mann and Jared Kaplan, discussed the extraction tools used to filter The Pile and the relative merits of using extraction tools Newspaper, Readability, and jusText to separate text content from footers, where copyright notices on webpages are typically located, in connection with training Anthropic's AI models. In June 2021, Mr. Mann and Dr. Kaplan concluded that jusText left too much "useless junk"—such as copyright notice information contained in footers—in scraped web data when compared to Readability and Newspaper. Mr. Mann also expressed his desire that the AI "model will learn to ignore the boilerplate," like copyright notices. In one chat, a member of Anthropic's technical staff shared an example of jusText's purported deficiencies with Mr. Mann and Dr. Kaplan: when applied to a scraped webpage containing footnotes, a copyright owner name, and "© 2019" copyright notice, jusText left that information untouched. In contrast, Newspaper,

---

[37] *See id.* at 22–23.

[38] Askell, *supra* note 26, at 27.

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

which removed the footnotes, copyright owner name, and copyright notice entirely, was considered "a significant improvement." Because Newspaper removed Copyright Management Information more effectively, Anthropic purposefully decided to employ that tool to remove copyright notices and other Copyright Management Information from Publishers' lyrics and other copyrighted works. In making that decision, Anthropic dismissed this critical information as "useless junk" to be scrubbed from Claude's training dataset. Anthropic continues this practice today.

106.    Similarly, the Common Crawl dataset that Anthropic employs for AI training contains copies of Publishers' lyrics scraped from the websites of Publishers' licensees MusixMatch, LyricFind, and Genius, among others. When MusixMatch, LyricFind, and Genius display lyrics on their respective websites under the terms of their licenses with Publishers, those lyrics are accompanied by Copyright Management Information. The composition of the Common Crawl dataset is publicly known, and Anthropic understood that the dataset included Publishers' copyrighted lyrics and corresponding Copyright Management Information, including because it purports to undertake due diligence on all data it uses for training. After copying Common Crawl, including the copies of Publishers' lyrics therein, for use in training Claude, Anthropic has employed extraction algorithms to deliberately strip those lyrics of their Copyright Management Information to curate its own training datasets, including to train its latest Claude models.

107.    Anthropic intentionally uses such extractor algorithms to remove this Copyright Management Information from Publishers' and other works in its training datasets. Anthropic wants to train its Claude AI models specifically on the content of Publishers' musical compositions, including the lyrics, so that the models' output will reproduce that expressive content, rather than copyright notices or other Copyright Management Information accompanying those lyrics, information that is critical to protecting Publishers' rights but which Anthropic deemed useless. Anthropic understands that Claude's output of Publishers' lyrics are likely to contain Copyright Management Information unless Anthropic engages in a process to remove that information. Anthropic deliberately extracts Copyright Management Information from its training data in order to prevent the models from overweighting and displaying such information alongside Publishers'

Coblentz Patch Duffy & Bass LLP
One Montgomery Street, Suite 3000, San Francisco, California 94104-5500
415.391.4800  ·  Fax 415.989.1663

lyrics in outputs, thereby concealing Anthropic's infringement from Anthropic's users, Publishers, and other copyright owners.

**F.     *Anthropic's Continued Exploitation of Publishers' Works in AI Output***

108.    Once the training process is complete, Anthropic's Claude AI models generate outputs consistent in structure and style with both the text in Anthropic's training corpora and its reinforcement feedback.

109.    The tendency of AI models, including Claude, to "memorize" and regurgitate their training data is well documented and well known to Anthropic. For example, in July 2020, several artificial intelligence researchers at OpenAI—including future Anthropic founders Dario Amodei, Benjamin Mann, Jack Clark and Jared Kaplan—observed that "[a] major methodological concern with language models pretrained on a broad swath of internet data, particularly large models with the capacity to memorize vast amounts of content, is potential contamination of downstream tasks by having their test or development sets inadvertently seen during pre-training."[39] Later, an Anthropic internal report put it more bluntly: "Large LMs memorize A LOT, like a LOT." Mr. Mann has separately confirmed Anthropic's view that certain content is "worth memorizing," so that Anthropic's AI models can understand and respond to prompts relating to that specific content. Recently unsealed documents in *Bartz* further underscore Claude's known tendency to memorize and regurgitate copyrighted content, including an email exchange between Anthropic employees and third-party researchers discussing how Claude "learned from the training set with a high degree of memorization" and "reconstructs (copyrighted) training data with little prompting effort," as well as an internal Anthropic memo describing how "[b]igger models memorize faster." This includes, in particular, Anthropic's AI models' memorizing and regurgitating the lyrics to Publishers' works, generating output of verbatim and near-verbatim copies of Publishers' lyrics, as well as output copying the "heart" of those works, in response to a wide range of different third-party user prompts.

110.    Contrary to Anthropic's assertions, these regurgitations are a feature—not a bug—of the company's AI models. Anthropic understands that Claude users specifically seek Publishers'

---

[39] Brown, *supra* note 35, at 9.

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · FAX 415.989.1663

lyrics and derivatives of those lyrics, and it has developed and trained Claude to respond to precisely those types of requests.

111.    Evincing Anthropic's understanding and intention that Claude users would use Claude to seek Publishers' lyrics and derivatives of those lyrics, when developing the finetuning process for Claude, Anthropic hired teams of temporary workers to "[c]hat with the AI to get help with any text-based task."[40] Anthropic communicated daily with these workers over Slack to provide guidance and feedback.[41] In written instructions, Anthropic provided example tasks that the workers could assign the model, including "suggesting songs based on your favorite music" or "ask[ing] models to re-write text with style, content, and formatting changes or requests."[42] As a result, the workers repeatedly prompted the AI models for Publishers' lyrics, regardless of whether those lyrics were protected by copyright.

112.    Further revealing Anthropic's understanding and intention that its users would use Claude to seek Publishers' lyrics and derivatives of such lyrics, Anthropic's internal records reveal that its own employees frequently prompted Claude for song lyrics and derivatives of lyrics, including for copyrighted works owned by Publishers and others, when developing, testing, and using Claude models. For example, in January and February 2023, shortly before first releasing Claude to the public, numerous Anthropic employees discussed prompting Claude for copies of Publishers' lyrics and other lyrics. Anthropic's founder and chief compute officer Tom Brown queried, "@Claude what are the lyrics to desolation row by [Bob] Dylan?", another Anthropic employee prompted the model to "write a coherent poem made up of fragments" of "lyrics from the Beatles, Bob Dylan, and other classics from the 60s/70s," and another employee asked Claude, "What are the lyrics to we found love by Calvin Harris?", demonstrating how Anthropic was testing and confirming the model's ability to respond to requests for lyrics.

---

[40] Yuntao Bai et al., *Training a Helpful and Harmless Assistant with Reinforcement Learning from Human Feedback,* 63–65, ARXIV (Apr. 12, 2022), https://arxiv.org/pdf/2204.05862.

[41] *Id.*

[42] *Id.* at 65, 67.

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · FAX 415.989.1663

113.    As Anthropic intended and expected, after Anthropic released its AI models to the general public, third-party users have made and continue to make similar requests for Publishers' lyrics, and Claude has generated and continues to generate responses reproducing those lyrics, in violation of Publishers' rights.

114.    Anthropic closely monitors and analyzes its users' interactions with Claude and the output generated by Claude. In addition to conducting extensive pre-deployment testing, Anthropic collects user prompts and corresponding Claude output to study the specific ways in which Claude is being used, including publishing certain findings from these analyses.[43] Anthropic is well aware based on its extensive and ongoing study of user behavior and analysis of Claude's prompts and output data that users request lyrics to Publishers' works and that Claude delivers copies of those lyrics and other copyrighted works in output—including based on user prompts and output analyzed by Anthropic reflecting clusters of requests to "[h]elp me find, analyze, or modify song lyrics," "[t]ranslate songs or lyrics between languages," and "[h]elp me identify or find songs with specific characteristics," including based on their lyrics. These and other clusters analyzed by Anthropic include Claude prompts and output relating to Publishers' lyrics specifically.

115.    Anthropic likewise has the ability to program so-called "guardrails" into its AI models, including to modify prompts that could elicit infringing responses, prevent the models from responding to certain prompts, or prevent the models from generating output that copies Publishers' lyrics or other copyrighted content. Before Publishers sued Anthropic in *Concord I,* Anthropic had implemented only the most limited and ineffective guardrails in its AI models. After Publishers filed *Concord I* and publicly exposed Anthropic's infringement, Anthropic adopted additional guardrails purportedly designed to minimize AI output copying Publishers' copyrighted works.

116.    Anthropic implemented these guardrails because it knew that its AI models had been trained on Publishers' lyrics and other copyrighted works, it monitored Claude user activity and Claude output, it understood that Claude users were prompting the models regarding Publishers' lyrics and other copyrighted works, and it knew that the models were generating specific output that

---

[43] *See, e.g.*, Alex Tamkin et al., *Clio: Privacy-Preserving Insights into Real-World AI Use*, ARXIV (Dec. 18, 2024), https://arxiv.org/pdf/2412.13678.

020382.0001 4938-3535-9390.1     33     Case No. 5:26-cv-00880-EKL

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · FAX 415.989.1663

Coblentz Patch Duffy & Bass LLP
One Montgomery Street, Suite 3000, San Francisco, California 94104-5500
415.391.4800 · Fax 415.989.1663

unlawfully copied Publishers' lyrics and other copyrighted works. When Anthropic first developed and later refined and expanded these guardrails, and when it monitored the effectiveness of the guardrails, it collected and analyzed Claude prompts and output data, including specific infringing output copying copyrighted works. Further, Anthropic's broader study of user behavior and Claude output has included identifying and analyzing specific Claude use cases relating to lyrics, efforts by users to avoid these guardrails, and instances in which the guardrails have failed and Claude has generated infringing output, including output copying Publishers' lyrics. Relatedly, Anthropic's Terms of Service emphasize that Anthropic may use or analyze Claude prompts and output "flagged for safety review"—including specific infringements; to "improve [Anthropic's] ability to detect" other such infringements; and to conduct "algorithmic and human review" of Claude prompts and output.[44]

117.    Anthropic's ongoing development of these guardrails make clear that it knew of specific infringement of Publishers' works by Claude users. Anthropic reworked and expanded these guardrails because it identified specific instances of Claude output copying Publishers' lyrics, including following *Concord I*. Recently unsealed *Bartz* filings further reveal that Anthropic has utilized the pirated books it illegally torrented from LibGen in connection with its guardrails.

118.    Although Anthropic's guardrails may have addressed some of the most egregiously infringing output that Claude frequently generated prior to *Concord I*, they still do not prevent a wide range of prompts and outputs implicating Publishers' lyrics and violating Publishers' rights. For example, Anthropic deliberately chose to include lyrics for only a limited number of specific songs as part its guardrails (including the 500 Works in Suit identified in *Concord I*), such that those guardrails will not comprehensively prevent output copying lyrics from the much broader universe of copyrighted songs beyond that limited set chosen by Anthropic. Likewise, these guardrails are not designed to block all prompts and output that may copy or contain Publishers' copyrighted works, such as requests that Claude generate supposedly "new" or "original" songs, including in the style of specific songs or artists, and Anthropic's AI models continue to generate output containing

---

[44] *Consumer Terms of Service*, ANTHROPIC, https://www.anthropic.com/legal/consumer-terms.

Publishers' lyrics even when not specifically requested in response to those and other types of prompts. What's more, because these guardrails address only Claude output, and do nothing to prevent Anthropic's underlying exploitation of Publishers' lyrics in AI training, they are at most a band-aid—not a cure—for Anthropic's infringement.

119. The scientific literature confirms that Claude will still deliver large amounts of copyrighted content as output, such as Publishers' lyrics. Discovery will reveal additional evidence of third-party Claude users making lyric- and song-related requests and Claude generating output copying lyrics in connection with these and other requests, which facts are in the possession and control of Anthropic.

120. Anthropic is keenly aware that its Claude AI models generate verbatim copies of Publishers' lyrics and other copyrighted material contained in its training data in this manner. Anthropic knew not only that its unauthorized copying of Publishers' lyrics on a massive scale during training had resulted in the unauthorized encoding of those lyrics in the Claude models themselves, but also that this initial training would inevitably result in the unauthorized copying of Publishers' lyrics in Claude outputs in response to a wide range of third-party prompts, even those not specifically requesting lyrics. Following the *Concord I* litigation, there can be no question as to Anthropic's specific awareness of such outputs copying Publishers' works.

121. Anthropic also intentionally removes and alters Publishers' Copyright Management Information when its Claude AI models generate and distribute outputs containing Publishers' lyrics but omitting the required Copyright Management Information. Anthropic's AI models regurgitate Publishers' lyrics as output to users, unaccompanied by the corresponding copyright notice, song title, songwriter, or other critical copyright management information, consistent with Anthropic's training and design. That is particularly the case when, for example, Claude is prompted to generate purportedly "new" or "original" lyrics in the style of an existing song or songwriter, and the model generates output copying existing lyrics while failing to provide proper attribution or include Copyright Management Information.

122. Claude omits Copyright Management Information in response to requests by third-party users. Discovery will reveal additional evidence of Claude distributing output lacking required

One Montgomery Street, Suite 3000, San Francisco, California 94104-5500
415.391.4800 · Fax 415.989.1663
COBLENTZ PATCH DUFFY & BASS LLP

Copyright Management Information to third-party users, which facts are in the possession and control of Anthropic.

123. Anthropic distributes that output knowing that Publishers' Copyright Management Information has been removed, because Anthropic itself removed that information during training, likewise trained on third-party datasets from which it knew such information had been removed, and accordingly omitted that information when generating output copying Publishers' lyrics. Anthropic does so intentionally. Its objective is for its AI models to reproduce Publishers' lyrics' expressive content, while it believes that corresponding Copyright Management Information is "useless junk" and '"boilerplate" to be excluded. Anthropic also intentionally removes Publishers' Copyright Management Information in this manner to prevent its AI models from displaying such information alongside Publishers' lyrics in outputs, thereby concealing Anthropic's infringement from Anthropic's users, Publishers, and other copyright owners.

**G.    *Anthropic's Profits From Its Infringement***

124. Anthropic has benefitted immensely from exploiting the copyrighted works of Publishers and others in connection with its AI models.

125. Anthropic is reportedly valued at $380 billion or more. The company has received billions of dollars in funding including from Amazon, Google, and many others. Anthropic nearly doubled its valuation in just two months from $183 billion in September 2025 to $350 billion in November 2025. Anthropic is now one of the largest AI companies in the world.

126. One of the main reasons that Anthropic's AI models are so popular and valuable is because Anthropic has trained those models on a text corpus that includes Publishers' copyrighted lyrics. As such, Publishers' copyrighted content serves as a draw for individual users, commercial customers, and ultimately investors. Indeed, countless such users have prompted Claude for Publishers' lyrics.

127. Anthropic has monetized and earns significant revenues from the version of its Claude chatbot that it makes available to its many millions of individual users and business customers through Anthropic's Claude.ai website. Although Anthropic initially made this version of the Claude chatbot available to users for free, the company has set session-based usage caps for

020382.0001 4938-3535-9390.1                     36                     Case No. 5:26-cv-00880-EKL

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

One Montgomery Street, Suite 3000, San Francisco, California 94104-5500
415.391.4800 · Fax 415.989.1663

COBLENTZ PATCH DUFFY & BASS LLP

unpaid users. Anthropic now encourages individual users to sign up for "Claude Pro," with a subscription fee of $20 per month or $200 per year, or the "Max plan," which offers "20x more usage than Pro" for $100 per month. In this manner, Anthropic earns revenues from individual users—including those who use Claude to generate copies of Publishers' lyrics and for other song- and lyric-related uses that rely on the inclusion of Publishers' lyrics in Claude's training data. The more such users utilize Claude for these purposes, the more money Anthropic makes.

128.    Anthropic also reaps enormous financial revenues from the Claude AI models it builds using infringing content, including as a result of exploiting Publishers' lyrics in training and output containing those lyrics, and sells to thousands of commercial customers. Anthropic has several subscription models for commercial customers. Anthropic currently sells businesses paid "Team" and "Enterprise" subscription plans for hundreds or thousands of dollars a month. Anthropic separately offers commercial customers access to Claude as an Application Programming Interface ("API"), charging these customers for using the Claude API on a per-token, pay-as-you-go model. Anthropic receives revenues from these commercial customers based both on the amount of text each customers' end users submit into the Claude API, and the amount of text the models generate as output. In other words, Anthropic is paid every time one of its customers' end users submits a request for Publishers' lyrics, and it is paid again every time its Claude API generates output copying and relying on those lyrics.

129.    Each of Anthropic's commercial customers, by integrating and using the Claude API or chatbot in their own software, likewise infringes Publishers' copyrights when they use these AI models to generate output copying or relying on Publishers' lyrics. Moreover, when Anthropic licenses Claude to commercial clients, it is essentially including in those licenses Publishers' copyrighted content, which it has no right to license and is unauthorized.

130.    Anthropic also collects, analyzes, and exploits data from Claude users to further develop and improve its AI models, including its commercially available products. By providing Anthropic additional data on which to refine its AI models, as well as generating publicity regarding the company and its products, each new Claude model deployment enables Anthropic to seek and secure additional valuable commercial funding.

**H.**     *The Continued and Serious Harm to Publishers from Anthropic's Infringement*

131.     Anthropic's unlawful conduct has caused and continues to cause substantial and irreparable harm to Publishers and their songwriter-clients.

132.     Publishers' musical compositions are creative intellectual property at the core of copyright protection under the Copyright Act. In turn, Anthropic is a for-profit commercial operation that has engaged in extensive reproduction and distribution of Publishers' works through its use of BitTorrent to acquire a library of copyrighted works from notorious pirate library websites. Distribution through BitTorrent is particularly pernicious, because each file can be distributed hundreds or thousands of times through the swarm. Anthropic's widescale use of BitTorrent contributes to the continued viability and normalization of that infringing protocol, and Anthropic's acquisition of copies of Publishers' works from notorious pirate library websites contributes to the continued viability and normalization of those pirate sites as sources of content, causing further damages to Publishers.

133.     Anthropic's removal of Copyright Management Information from Publishers' works makes it harder for Publishers to enforce their copyrights and protect their works from further exploitation by the Claude models and users.

134.     Anthropic's extensive use of Publishers' works in training for and as outputs from its AI models devalues the creative efforts of songwriters and deprives them of compensation and credit. Anthropic's actions also deny songwriters control over how their creative works are reproduced, modified, and adapted into other works, uses which would typically be subject to their consent under their governing agreements with music publishers. Moreover, the sheer breadth and scope of Anthropic's copying makes it effectively impossible to measure, calculate, or even estimate the financial damage it imposes on songwriters and publishers.

135.     Anthropic has failed to seek or obtain the licenses or other agreements necessary for it to lawfully exploit Publishers' works either as AI training data or in AI output. Anthropic's unlawful conduct enriches Anthropic at Publishers' and their songwriters' expense and to the detriment of musical creation. Anthropic's infringement undermines the incentive for songwriters

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · FAX 415.989.1663

to create music and for Publishers to invest in, support, and exploit those creative efforts, which in turn hinders songwriters' ability to earn a living based on their craft.

136.    Anthropic's unauthorized use also undercuts the existing and potential markets for licensing song lyrics, both as training data and for myriad other uses, and undermines those legitimate business and services that properly license lyrics (including lyrics aggregators, websites, and digital services), given that users of Anthropic's AI models do not visit the legitimate sites that compensate Publishers for the right to use their lyrics. Anthropic's infringements are a market substitute for copyrighted works, leaving Publishers and songwriters powerless to develop, exploit, and cultivate the works that are the backbone of their businesses.

137.    Anthropic's extensive copying of Publishers' and other music publishers' works also allows Anthropic to offer AI models that users can and do use to create vast quantities of new musical compositions and lyrics that compete with and dilute the market for Publishers' legitimate product, and divert royalties and income from legitimate composers and publishers. Indeed, in one unsealed internal Anthropic memo, Dr. Amodei described how "human labor is being used to train AI models by large, centralized actors, who concentrate the resulting profits while in the long run making the human labor obsolete." If "[t]he current trend continues," he predicted that "AI model training [will] become[] an increasingly extractive concentrator of wealth, in more and more industries"—including, in particular, "writing" and "music."

138.    Anthropic could stop infringing Publishers' musical compositions. Unfortunately, Anthropic continues to directly and vicariously infringe Publishers' musical compositions in order to grow Anthropic's business and reap enormous financial gains.

139.    Accordingly, Publishers have been left with no choice but to file this lawsuit to put an end to Anthropic's ongoing infringement of their rights and remedy the significant harm Anthropic has caused and continues to cause.

## CLAIMS FOR RELIEF

### Count I—Direct Copyright Infringement by Torrenting (Against All Defendants)

140.    Publishers re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs 1 through 139 of this Complaint.

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · FAX 415.989.1663

141.    As detailed above, Defendants, without Publishers' permission or consent, have unlawfully reproduced and distributed to the public Publishers' musical compositions, including the sheet music and lyrics contained therein. In particular, Defendants have unlawfully reproduced and distributed to the public through torrenting Publishers' copyrighted musical compositions, as listed in **Exhibit A**. Such activity constitutes direct infringement by Defendants of Publishers' registered copyrights and exclusive rights under copyright in violation of the Copyright Act, 17 U.S.C. §§ 106(1), (3) and 501.

142.    Publishers are the legal or beneficial copyright owners of the musical compositions listed in **Exhibit A**, which is a non-exhaustive, exemplary list.

143.    Each infringement by Defendants in and to Publishers' musical compositions constitutes a separate and distinct act of infringement.

144.    Defendants' acts of infringement are willful, intentional, and purposeful, in disregard of and with indifference to Publishers' rights.

145.    As a direct and proximate result of Defendants' infringement of Publishers' copyrights and exclusive rights, Publishers are entitled to statutory damages, pursuant to 17 U.S.C. § 504(c). Alternatively, at Publishers' election, pursuant to 17 U.S.C. § 504(b), Publishers shall be entitled to their actual damages and Defendants' profits from infringement that are not taken into account in computing the actual damages, as will be proven at trial.

146.    Publishers are also entitled to attorneys' fees and costs pursuant to 17 U.S.C. § 505.

### Count II—Direct Copyright Infringement in Training and Output

### (Against Anthropic)

147.    Publishers re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs 1 through 139 of this Complaint.

148.    As detailed above, Anthropic, without Publishers' permission or consent, has unlawfully reproduced, distributed to the public, publicly displayed, and/or prepared derivative works based upon Publishers' musical compositions. In particular, Anthropic has unlawfully reproduced, distributed to the public, publicly displayed, and/or prepared derivative works based upon Publishers' musical compositions, as listed in **Exhibit B**, through its training of Claude AI

models using Publishers' copyrighted compositions and the output those models generate. Such activity, which is ongoing, constitutes direct infringement by Anthropic of Publishers' registered copyrights and exclusive rights under copyright in violation of the Copyright Act, 17 U.S.C. §§ 106(1)-(3), (5) and 501.

149.   Publishers are the legal or beneficial copyright owners of the musical compositions listed in **Exhibit B** attached hereto, which is a non-exhaustive, exemplary list.

150.   Each infringement by Anthropic in and to Publishers' musical compositions constitutes a separate and distinct act of infringement.

151.   Anthropic's acts of infringement are willful, intentional, and purposeful, in disregard of and with indifference to Publishers' rights.

152.   As a direct and proximate result of Anthropic's wrongful conduct, which is ongoing, Publishers have been, and will continue to be, substantially and irreparably harmed in an amount not readily capable of determination. Publishers have no adequate remedy at law. Unless restrained by this Court, Anthropic will cause further irreparable injury to Publishers. Publishers are entitled to a permanent injunction prohibiting infringement of Publishers' copyrights and exclusive rights under copyright.

153.   As a direct and proximate result of Defendants' infringement of Publishers' copyrights and exclusive rights, Publishers are entitled to statutory damages, pursuant to 17 U.S.C. § 504(c). Alternatively, at Publishers' election, pursuant to 17 U.S.C. § 504(b), Publishers shall be entitled to their actual damages and Defendants' profits from infringement that are not taken into account in computing the actual damages, as will be proven at trial.

154.   Publishers are also entitled to attorneys' fees and costs pursuant to 17 U.S.C. § 505.

### Count III—Contributory Infringement by Torrenting

### (Against Dario Amodei and Benjamin Mann)

155.   Publishers re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs 1 through 139 of this Complaint.

156.   As detailed above, in June 2021, Defendant Benjamin Mann used the BitTorrent protocol to unlawfully reproduce and distribute to the public via torrenting millions of pirated books

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · FAX 415.989.1663

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · FAX 415.989.1663

from LibGen including many containing Publishers' copyrighted musical compositions. In July 2022, other Anthropic employees used the BitTorrent protocol to unlawfully reproduce and distribute to the public via torrenting millions of pirated books from PiLiMi including many containing Publishers' copyrighted musical compositions. Such activity constitutes direct infringement or an unauthorized act in violation of the Copyright Act, 17 U.S.C. §§ 106(1), (3) and 501.

157.    Dario Amodei expressly directed, controlled, and intentionally induced these infringements by Mr. Mann and other Anthropic employees. Without his direction and approval, this activity would not have occurred. Similarly, Mr. Mann expressly directed, controlled, and intentionally induced other Anthropic employees to engage in the same kind of torrenting through PiLiMi that he had done through LibGen. Without his direction and approval, this activity would not have occurred. Dr. Amodei and Mr. Mann were each fully aware that this activity constituted making illegal copies from well-known pirate libraries and further distributing those illegal copies to others. Dr. Amodei and Mr. Mann each knew that they were directing the Anthropic employees working under them to make unlawful copies from known pirated sources and to distribute those unlawful copies further. Accordingly, Dr. Amodei and Mr. Mann are contributorily liable for the infringement of Publishers' copyrighted musical compositions via torrenting, including the song lyrics contained therein, in violation of Publishers' registered copyrights and exclusive rights under copyright in violation of the Copyright Act, 17 U.S.C. §§ 106(1), (3) and 501.

158.    A non-exhaustive, exemplary list of the musical compositions for which Publishers are the legal or beneficial copyright owners, and for which Dr. Amodei and Mr. Mann are contributorily liable, is listed in **Exhibit A**.

159.    Each infringement of Publishers' musical compositions constitutes a separate and distinct act of infringement.

160.    Dr. Amodei's and Mr. Mann's acts of infringement are willful, intentional, and purposeful, in disregard of and with indifference to Publishers' rights.

161.    As a direct and proximate result of Dr. Amodei's and Mr. Mann's infringement of Publishers' copyrights and exclusive rights, Publishers are entitled to statutory damages, pursuant

to 17 U.S.C. § 504(c). Alternatively, at Publishers' election, pursuant to 17 U.S.C. § 504(b), Publishers shall be entitled to their actual damages and Dr. Amodei's and Mr. Mann's profits from infringement that are not taken into account in computing the actual damages, as will be proven at trial.

162.    Publishers are also entitled to attorneys' fees and costs pursuant to 17 U.S.C. § 505.

### Count IV—Vicarious Infringement (Against Anthropic)

163.    Publishers re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs 1 through 139 of this Complaint.

164.    As detailed above, the licensees and users of Anthropic's AI models, without Publishers' permission or consent, have unlawfully reproduced, distributed to the public, publicly displayed, and/or prepared derivative works based upon Publishers' musical compositions, as listed in **Exhibit B**. Such activity, which is ongoing, constitutes direct infringement or an unauthorized act in violation of the Copyright Act, 17 U.S.C. §§ 106(1)-(3), (5) and 501.

165.    Anthropic is vicariously liable for these direct infringements by licensees and/or users of its AI models as described herein.

166.    As discussed above, Anthropic has the legal right and practical ability to supervise and control the infringing activities that occur through and as a result of its AI models. Anthropic has the ability to control both the input and output of its AI models based on how it develops and trains the models on an ongoing basis; it can monitor and review its AI models for harmful, infringing, or otherwise unlawful input and output; it has the ability to refine and finetune its AI models to address or remove such harmful, infringing, or otherwise unlawful input and output; it can control and limit user access to its AI models available through its website and as API (including by terminating such access altogether, pursuant to its terms of service); and it can monitor and review user interactions with its AI models, among other rights and abilities to supervise and control the infringing activities.

167.    At all relevant times, Anthropic has derived a direct financial benefit from its licensees and users' infringement of Publishers' copyrighted musical compositions through Anthropic's AI models. As discussed above, Anthropic has commercialized its AI models in a

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · FAX 415.989.1663

Coblentz Patch Duffy & Bass LLP
One Montgomery Street, Suite 3000, San Francisco, California 94104-5500
415.391.4800 · Fax 415.989.1663

number of ways, including by selling Claude.ai access to individual and business users and selling API access to commercial customers on a per-word basis. Through this pay-as-you-go subscription model, Anthropic receives revenues every time a user submits a request for Publishers' song lyrics through the API, and again every time the API generates output copying or relying on those lyrics. Among other financial benefits, Anthropic has also received billions of dollars in commercial funding in connection with the development of its AI models, and it has saved a substantial amount of money by failing to properly pay licensing fees for the use of Publishers' copyrighted lyrics.

168. Publishers' lyrics are also a draw for licensees and users. Anthropic's AI models have value and are in high demand because of the underlying text corpus that includes Publishers' copyrighted lyrics, among other reasons. Customers and users are drawn to Anthropic's AI models, at least in part, by the models' ability to generate copies of song lyrics, including Publishers' copyrighted lyrics, as well as the models' ability to generate various other lyric- and song-related and other text output based on the models' ingestion of Publishers' copyrighted lyrics.

169. Anthropic has refused to take reasonable steps to prevent the widespread infringement by users of its AI models. As a direct and proximate result of such refusal, users of Anthropic's AI models have infringed Publishers' copyrights in the musical compositions.

170. Accordingly, Anthropic is vicariously liable for the infringement of Publishers' copyrighted musical compositions, including the song lyrics contained therein, in violation of Publishers' registered copyrights and exclusive rights under copyright in violation of the Copyright Act, 17 U.S.C. §§ 106(1)-(3), (5) and 501.

171. A non-exhaustive, exemplary list of the musical compositions for which Publishers are the legal or beneficial copyright owners, and for which Anthropic is vicariously liable, is shown in **Exhibit B**.

172. Each infringement of Publishers' musical compositions constitutes a separate and distinct act of infringement.

173. Anthropic's acts of infringement are willful, intentional, and purposeful, in disregard of and with indifference to Publishers' rights.

174. As a direct and proximate result of Anthropic's wrongful conduct, which is ongoing, Publishers have been, and will continue to be, substantially and irreparably harmed in an amount not readily capable of determination. Publishers have no adequate remedy at law. Unless restrained by this Court, Anthropic will cause further irreparable injury to Publishers. Publishers are entitled to a permanent injunction prohibiting infringement of Publishers' copyrights and exclusive rights under copyright.

175. As a direct and proximate result of Anthropic's infringement of Publishers' copyrights and exclusive rights, Publishers are entitled to statutory damages, pursuant to 17 U.S.C. § 504(c). Alternatively, at Publishers' election, pursuant to 17 U.S.C. § 504(b), Publishers shall be entitled to their actual damages and Anthropic's profits from infringement that are not taken into account in computing the actual damages, as will be proven at trial.

176. Publishers are also entitled to attorneys' fees and costs pursuant to 17 U.S.C. § 505.

### Count V—Removal or Alteration of Copyright Management Information
### (Against Anthropic)

177. Publishers re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs 1 through 139 of this Complaint.

178. The titles of Publishers' musical compositions, the name and other identifying information about the authors of those musical compositions, and the name and other identifying information about the copyright owners of those musical compositions, including the song lyrics contained therein, constitute Copyright Management Information under the Copyright Act, 17 U.S.C. § 1202.

179. As detailed above, Anthropic has intentionally removed or altered Copyright Management Information from Publishers' works, without Publishers' authorization, in violation of the Copyright Act, 17 U.S.C. § 1202(b)(1), and/or distributed Publishers' works or copies of Publishers' works knowing that Copyright Management Information has been removed or altered, without Publishers' authorization, in violation of the Copyright Act, 17 U.S.C. § 1202(b)(3). Further, Anthropic has done so knowing or having reasonable grounds to know that it will induce, enable, facilitate, or conceal an infringement of Publishers' works.

Coblentz Patch Duffy & Bass LLP
One Montgomery Street, Suite 3000, San Francisco, California 94104-5500
415.391.4800 · Fax 415.989.1663

180. Anthropic has intentionally removed and altered Copyright Management Information in the process of training Anthropic's AI models, including by copying Publishers' lyrics from websites containing those lyrics, including the websites of Publishers' licensees, and applying algorithms known to remove copyright notices and other Copyright Management Information from that copied text. Anthropic likewise uses third-party training datasets from which it knows such Copyright Management Information has been removed. Anthropic does so by design. Anthropic seeks to train its AI models on the content of Publishers' copyrighted lyrics, because its objective is for the models to reproduce that expressive content, while it believes that corresponding Copyright Management Information is "useless junk" and "boilerplate," so it excludes as much of that information as it can from the text it exploits to train its AI models. Anthropic has also intentionally removed and altered Copyright Management Information in the output of those AI models, including by generating text that copies Publishers' lyrics verbatim while omitting the Copyright Management Information that accompanies authorized versions of these works, and in the process of torrenting Publishers' works from pirate libraries.

181. Anthropic has also distributed Publishers' works and copies of those works knowing that Copyright Management Information has been removed or altered, including by copying training datasets that contain Publishers' copyrighted lyrics and to which algorithms known to remove Copyright Management Information had been applied, and knowingly using copies of Publishers' lyrics from which Copyright Management Information had been removed to train its models, while knowing that those models would "memorize" and regurgitate copies of those works without their Copyright Management Information in the models' outputs, as well as in the process of torrenting Publishers' works from pirate libraries.

182. Anthropic knew or had reasonable grounds to know that these acts would induce, enable, facilitate, or conceal an infringement of Publishers' works, including concealing Anthropic's own infringement of Publishers' lyrics as the input and output of its AI models; concealing other infringements in connection with the unlawful inclusion of Publishers' works in third-party training datasets; and inducing, enabling, facilitating, and concealing infringements by Anthropic's users, who are not informed that the output they receive from Anthropic's AI models contains copyrighted

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · FAX 415.989.1663

content, and who Anthropic—given its indemnification policy—anticipated would be defendants in copyright infringement suits.

183. A non-exhaustive, exemplary list of the musical compositions for which Publishers are the legal or beneficial copyright owners, and for which Anthropic is liable for removal or alteration of Copyright Management Information, is listed in **Exhibit B**.

184. Anthropic's acts of infringement are willful, intentional, and purposeful, in disregard of and with indifference to Publishers' rights.

185. As a direct and proximate result of Anthropic's wrongful conduct, which is ongoing, Publishers have been, and will continue to be, substantially and irreparably harmed in an amount not readily capable of determination. Publishers have no adequate remedy at law. Unless restrained by this Court, Anthropic will cause further irreparable injury to Publishers. Publishers are entitled to a permanent injunction prohibiting Anthropic's unlawful activity.

186. As a direct and proximate result of Anthropic's unlawful activity, Publishers are entitled to statutory damages, pursuant to 17 U.S.C. § 1203(c)(3)(B). Alternatively, at Publishers' election, pursuant to 17 U.S.C. § 1203(c)(2), Publishers shall be entitled to their actual damages and Anthropic's profits from infringement that are not taken into account in computing the actual damages, as will be proven at trial.

187. Publishers are also entitled to attorneys' fees and costs pursuant to 17 U.S.C. § 1203(b)(4)-(5).

## PRAYER FOR RELIEF

By reason of the facts and circumstances alleged above, Publishers seek relief against Anthropic as follows:

a. Judgment on each of the claims set forth above, including that Anthropic has directly and vicariously infringed Publishers' copyrights under the Copyright Act, that Dario Amodei and Benjamin Mann have directly and contributorily infringed Publishers' copyrights under the Copyright Act, that Anthropic has unlawfully removed and/or altered Publishers' Copyright Management Information in violation of the Copyright Act, and that such infringements and unlawful activities were willful;

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · FAX 415.989.1663

b.      An order requiring Defendants to pay Publishers statutory damages in an amount up to the maximum provided by law, arising from Defendants' willful violations of Publishers' rights under the Copyright Act, including in an amount up to $150,000 per work infringed, pursuant to 17 U.S.C. § 504(c); or in the alternative, at Publishers' election, Publishers' actual damages and Defendants' profits from the infringement, in an amount to be proven at trial, pursuant to 17 U.S.C. § 504(b);

c.      An order requiring Anthropic to pay Publishers statutory damages in an amount up to the maximum provided by law, arising from Anthropic's removal and/or alteration of Publishers' Copyright Management Information in violation of the Copyright Act, including in an amount up to $25,000 per violation, pursuant to 17 U.S.C. § 1203(c)(3)(B); or in the alternative, at Publishers' election, Publishers' actual damages and Anthropic's profits, in an amount to be proven at trial, pursuant to 17 U.S.C. § 1203(c)(2);

d.      An order for such equitable relief under Title 17, Title 28, and/or the Court's inherent authority as is necessary to prevent or restrain infringement of Publishers' copyrights, including a permanent injunction requiring that Anthropic and its officers, agents, servants, employees, attorneys, directors, successors, assigns, licensees, and all others in active concert or participation with any of them, including Dario Amodei and Benjamin Mann, cease directly or indirectly infringing, or causing, aiding, enabling, facilitating, encouraging, promoting, inducing, or materially contributing to or participating in the infringement of any of Publishers' exclusive rights under copyright, including without limitation in the musical compositions in Exhibits A and B;

e.      An order requiring Defendants to provide an accounting of the training data, training methods, and known capabilities of Anthropic's AI models, including requiring that Anthropic identify the Publishers' lyrics and other copyrighted works on which it has trained its AI models, and disclose the methods by which Anthropic has collected, copied, processed, and encoded this training data (including any third parties it has engaged to collect or license such data).

f.      An order requiring that Defendants destroy under the Court's supervision all infringing copies of Publishers' copyrighted works in Defendants' possession or control, and then

020382.0001 4938-3535-9390.1     48     Case No. 5:26-cv-00880-EKL

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · FAX 415.989.1663

file a sworn report setting forth in detail the manner in which it has complied with the aforesaid order, pursuant to 17 U.S.C. § 503(b);

g.    Publishers' reasonable attorneys' fees and costs in this action, pursuant to 17 U.S.C. § 505 and/or 17 U.S.C. § 1203(b)(4)-(5);

h.    Pre-judgment and post-judgment interest at the applicable rate on any monetary award made part of the judgment against Defendants; and

i.    Such other and further relief as the Court deems proper.

## JURY TRIAL DEMAND

Publishers hereby request a trial by jury.

Dated: April 6, 2026                    Respectfully submitted,

                                        */s/ Jeffrey G. Knowles*
                                        **OPPENHEIM + ZEBRAK, LLP**
                                        Matthew J. Oppenheim
                                        Nicholas C. Hailey
                                        Corey Miller
                                        (admitted *pro hac vice*)
                                        4530 Wisconsin Ave., NW, 5th Floor
                                        Washington, DC 20016
                                        Telephone: (202) 480-2999
                                        matt@oandzlaw.com
                                        nick@oandzlaw.com
                                        corey@oandzlaw.com

                                        Jennifer L. Pariser
                                        Andrew Guerra
                                        Bret Matera
                                        Timothy Chung
                                        Michelle Gomez-Reichman
                                        (admitted *pro hac vice*)
                                        461 5th Avenue, 19th Floor
                                        New York, NY 10017
                                        Telephone: (212) 951-1156
                                        jpariser@oandzlaw.com
                                        andrew@oandzlaw.com
                                        bmatera@oandzlaw.com
                                        tchung@oandzlaw.com
                                        mgomez-reichman@oandzlaw.com

                                        **COBLENTZ PATCH DUFFY & BASS LLP**
                                        Jeffrey G. Knowles (SBN 129754)
                                        Thomas A. Harvey (SBN 235342)
                                        Bina G. Patel (SBN 315352)
                                        One Montgomery Street, Suite 3000
                                        San Francisco, California 94104-5500

COBLENTZ PATCH DUFFY & BASS LLP
One Montgomery Street, Suite 3000, San Francisco, California 94104-5500
415.391.4800 · Fax 415.989.1663

020382.0001 4938-3535-9390.1                    49                    Case No. 5:26-cv-00880-EKL

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Telephone: (415) 391-4800
ef-jgk@cpdb.com
ef-tah@cpdb.com
ef-bgp@cpdb.com

**COWAN, LIEBOWITZ & LATMAN, P.C.**
Richard S. Mandel
Jonathan Z. King
Richard Dannay
(admitted *pro hac vice*)
114 West 47th Street
New York, NY 10036-1525
Telephone: (212) 790-9200
rsm@cll.com
jzk@cll.com
rxd@cll.com

*Attorneys for Plaintiffs*

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · FAX 415.989.1663

**ATTESTATION**

I, Jeffrey G. Knowles, am the ECF user whose identification and password are being used to file the FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL.  In compliance with LR 5-1(i)(3), I hereby attest that all parties have concurred in this filing.

DATED:  April 6, 2026                    COBLENTZ PATCH DUFFY & BASS LLP

By:    _/s/ Jeffrey G. Knowles_
          JEFFREY G. KNOWLES
          Attorneys for Plaintiffs

COBLENTZ PATCH DUFFY & BASS LLP
One Montgomery Street, Suite 3000, San Francisco, California 94104-5500
415.391.4800 · Fax 415.989.1663

020382.0001 4938-3535-9390.1                    51                    Case No. 5:26-cv-00880-EKL
FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL