MATTHEW J. OPPENHEIM
(admitted *pro hac vice*)
**OPPENHEIM + ZEBRAK, LLP**
matt@oandzlaw.com
4530 Wisconsin Ave., NW, 5th Floor
Washington, DC 20016
Telephone: (202) 480-2999

*Attorney for Concord I and Concord II Plaintiffs*

SONAL N. MEHTA (SBN 222086)
**WILMER CUTLER PICKERING HALE AND DORR LLP**
sonal.mehta@wilmerhale.com
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6000

*Attorney for Defendant Anthropic PBC*

[Additional Counsel on signature page]

ROBERT A. JACOBS (CA Bar No. 160350)
**MANATT, PHELPS & PHILLIPS, LLP**
rjacobs@manatt.com
2049 Century Park East, Suite 1700
Los Angeles, California 90067
Telephone: 310.312.4000
Facsimile: 310.312.4224

*Attorney For Plaintiff BMG Rights Management (US) LLC*

GRACE YANG (CA Bar No. 286635)
**CONRAD | METLITZKY | KANE LLP**
gyang@conmetkane.com
217 Leidesdorff Street
San Francisco, CA 94111
Tel: (415) 343-7100
Fax: (415) 343-7101

*Attorney for Defendants Dario Amodei and Benjamin Mann*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

|  |  |
|---|---|
| CONCORD MUSIC GROUP, INC., ET AL., <br><br> Plaintiffs, <br><br> v. <br><br> ANTHROPIC PBC, <br><br> Defendant. | Case Number: 5:24-cv-03811-EKL-SVK <br><br> **JOINT STATUS REPORT PURSUANT TO APRIL 24, 2026 ORDER** <br><br> Judge Eumi K. Lee <br> Magistrate Judge Susan van Keulen |

CONCORD MUSIC GROUP, INC., ET AL.,

    Plaintiffs,

    v.

ANTHROPIC PBC, DARIO AMODEI, and BENJAMIN MANN

    Defendants.

Case Number: 5:26-cv-00880-EKL-SVK

**JOINT STATUS REPORT PURSUANT TO APRIL 24, 2026 ORDER**

Judge Eumi K. Lee
Magistrate Judge Susan van Keulen

BMG RIGHTS MANAGEMENT (US) LLC,

    Plaintiff,

    v.

ANTHROPIC PBC,

    Defendant.

Case Number: 5:26-cv-02334-EKL-SVK

**JOINT STATUS REPORT PURSUANT TO APRIL 24, 2026 ORDER**

Judge Eumi K. Lee
Magistrate Judge Susan van Keulen

1

Case Nos. 5:24-cv-03811-EKL-SVK
5:26-cv-00880-EKL-SVK
5:26-cv-02334-EKL-SVK
JOINT STATUS REPORT PURSUANT TO APRIL 24, 2026 ORDER

Pursuant to the Court's April 24, 2026 Order, the parties to *Concord Music Group, Inc., et al. v. Anthropic PBC*, Case No. 5:24-cv-03811-EKL-SVK ("*Concord I*"), *Concord Music Group, Inc., et al. v. Anthropic PBC, et al.*, Case No. 26-cv-00880-EKL-SVK ("*Concord II*"), and *BMG Rights Management (US) LLC v. Anthropic PBC*, Case No. 26-cv-02334-EKL ("*BMG*") submit this Joint Status Report.

## I.    *Concord II* **Case Management Proposals**

The Court's April 24, 2026 Order stated that "the briefing on the motion to stay raise[d] important questions about the best method to efficiently proceed on the significantly expanded list of works asserted in the BitTorrent Case," and directed the parties to address "whether the cases may proceed based on prioritized or representative works, while deferring litigation of other works, comparable to a bellwether case management plan." ECF No. 88 at 3-4. The Court stated that it "encourage[d] creative solutions" and instructed the Parties to "meet and confer and submit a stipulation or status report with their proposed case management plan(s)." *Id.* at 4.

The Parties met and conferred by videoconference on May 19, 2026 and by email. The Parties' case management proposals are included below.

### A. *Concord II* **Plaintiffs' Case Management Proposal**

The *Concord II* Plaintiffs allege that Anthropic infringed their copyrights in 20,517 works by illegally copying those works in AI training and output and also by removing and altering copyright management information ("CMI") for those works. *See, e.g.*, ECF No. 75 at 40-41, 45-47 (Counts II, V), ECF No. 75-2 (Ex. B listing 20,517 works in suit).

With respect to this "significantly expanded" list of 20,517 works asserted in connection with Publishers' AI training and output and CMI claims (Counts II, V), the *Concord II* Plaintiffs agree that these claims "may proceed based on prioritized or representative works, while deferring litigation of other works, comparable to a bellwether case management plan." ECF No. 88 at 3–4.

Specifically, the *Concord II* Plaintiffs propose that the best method to efficiently proceed on Counts II and V is to prioritize a subset of 500 bellwether works out of the 20,517 works in suit (while tolling the *Concord II* Plaintiffs claims as to the remaining 20,017 works pending

completion of the bellwether process). These 500 bellwether works would comprise 250 works that were included in Anthropic's guardrails at the time the *Concord II* Plaintiffs filed the present suit, and 250 works that were not; the *Concord II* Plaintiffs would select half of each set of works, while Anthropic would select the other half, subject to the restriction that the percentage of works from each Publisher in each half of the bellwether should mirror the overall percentage of works from that Publisher in suit. Work-specific discovery would be limited to the 500 bellwether works alone, which would allow the Parties to conserve resources on discovery, while efficiently progressing the merits of the case.

Other courts have adopted similar bellwether processes in mass copyright infringement cases. *See, e.g.*, *Grant Heilman Photography, Inc. v. McGraw-Hill Companies*, 115 F. Supp. 3d 518, 522-23 (E.D. Pa. 2015) (recognizing bellwether process as "an effective means for a trial judge to enhance settlement prospects or resolve common issues or claims in complex litigations" such as copyright infringement actions, and addressing post-trial motions following bellwether trial on 53 out of 2,300-plus copyright infringement claims). The purpose of the bellwether process, of course, is that "representative" claims are tried, and "[t]he results of the trial are used in the other [claims] purely for informational purposes as an aid to settlement." *Dunson v. Cordis Corp.*, 854 F.3d 551, 555 (9th Cir. 2017). As the Court envisioned in suggesting it, the bellwether process efficiently facilitates resolution of key legal and factual issues that can then aid settlement on the remaining claims, without requiring exhaustive discovery and trial of every outstanding claim.

Apart from the bellwether process, and consistent with the approach taken in *Concord I* (in which Magistrate Judge van Keulen ordered production of the 5-million-record Claude sample for purposes of efficiency and to address burden, *see, e.g.*, ECF No. 377 at 5-6), the *Concord II* Plaintiffs' position is that Anthropic should produce a random, statistically significant sample of Claude prompt-output records from the period for which Anthropic is preserving Claude records for *Concord II*. As in *Concord I*, this Claude sample will serve a distinct purpose from work-specific discovery into the 500 bellwether works above; the sample will allow the Parties to

Case Nos. 5:24-cv-03811-EKL-SVK
5:26-cv-00880-EKL-SVK
5:26-cv-02334-EKL-SVK
JOINT STATUS REPORT PURSUANT TO APRIL 24, 2026 ORDER

efficiently analyze and evaluate Claude usage more broadly during the relevant period. As with *Concord I*, half of the records in the sample should come from the pre-suit period and half from the post-suit period. The *Concord II* Plaintiffs anticipate that the number of records included in the sample in *Concord II* should be in a similar range as in *Concord I*, though the precise number of records necessary to achieve statistical significance will depend on, among other things, the total number of Claude records for the given time period.

The *Concord II* Plaintiffs separately allege in *Concord II* that Defendants infringed their copyrights in 714 works in suit by illegally torrenting those works from pirate websites. *See, e.g.*, ECF No. 75 at 39-40, 41-43 (Counts I, III); ECF No. 75-1 (Ex. A listing 714 works in suit). Given that these torrenting claims do not implicate a "significantly expanded" number of works relative to *Concord I*, however, the *Concord II* Plaintiffs do not understand the Court's April 24 Order to contemplate a bellwether process with respect to these torrenting claims. Nor do the *Concord II* Plaintiffs believe a bellwether process is necessary in light of the efficiencies that will be achieved by coordinated these torrenting claims between this case and the *BMG* case (as described further in Sec. II.A.1 below).

Rather than focus on the on "the best method to efficiently proceed" in *Concord II*, as the Court instructed, Anthropic's proposal for "phased discovery" instead seeks to not proceed at all. Indeed, Anthropic's proposal—which would indefinitely postpone all discovery on the *Concord II* Plaintiffs' AI training, output, and CMI claims—simply seeks to recreate Anthropic's request for a stay that the Court has rejected.[1] *See, e.g., Concord II*, ECF No. 59 at 3 (Anthropic arguing that "[p]ermitting *Concord I* and *Concord II* to proceed simultaneously would be inefficient, as it would result in unnecessary labor for both parties and the Court. *Concord I* is well-positioned to

---

[1] Anthropic provided its "phased discovery" proposal to Publishers for the first time at 3:11 pm PT on the day of filing. The *Concord II* Plaintiffs have done their best to address Anthropic's proposal given the limited time before filing but reserve all rights. Anthropic's claim that it "outlined its case management proposal to Publishers on May 13" is misleading; the proposal Anthropic presents here for the first time is substantially different from the proposal Anthropic outlined on May 13. And Anthropic's timeline conveniently ignores that Publishers presented the bellwether proposal included here to Anthropic by email on May 7, 2026.

materially narrow this case. . . . Allowing the cases to proceed in parallel would result in duplicative, time-consuming discovery . . . before the Court has the benefit of the rulings resolving the governing legal questions in *Concord I*.”). Anthropic disingenuously claims to “embrace the bellwether process” while ignoring that the Court already rejected Anthropic’s proposal and instead directed the parties to develop a bellwether process for *Concord II.*

Anthropic’s proposal ignores that the *Concord II* claims cover different models and different time periods from *Concord I.* As such, *Concord I* will present different underlying facts from *Concord I* in ways that may substantially affect the outcome of key issues. Anthropic’s practices with regard to data collection, filtering, cleaning, and deduplication, pre-training and fine-tuning techniques, and copyright guardrails all have evolved substantially over time; in addition, the economics of AI companies, music publishing, and training data licensing are all rapidly shifting and evolving. Discovery in *Concord II* will likely show significant differences in many, if not all, of those areas from *Concord I* which, as the summary judgment briefing in *Concord I* has demonstrated, are all factual points bearing on key issues. Anthropic’s attempt to prevent the *Concord II* Plaintiffs from developing those new facts is simply an attempt to stall and avoid having to reckon with its illegal conduct.

Finally, Anthropic’s proposal that the parties proceed to discovery only “on a set of works for which Publishers come forward with prima facie evidence that they own a valid copyright” baselessly seeks to entirely upend the Federal Rules’ pleading and discovery process. The *Concord II* Plaintiffs have properly pled ownership, and their burden to prove ownership arises only ***after*** discovery is complete, not before. For obvious reasons, Anthropic cites no authority requiring a plaintiff to present “prime facie evidence” of ownership in order to seek discovery from a defendant in a copyright infringement case. Plaintiffs will, of course, produce evidence of ownership in discovery, but discovery is a two-way street: Anthropic cannot defer its own discovery burdens until after Plaintiffs complete theirs. Anthropic’s proposal is especially vexing because, after exhaustive ownership discovery in *Concord I*, Anthropic ultimately did not contest the *Concord I* Plaintiffs’ ownership of a single work in its opposition to the *Concord I* Plaintiffs’

Case Nos. 5:24-cv-03811-EKL-SVK
5:26-cv-00880-EKL-SVK
5:26-cv-02334-EKL-SVK
JOINT STATUS REPORT PURSUANT TO APRIL 24, 2026 ORDER

motion for summary judgment. *See Concord I*, ECF No. 694 at 36–38.

**B. Anthropic's Case Management Proposal**

*a. Phased Discovery*

Publishers fundamentally misunderstand (or misstate) Anthropic's position. Anthropic is not seeking to stay or postpone discovery. Rather, Anthropic's proposal embraces the Court's guidance that the parties should explore creative solutions to efficiently manage these cases and, indeed, embraces the "bellwether" process by proposing that the Court's rulings on *Concord I* provide precisely the insight and information that a bellwether process seeks to provide.

Specifically, to avoid wasting the Court's and the Parties' time, Anthropic proposes phased discovery in *Concord II*, prioritizing discovery on claims that do not overlap with *Concord I*. Specifically, Anthropic proposes that the Parties prioritize discovery in **Phase One** on the claims related to alleged torrenting (Counts I and III in *Concord II*) and the works-in-suit implicated by those torrenting claims (Ex. A) and deferring discovery on the claims overlapping with *Concord I* to **Phase Two** until resolution of the Parties' cross-motions for summary judgment in *Concord I*.[2] Prioritizing discovery on new claims will promote efficiency for the Court and Parties by avoiding delay on new factual issues but allowing resolution of the *Concord I* summary judgment motions, which will determine several threshold legal issues on the remaining claims and will potentially avoid the Court and Parties spending time and resources on discovery into issues that may be eliminated from the case.

The Publishers suggest that discovery should proceed on the overlapping claims in parallel on a "bellwether" of 500 works. That proposal would not further the efficiency considerations the Court highlighted in its Order for several reasons. *First*, Publishers use the word "bellwether," but

---

[2] Anthropic doubts the Court is interested in the history of this submission, but is compelled to respond to Publishers' misstatements. Anthropic outlined its case management proposal to Publishers on May 13, at which time Anthropic asked for a conferral with Publishers. Publishers delayed meeting and conferring until May 19, three days before this report was due, and did not send a draft status report until the day before (May 21) and Anthropic responded the following afternoon. Anthropic also proposed that the Parties seek a brief extension to continue conferring on the proposed case management plan, which Publishers repeatedly refused.

their proposal does not explain why prioritization of 500 works would aid resolution of the remaining 20,017. Nor could they. If the case proceeds following resolution of the *Concord I* cross-motions, the value of a "bellwether" will have been achieved in *Concord I* but individualized proof would be necessary on several work-specific issues including ownership and unauthorized copying.

Moreover, Publishers suggest "prioritizing" a set of works but offer no proposal for how that bellwether will be used. In the sole case Publishers cite, the court held a bellwether trial because the trial implicated a statute of limitations issue that had the potential to "'dramatically narrow[]' the scope of the trial." *Grant Heilman Photography, Inc. v. McGraw-Hill Companies*, 115 F. Supp. 3d 518, 523 (E.D. Pa. 2015). Publishers have not put forward any suggestion for how their framework would "narrow" the scope of the case. Instead, it would serve only to drag the litigation out further. If Publishers' proposal were to be accepted, the parties will have spent nearly three years litigating the first 500 works they elected to assert, then years litigating another 500, and then years litigating the remaining 19500+.

*Second*, to the extent a "bellwether" framework is intended as Publishers suggest "for informational purposes as an aid to settlement," the Publishers already brought a "bellwether" suit: *Concord I*. Publishers selected 500 (now 499) works to litigate these issues. And the Parties have exhaustively litigated whether Anthropic's use of lyrics to train Claude is fair use, whether Publishers can establish that Anthropic engaged in volitional conduct for Claude outputs, and whether Publishers' DMCA claims fail as a matter of law. Discovery in that case proceeded for two years and resulted in over 20 joint discovery disputes. Relitigating overlapping issues during the pendency of the *Concord I* cross-motions risks duplicating thousands of hours of discovery practice. That is especially true where the direct infringement claims are nearly verbatim between *Concord I* and *Concord II*. *Compare Concord II* Dkt. 75 ¶¶ 147-154 (*Concord II* claim for "Direct Copyright Infringement") *with Concord I* Dkt. 337 ¶¶ 159-166 (*Concord I* claim for "Direct Copyright Infringement"). The sole differences are (1) the number of works-in-suit and (2) the fact that Anthropic has, in the intervening year, "release[ed] multiple new versions of Claude." Dkt. 75

7

at 6. Publishers draw out a string of supposed differences attributable to the new versions of Claude (pretraining, filtering, cleaning, etc.) but do not explain how any of those differences affect any of the claims or defenses in this case. Nor could they. Those differences do not affect the potentially dispositive nature of the threshold issues being decided in *Concord I*, as the verbatim allegations show. At the very least, resolution of the issues in *Concord I* will provide the Parties valuable guidance on the overlapping claims. Indeed, as Publishers themselves recognize "the bellwether process efficiently facilitates resolution of key legal and factual issues that can then aid settlement on the remaining claims, without requiring exhaustive discovery and trial of every outstanding claim." That is precisely what resolution of the central issues raised in *Concord I* will do here for the vast majority of the claims. For those reasons, Anthropic respectfully submits that discovery on the overlapping claims should proceed as **Phase Two**.

Based on the current scope of the case, for purposes of **Phase Two** discovery, Anthropic proposes that the Parties proceed on discovery on a set of works for which Publishers come forward with prima facie evidence that they own a valid copyright. For any works-in-suit for which Publishers make that showing, the Parties will proceed to discovery as to those works.

    *b.   Request for Production of a Sample of Prompt and Completion Records*

Publishers also propose that the Court order, as part of this case management proposal, the production of a set of Claude prompt and completion records.[3] The scope of the sampling was the subject of extensive negotiation and multiple discovery filings in *Concord I*. Anthropic is ready and willing to engage in good-faith negotiations about the appropriate scope of any production in this case, but respectfully submits that those conversations will be more productive after receiving this Court's guidance on the scope of discovery and the case and after service of actual document requests.

---

[3] Anthropic reached out to Publishers on March 13, 2026 with a proposal to preserve a subset of those records in accordance with this District's guidance to prioritize early discussions of preservation. The parties have not yet reached an agreement and Anthropic anticipates that the Parties will submit joint or competing proposals to Judge van Keulen in short order.

C.    **Request for a Status Conference**

The Parties respectfully jointly request a status conference regarding the Parties' competing proposed case management plans to provide clarity regarding the scope of discovery in advance of the Initial Case Management Conference and the Parties' Rule 26(f) meet and confer.

II.    **Coordination of *Concord I*, *Concord II*, and *BMG* Cases**

The Court's April 24, 2026 Order instructed the parties to the *Concord I*, *Concord II*, and *BMG* cases to "meet and confer regarding coordination of the cases, including with respect to potential ownership disputes," and to file a joint status report with the parties' respective positions "regarding the likelihood and nature of potential ownership disputes, and the appropriate time and process to address such disputes," and "whether the Court may rule on the pending summary judgment motions in the Original Case before resolving ownership disputes, if any." ECF No. 697 at 4.

The Plaintiffs in *Concord I*, *Concord II*, and *BMG* met and conferred with Anthropic by videoconference on May 19, 2026 and by email. The parties provide their proposals regarding case coordination and their positions regarding "potential ownership disputes" below. The *Concord I*, *Concord II*, and *BMG* Plaintiffs and Anthropic agree that the Court may rule on the pending summary judgment motions in *Concord I* without addressing or resolving any purported disputes.

A.    ***Concord I*, *Concord II*, and *BMG* Plaintiffs' Position**

1.    **Plaintiffs' Case Coordination Proposal**

The *Concord I* Plaintiffs allege that Anthropic infringed their copyrights in 499 works by illegally copying those works in AI training and output and also by removing and altering copyright management information ("CMI") for those works. First Am. Compl., *Concord I*, ECF No. 337 at 66–67, 72–74 (Counts I, V), ECF No. 337-1 (Ex. A listing 499 works in suit). The *Concord II* Plaintiffs allege, *inter alia*, that Anthropic infringed their copyrights in 20,517 works after the period at issue in *Concord I* by illegally copying those works in AI training and output and also by removing and altering CMI for those works. First Am. Compl., *Concord II*, ECF No. 75 at 40–41, 45–47 (Counts II, V); ECF No. 75-1 (Ex. A listing 20,517 works in suit).

The *BMG* Plaintiff alleges that Anthropic infringed its copyrights in 467 works by illegally copying those works in AI training and output and also by removing and altering CMI for those works. Compl., *BMG*, ECF No. 1 at 31–32, 39–42 (First and Fifth Claims for Relief); ECF No. 1-1 (Ex. A listing 467 works in suit). BMG's allegations span the time periods and models at issue in both *Concord I* and *Concord II*.

The *Concord II* Plaintiffs separately allege that Defendants infringed their copyrights in 714 works in suit by illegally torrenting those works from pirate websites. *See* First Am . Compl., *Concord II*, ECF No. 75 at 39-40, 41-43 (Counts I, III); ECF No. 75-1 (Ex. A listing 714 works in suit). The *BMG* Plaintiff also alleges that Anthropic infringed its copyrights in 26 works in suit by illegally torrenting those works from pirate websites. Compl., *BMG*, ECF No. 1 at 33–34, (Second Claim for Relief); ECF No. 1-2 (Ex. B listing 26 works in suit).

The *Concord I*, *Concord II*, and *BMG* Plaintiffs jointly propose the following framework for efficiently coordinating the actions:

- For the torrenting claims in *Concord II* (Count I) and *BMG* (Second Claim for Relief): The *Concord II* Plaintiffs and BMG will proceed on these claims on the same schedule and will coordinate discovery by, for example, serving joint written discovery requests, taking depositions of Anthropic witnesses on the same or consecutive days, and jointly addressing discovery disputes.

- For the *BMG* AI training/output and CMI claims for the time period and models at issue in *Concord I*: BMG will be granted access to all relevant *Concord I* discovery but will not take new discovery until after the Court issues its summary judgment decisions in *Concord I*. The parties agree to meet and confer on any modifications to the *Concord I* Protective Order, *Concord I* ECF No. 293, necessary to effectuate BMG's access to such material. Following resolution of the summary judgment motions in *Concord I*, Anthropic and BMG will meet and confer on how best to proceed with these claims.

- For the *BMG* AI training/output and CMI claims for the time period and models at issue in *Concord II*: BMG will be granted access to all relevant *Concord II* discovery from the

10

*Concord II* bellwether process (as proposed above), including, without limitation, allowing BMG counsel to attend depositions, but BMG will not take new discovery on its claims until after the *Concord II* bellwether is resolved. Anthropic and BMG will at that point meet and confer about how best to proceed with BMG's claims.

- BMG's non-torrenting claims, and the *Concord II* plaintiffs' non-torrenting claims not included in the bellwether, will be tolled as appropriate during pendency of the *Concord I* motions for summary judgment and the *Concord II* bellwether. BMG will not be precluded from seeking to amend its complaint during this time based on discovery from either *Concord* case or otherwise.

- The parties will continually evaluate whether this process remains an efficient and fair method of resolving these actions. If circumstances arise such that this process is no longer the most efficient means to resolve any or all of these actions, or such that one party may be prejudiced, the parties will meet and confer about how best to proceed.

Anthropic's proposals (i) for "phased discovery", and (ii) that ownership is a "threshold" issue Plaintiffs must prove before proceeding to further discovery are fatally flawed for the reasons described above.[4] Anthropic's rejection of the *Concord II* Plaintiffs' bellwether proposal also undermines the basis for BMG's agreement to postpone participating in discovery; BMG's agreement to do so is conditional on the Court's adopting the bellwether concept, the information from which would aid BMG's and Anthropic's attempt to negotiate a settlement. Anthropic's proposal that BMG be bound by a discovery process in which it has not participated is obviously not acceptable and would undermine the efficiencies of the Plaintiffs' proposals for coordination and the bellwether process.

The *Concord II* and *BMG* Plaintiffs are willing to negotiate a written coordination Order with Anthropic. But Anthropic's proposal that torrenting discovery proceed as if there were only one case with one set of plaintiffs, not two, ignores the obvious reality that there are in fact two

---

[4] Anthropic provided its case coordination proposal to Plaintiffs for the first time at 3:11 pm PT on the day of filing. Plaintiffs have done their best to address Anthropic's proposal given the limited time before filing but reserve all rights.

cases with two sets of plaintiffs and two sets of counsel. While the *Concord II* and *BMG* Plaintiffs agree to coordinate on discovery and are willing to negotiate reasonable discovery limits per side (that are something less than, for example, two separate sets of depositions of Anthropic witnesses), Anthropic's proposal that the default limits for one case apply to two separate cases prejudicially undermines each case's plaintiffs' opportunity and right to develop their case.

### 2.   Plaintiffs' Position Regarding "Potential Ownership Disputes"

Having met and conferred with BMG, the *Concord I* and *Concord II* Plaintiffs are not aware of any current ownership disputes with BMG regarding the works in suit in the *Concord I*, *Concord II*, and *BMG* cases. In any event, even if an ownership dispute did arise in the future with respect to a given work, that would not bear on Anthropic's underlying infringement liability. Further, the Plaintiffs agree that the Court may rule on the *Concord I* summary judgment motions based on the existing *Concord I* factual record without addressing this issue.

To the extent the works in suit in *BMG* overlap with certain works in suit in *Concord I* or *Concord II*, that is because of shared ownership of works—not any mutually incompatible ownership claims. The *Concord I* and *Concord II* Plaintiffs are not aware of any works in suit in their cases for which the *BMG* Plaintiff asserts mutually incompatible ownership claims. As for the *BMG* works in suit, the *Concord I* Plaintiffs identified three works that appeared to have been erroneously identified as works owned by BMG, and BMG subsequently confirmed that those works were included as works in suit erroneously and will be withdrawn.[5] In the event any other similar discrepancies are identified in the future, the *Concord I* and *Concord II* Plaintiffs anticipate that they will be able to similarly resolve any such issues directly with BMG.

### B.   Anthropic's Position

#### 1.   Anthropic's Case Coordination Proposal

Anthropic agrees that coordination of the *Concord II* and *BMG* cases is appropriate.

---

[5] Those works are "Kryptonite" (PA0000999801), "Poison" (PA0000472703, PA0000445681), and "Powerless" (PA0001805751), each of which is 100% owned and/or controlled by the *Concord I* Plaintiffs.

Anthropic proposes the following coordination plan for the discovery phases that it has outlined above, and responds to Plaintiffs' proposals where appropriate.

- **Phase One (Torrenting Claims)**: Anthropic agrees that the *Concord II* and *BMG* Plaintiffs should proceed on the same schedule and coordinate discovery with respect to Phase One discovery related to new claims. Anthropic proposes that the Parties submit a written coordination Order seven (7) days in advance of the Initial Case Management Conference that includes the following provisions: (1) each deponent will be deposed only one time across both *Concord II* and *BMG* for a deposition of no more than 7 hours, and (2) any discovery limits, whether agreed on by the Parties or any applicable default limits, will be counted *per side* (i.e., the Plaintiffs in *Concord II* and *BMG* will be subject to a joint limit). Publishers contend they are willing to coordinate, but appear unwilling to agree to reasonable limitations on discovery accounting for the overlapping nature of the claims.

- **Phase Two (Non-Torrenting Claims):** Following resolution of the *Concord I* motions for summary judgment, the Parties will meet and confer and file a status report, and proposal for contested briefing, if necessary, regarding the decision's effect on *Concord II* and *BMG*.[6] Based on the current scope of the case, Anthropic proposes that the Parties proceed to discovery on a set of works for which Publishers come forward with prima facie evidence that they own a valid copyright. For any works-in-suit for which Publishers make that showing, the Parties will proceed to discovery as to those works. That proposal addresses the concern regarding the "significantly expanded list of works," Dkt. 88 at 3, by prioritizing certain works in the second phase of discovery.  Anthropic's proposal would also front any ownership issues early in the case, the importance of which is evident given BMG's new concession that it apparently does not own certain

---

[6] In connection with this stipulation, Anthropic proposed that the Parties to *Concord II* agree to be bound by a decision granting summary judgment in *Concord I*. Publishers did not agree.

works on which it sued.

Anthropic agrees to Plaintiffs' proposal that BMG will not be permitted to take new discovery as to any non-torrenting claims but disagrees to the extent Plaintiffs suggest that BMG is permitted to engage in a second round of discovery *after* discovery has proceeded in *Concord II* on those non-torrenting claims.

### 2. Anthropic's Position Regarding Potential Ownership Disputes

Anthropic agrees with Plaintiffs' position that the Court may rule on the *Concord I* summary judgment motions based on the existing *Concord I* factual record without addressing potential ownership disputes as between BMG and the *Concord I* plaintiffs.[7]

As to *Concord II* and *BMG*, Anthropic does not yet have relevant discovery to assess Publishers' alleged ownership of the copyrights for the works identified in those complaints and reserves the right to challenge those issues in *Concord II* and *BMG*. But the *BMG* Plaintiffs' concession in this filing that BMG does not in fact own three of the works on which it sued confirms that Anthropic is entitled to discovery into that issue and that it should be a threshold issue on which all of the Plaintiffs must come forward with proof of ownership at the earliest stage of the case.

### III. Defendant Mann's Request to Further Continue His Answer Deadline in *Concord II*.

On April 24, 2026, the Court continued Defendants' May 4, 2026 deadline to respond to Plaintiffs' Complaint by 90 days, until August 3, 2026. ECF No. 88. On April 27, 2026, the Court terminated Defendant Mann's Administrative Motion to Extend Answer Deadline (ECF No. 87) "in light of the amended schedule set forth in the Court's [April 24, 2026] Order." ECF No. 89. The Court instructed that, "[i]f Defendant Mann wishes to further continue his answer deadline, the parties shall present their positions on this issue in the stipulation or status report due 5/22/2026

---

[7] Anthropic has argued in its motion for summary judgment that Publishers cannot be granted summary judgment on the "copying" element of their direct infringement claims because they have not definitively established the contents of the protected work. Dkt. 694 at 36-38. That argument is distinct from any potential ownership disputes as between BMG and the *Concord I* plaintiffs.

that shall address case management in the BitTorrent Case." *Id.*

Because Defendant Mann is seeking to further continue his answer deadline beyond August 3, 2026, the Parties present their respective positions on that issue below.

### A. Defendant Mann's Position

Counsel for Mr. Mann and Dr. Amodei have determined that, while both dispute Plaintiffs' allegations, only Dr. Amodei will move to dismiss-in-part. Anthropic separately expects to move to dismiss-in-part. As a result, Mr. Mann would be required to respond to Plaintiffs' complaint months before the remaining defendants, creating two out-of-step case schedules.

Requiring this case to proceed on separate tracks will frustrate its orderly progression. Mr. Mann moves the Court to exercise its discretion and extend his response deadline to match that of Anthropic and Dr. Amodei (*i.e.*, 14 days after notice of the Court's decision on their motions to dismiss, pursuant to Federal Rule of Civil Procedure 12(a)(4)(A)).

*First*, Mr. Mann would be forced to answer allegations that are still in flux. Plaintiffs' allegations against Mr. Mann are inextricably intertwined with those concerning Anthropic and Dr. Amodei. Yang Decl. ¶ 8; *see also* Dkt. No. 75 ("Amd. Compl."). For example: "[W]hen Dr. Amodei, Mr. Mann, and a faction of other senior OpenAI employees splintered from the company to form Anthropic in 2021, they continued to illegally torrent copyrighted works from multiple pirate libraries," Amd. Cmpl. ¶ 67, "Dr. Amodei, Mr. Mann, and their Anthropic colleagues understood at this time that LibGen was an illegal pirate library," *id.* ¶ 71, "Dr. Amodei, Mr. Mann, and other Anthropic leadership discussed whether or not to torrent these files from PiLiMi, and they authorized the decision to proceed with the torrenting," *id.* ¶ 73, and so on, *see also id.* ¶¶ 63, 64, 71, 74. Resolution of Dr. Amodei and Anthropic's Rule 12 motions will determine which allegations all defendants must answer.

*Second*, separate case schedules will unnecessarily burden party and Court resources. Discovery is certain to implicate an overlapping set of custodians, documents, and data sources, all involving Anthropic's facilities and records. Separate discovery schedules will frustrate any effort to coordinate discovery requests, responses, and searches, de-duplicate productions, and so

forth. Any discovery disputes and motion practice requiring the Court's assistance, meanwhile, will be litigated on a per-defendant basis, forcing the parties and the Court to spend months treading and retreading old ground. Courts in this district have extended response deadlines to avoid inefficiencies caused by separate litigation tracks. *See, e.g.*, *FaceBook, Inc. v. ConectU LLC*, No. C 07-01389 (RS), 2007 WL 1725441, at *1–2 (N.D. Cal. June 14, 2007) (extending certain defendants' deadlines to respond to the complaint, because other defendants were filing motions to dismiss). The Court should do the same here.

This status report follows weeks of fruitless correspondence and two meet-and-confers with opposing counsel. *See* Declaration of Grace Yang ("Yang Decl.") ¶¶ 8–12. Despite ample opportunity, plaintiffs' counsel has not been able to identify any prejudice should Mr. Mann's extension be granted. *Id*. ¶ 12. They instead cite a general desire to "move the case forward," and vague concerns that any extension would "needlessly delay progressing the case." *Id*. ¶¶10, 12, Ex. B. Those concerns are unfounded: A case management conference has not been scheduled, and the case schedule for this matter is limited to defendants' August 3, 2026 responsive pleading deadline. Dkt. No. 88 at 5. Aligning defendants' litigation tracks will not delay global resolution, it will disentangle the path to an "expedite[d] global resolution of the related actions." Dkt. No. 88 at 3.

Plaintiffs' counsel has otherwise argued that Mr. Mann is not *entitled* to an extension under the Federal Rules, pointing to two inapposite decisions chastising non-movants who (1) *presumed* that their own responsive pleading deadlines were tolled by their respective co-defendants' Rule 12 motions, and (2) *failed to file* responsive pleadings as a result. Yang Decl., Ex. B; *Posey v. Pruger*, 2015 WL 5610764,at *4 (N.D. Ill. Sept. 22, 2015) ("In a multi-defendant case, the filing of a Rule 12(b) motion by one defendant does not *necessarily* toll the answer period for other defendants who have not joined the motion.") (emphasis added); *Mitchell v. CJKANT Res. Grp., LLC*, 2021 WL 2954311 (M.D. Fla. Feb. 19,2021). Mr. Mann's counsel agrees that he is not *entitled* to an extension. But whether a non-movant is *entitled* to a toll *per se* has no bearing on whether the efficiencies and equities in *this* case warrant the Court's exercise of its discretion.

### B.  Plaintiffs' Position

Mr. Mann's deadline to respond to the Complaint is not until August 3, 2026. That deadline has already been extended three times—twice by agreement of the Parties, ECF Nos. 50, 73, and a third time, by the Court, for an additional 90 days, ECF No. 88. Altogether, Mr. Mann will have four full months to answer the operative Complaint. Unsatisfied, Mr. Mann now seeks to delay his Answer even longer, until some indeterminate date many months in the future, after yet-to-be-filed motions to dismiss by different Defendants are all resolved. There is no basis whatsoever for the delay Mr. Mann seeks.

Mr. Mann fails to identify any legitimate reason to further extend his deadline to answer the Complaint beyond August 3, 2026. Nor does he explain how answering the Complaint on the current schedule would cause him any "substantial harm or prejudice." L.R. 6-3 (a)(3). Those defects alone are fatal to Mr. Mann's request under L.R. 6-3.

What's more, permitting Mr. Mann to delay his Answer indefinitely would seriously prejudice Publishers. Publishers are entitled to a timely Answer from Mr. Mann that provides them notice of the issues in dispute and the affirmative defenses he asserts. Mr. Mann's Answer will pin down key facts and allow the Publishers to progress—and, potentially, resolve—their claims against him. Mr. Mann cannot keep Publishers in the dark on these critical issues until some unknown date far in the future. That is delay for the sake of delay.

#### 1.    Background

Mr. Mann is one of three Defendants in this case, along with Anthropic and its CEO (and Mr. Mann's Anthropic co-founder) Dario Amodei. Critically, Publishers allege that Mr. Mann personally engaged in the illegal torrenting of their works at the heart of this case.

Publishers assert claims against Mr. Mann in particular for direct copyright infringement (Count I) and contributory copyright infringement (Count III), based on Mr. Mann's personal role in illegally torrenting Publishers' copyrighted works. Publishers allege, *inter alia*, that (1) Mr. Mann personally used BitTorrent to download via torrenting approximately 5 million copies of pirated books from the pirate website Library Genesis ("LibGen"), including many books

containing Publishers' copyrighted musical compositions, for warehousing and use by Anthropic, Second Am. Compl. ("SAC") ¶¶ 69–70, ECF No. 93; (2) Mr. Mann personally directed two Anthropic employees to download via torrenting millions of additional copies of pirated books from the pirate website Pirate Library Mirror ("PiLiMi"), again including many books of Publishers' copyrighted works, *id.* ¶¶ 72–73; (3) Mr. Mann discussed these torrenting activities with Dr. Amodei and other Anthropic senior leadership before proceeding, and Dr. Amodei and others approved this torrenting, *id.* ¶¶ 71, 73, 74; and (4) Mr. Mann, along with Dr. Amodei and other Anthropic colleagues, understood that they were torrenting pirated copies of copyrighted works, *id.* ¶¶ 71, 73.

Publishers anticipate that Mr. Mann will admit to many, or even all, of these allegations when he answers the Complaint. Indeed, Anthropic explicitly admitted in unsealed interrogatory responses in *Bartz* that "***Ben Mann torrented the LibGen Dataset*** between June 8, 2021 and June 19, 2021." *Bartz v. Anthropic*, Case No. 3:24-cv-05417-AMO (N.D. Cal.), ECF No. 554-6 at 5 (emphasis added). Unsealed Anthropic-produced Slack conversations from *Bartz* further underscore Mr. Mann's personal involvement in the illegal torrenting. In one internal Slack conversation from June 7, 2021, Mr. Mann himself wrote that he was "[c]urrently pulling libgen" via torrenting. *Bartz*, ECF No. 560-30 at -389773; *see also* SAC ¶ 70. In a July 3, 2022 Slack conversation, Mr. Mann shared the link to the PiLiMi pirate website with several Anthropic colleagues and wrote "just in time!!", before directing another Anthropic employee to torrent the PiLiMi dataset. *Bartz*, ECF No. 560-31 at -391318 to -391319; *see also* SAC ¶¶ 72–73. A third Slack conversation between Mr. Mann and other Anthropic employees confirmed their understanding that PiLiMi's contents were sourced from "a popular (and ***illegal***) library." *Bartz*, ECF No. 554-13 at -534120 (emphasis added); *see also* SAC ¶ 73.

Given this record, Judge Alsup found in *Bartz* that Mr. Mann personally torrented LibGen—"Mann downloaded in this way at least five million copies of books from Library Genesis, or LibGen, which he knew had been pirated"—and played a role in torrenting PiLiMi. *Bartz v. Anthropic PBC*, 787 F. Supp. 3d 1007, 1015 (N.D. Cal. 2025)); *see also, e.g.*, *Bartz v.*

*Anthropic PBC*, 791 F. Supp. 3d 1038, 1046 (N.D. Cal. 2025).

In the present case, Mr. Mann has made clear that he does ***not*** intend to move to dismiss any of Publishers' torrenting claims against him. ECF No. 87 at 2. Rather, Mr. Mann simply wants to put off having to answer to Publishers' claims against him until after other Defendants' yet-to-be-filed motions to dismiss are briefed, argued, and decided by the Court.

### 2. Argument

There is no legitimate basis for the strategic delay Mr. Mann seeks, and such delay would seriously prejudice Publishers. Mr. Mann's request should be denied in full.

### a. Mr. Mann has no legitimate reason for further delay.

Under Fed. R. Civ. P. 12, Mr. Mann must respond to the Complaint by the August 3, 2026 deadline, regardless of whether any other Defendants move to dismiss. It is well-established that "a defendant who does not file a motion to dismiss does not get to delay its response, just because a co-defendant represented by the same counsel filed a motion to dismiss." *Mitchell v. CJKANT Res. Grp.*, 2021 WL 2954311, at *1 n.1 (M.D. Fla. Feb. 19, 2021); *see also, e.g.*, *Posey v. Pruger*, 2015 WL 5610764, at *4 (N.D. Ill. Sept. 22, 2015) ("In a multi-defendant case, the filing of a Rule 12(b) motion by one defendant does not necessarily toll the answer period for other defendants who have not joined the motion." (citing cases)); *Buckles v. Focus on Innovation, Inc.*, 2013 WL 5305683, at *2 (M.D. Fla. Sept. 20, 2013); *Hanley v. Volpe*, 48 F.R.D. 387, 387–88 (E.D. Wis. 1970).

Mr. Mann fails to identify any legitimate basis for deviating from the schedule required under the Federal Rules. Nor does he explain how answering the Complaint by the current deadline would cause him "substantial harm or prejudice." L.R. 6-3 (a)(3).

If Anthropic and Dr. Amodei proceed with filing motions to dismiss on August 3, 2026, Mr. Mann will suffer no prejudice by answering the allegations against him on the same date. The allegations against Mr. Mann are not "in flux." Regardless of how any other Defendants' motions to dismiss are resolved, the claims against Mr. Mann will ***not*** be dismissed, and he will have to answer those allegations as to himself. There is nothing inherently prejudicial about co-defendants

Case Nos. 5:24-cv-03811-EKL-SVK
5:26-cv-00880-EKL-SVK
5:26-cv-02334-EKL-SVK
JOINT STATUS REPORT PURSUANT TO APRIL 24, 2026 ORDER

proceeding on slightly different timelines in responding to the Complaint—indeed, that is the *default* under the Federal Rules. Nor is there any reason that Mr. Mann's timely answer will necessarily result in inconsistent discovery schedules or any other speculative "inefficiencies." Mr. Mann fails to identify any concrete reason why answering the Complaint would be inefficient or prejudicial to him.

To the contrary, Mr. Mann's timely answer will progress resolution of the torrenting claims against him by allowing the Parties to pin down important facts with respect to those claims. As the Court recently recognized in denying Anthropic's request for an "indefinite stay" of this case, these illegal torrenting claims "are not asserted in the Original Case, and discovery on those claims should proceed regardless of potential developments in the Original Case," ultimately finding "the lengthy stay implied by Anthropic's request will more likely delay than expedite global resolution of the related actions." ECF No. 88 at 3. For the same reasons, Mr. Mann's request to further delay his Answer would do nothing to expedite resolution of the case and would instead undermine efficient case management.

### b.    Further delay would highly prejudice Publishers.

Moreover, the indefinite delay Mr. Mann seeks would seriously prejudice Publishers. A defendant's answer to a complaint "serves an important dual purpose: It gives notice of the issues in dispute and binds the answering party to a position." *M.C. by & through M.N. v. Antelope Valley Union High Sch. Dist.*, 858 F.3d 1189, 1199 (9th Cir. 2017). An answer also "notif[ies] Plaintiffs of the theories of defense upon which Defendant intends to rely." *Dalrada Precision Corp. v. Cox*, 2025 WL 591070, at *2 (S.D. Cal. Feb. 24, 2025).

Here, Mr. Mann's timely Answer to the Complaint will advance the case in multiple ways. Understanding which facts are actually disputed by Mr. Mann and which are not will greatly aid the Parties in evaluating the claims, planning for discovery, and progressing the case. The sooner Mr. Mann admits (or denies) the specific allegations against him, the sooner Publishers will be able to advance and, possibly, resolve their claims against him. For example, if Mr. Mann admits in his Answer to what is obvious from the admissions in the *Bartz* record—including that he

Case Nos. 5:24-cv-03811-EKL-SVK
5:26-cv-00880-EKL-SVK
5:26-cv-02334-EKL-SVK
JOINT STATUS REPORT PURSUANT TO APRIL 24, 2026 ORDER

personally torrented millions of pirated books from LibGen—then Publishers may move for judgment on the pleadings, thereby resolving their claims against Mr. Mann in whole or in part and streamlining the remaining case. Moreover, Mr. Mann's Answer will also inform Publishers' claims against the other Defendants, including with respect to their allegations that Mr. Mann discussed his illegal torrenting activities with Dr. Amodei and received approval from Dr. Amodei for those activities. Mr. Mann should not be able to delay answering to these and other allegations—and thereby hide these critical facts—until after other Defendants move to dismiss on unrelated grounds. Such delay would prejudice Publishers and undermine judicial efficiency.

### c.    Mr. Mann fails to cite any cases supporting his position.

Mr. Mann cannot muster any authority to support his demanded extension. Mr. Mann cites a single case, *FaceBook v. ConectU*, but he mischaracterizes that decision in several critical ways. Most importantly, he ignores that the *ConectU* court actually ***rejected*** the type of extension he seeks here. 2007 WL 1725441, at *2 (N.D. Cal. June 14, 2007).

By way of background, in *ConectU*, the "central point of controversy" was over the plaintiff's addition of ***new*** defendants to the second amended complaint, *id.* at *1, which is not an issue in this case. The *ConectU* court found that, because certain initially named defendants had previously filed motions to dismiss for lack of personal jurisdiction, and because it was "likely" that "newly-added defendants will also seek dismissal for lack of personal jurisdiction," the newly-added defendants could respond to the complaint 20 days after a decision on the already pending motions to dismiss for personal jurisdiction. *Id.* at *1-2. That ruling obviously has no bearing here, for multiple reasons: Mr. Mann is not a "newly-added defendant," and he admittedly has no intention of filing a motion to dismiss himself.

By contrast, and relevant to this case, the *ConectU* court specifically ordered defendant ConectU to answer the complaint or move to dismiss by the initial deadline, ***without regard*** to the timing of any co-defendants' separate motions to dismiss for lack of personal jurisdiction. *Id.* at *2. In other words, *ConectU* required the defendant to answer on the standard timeline—***not*** on the indefinitely delayed basis sought by Mr. Mann here.

Case Nos. 5:24-cv-03811-EKL-SVK
5:26-cv-00880-EKL-SVK
5:26-cv-02334-EKL-SVK
JOINT STATUS REPORT PURSUANT TO APRIL 24, 2026 ORDER

Dated: May 22, 2026

By:   /s/ Corey Miller

**OPPENHEIM + ZEBRAK, LLP**
Matthew J. Oppenheim
Nicholas C. Hailey
Corey Miller
(admitted *pro hac vice*)
4530 Wisconsin Ave., NW, 5th Floor
Washington, DC 20016
Telephone: (202) 480-2999
matt@oandzlaw.com
nick@oandzlaw.com
corey@oandzlaw.com

Jennifer Pariser
Andrew Guerra
Bret Matera
Timothy Chung
Michelle Gomez-Reichman
(admitted *pro hac vice*)
461 5th Avenue, 19th Floor
New York, NY 10017
Telephone: (212) 951-1156
jpariser@oandzlaw.com
andrew@oandzlaw.com
bmatera@oandzlaw.com
tchung@oandzlaw.com
mgomez-reichman@oandzlaw.com

**COBLENTZ PATCH DUFFY & BASS LLP**
Jeffrey G. Knowles (SBN 129754)
One Montgomery Street, Suite 3000
San Francisco, CA 94104
Telephone: (415) 391-4800
ef-jgk@cpdb.com

**COWAN, LIEBOWITZ & LATMAN, P.C.**
Richard S. Mandel
Jonathan Z. King
Richard Dannay
114 West 47th Street
New York, NY 10036-1525
Telephone: (212) 790-9200
rsm@cll.com
jzk@cll.com
rxd@cll.com

*Attorneys for Concord I and Concord II
Plaintiffs*

Respectfully submitted,

By:   /s/ Sonal Mehta

**WILMER CUTLER PICKERING
HALE AND DORR LLP**
SONAL N. MEHTA (SBN 222086)
sonal.mehta@wilmerhale.com
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6000

LOUIS W. TOMPROS (*Pro Hac Vice*)
louis.tompros@wilmerhale.com
DISHA PATEL (*Pro Hac Vice*)
disha.patel@wilmerhale.com
60 State Street
Boston, MA 02109
Telephone: (617) 526-6220

ARI HOLTZBLATT (SBN 354361)
ari.holtzblatt@wilmerhale.com
ROBIN C. BURRELL (*Pro Hac Vice*)
robin.burrell@wilmerhale.com
2100 Pennsylvania Ave, NW
Washington, DC 20006
Telephone: (202) 663-6000

TAYLOR GOOCH (SBN 294282)
taylor.gooch@wilmerhale.com
50 California St.
San Francisco, CA 94111
Telephone: (628) 235-1000

JARED V. GRUBOW (*Pro Hac Vice*)
jared.grubow@wilmerhale.com
250 Greenwich St
New York, NY 10007
Telephone: (212) 230-8800

*Attorneys for Defendant Anthropic PBC*

Case Nos. 5:24-cv-03811-EKL-SVK
5:26-cv-00880-EKL-SVK
5:26-cv-02334-EKL-SVK
JOINT STATUS REPORT PURSUANT TO APRIL 24, 2026 ORDER

By:   /s/ Robert Jacobs
**MANATT, PHELPS & PHILLIPS, LLP**
ROBERT A. JACOBS (SBN 160350)
rjacobs@manatt.com
NATHANIEL L. BACH (SBN 246518)
nbach@manatt.com
EVAN D. COOPER (*pro hac vice*)
ecooper@manatt.com
2049 Century Park East, Suite 1700
Los Angeles, California 90067
Telephone: 310.312.4000
Facsimile: 310.312.4224

PRANA A. TOPPER (*pro hac vice*)
ptopper@manatt.com
7 Times Square, 23rd Floor
New York, NY 10036
Telephone: 212.790.4500
Facsimile: 212.790.4545

*Attorneys for Plaintiff BMG Rights Management (US) LLC*

By:   /s/ Grace Yang
**CONRAD | METLITZKY | KANE LLP**
GRACE YANG (CA Bar No. 286635)
gyang@conmetkane.com
MIRANDA KANE (CA Bar No. 150630)
mkane@conmetkane.com
HAYK ESAGHOULYAN (CA Bar No. 349050)
hesaghoulyan@conmetkane.com
217 Leidesdorff Street
San Francisco, CA 94111
Tel: (415) 343-7100
Fax: (415) 343-7101

*Attorneys for Defendants Dario Amodei and Benjamin Mann*

23