[Counsel on signature page]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| CONCORD MUSIC GROUP, INC., ET AL., | Case No. 5:26-cv-00880-EKL-SVK |
| Plaintiffs, | **JOINT DISCOVERY DISPUTE STATEMENT REGARDING ANTHROPIC'S PRESERVATION OF PROMPT AND OUTPUT RECORDS** |
| vs. | |
| ANTHROPIC PBC et al., | |
| Defendants. | Magistrate Judge Susan van Keulen |
| | **PUBLIC REDACTED VERSION** |

Pursuant to Sec. 8 of the Court's Civil Standing Order, and L.R. 37-1 and 37-2, the Parties respectfully submit this Joint Discovery Dispute Statement to seek the Court's intervention regarding Anthropic's obligations to preserve prompt and output data. Counsel for the Parties with authority to negotiate and compromise met and conferred to try to resolve this dispute via videoconference on April 2, 2026 and April 7, 2026, and by email, but have been unable to reach agreement on the issues below. Anthropic respectfully requests that the Court enter an order defining the appropriate scope of preservation consistent with the Court's ESI Guidelines. Specifically, Anthropic requests an order limiting Anthropic's preservation obligations for prompt and output records to (1) a deduplicated random sample of 500 million records taken from the ~█████████ prompts and outputs captured from its Claude.ai and first-party Claude API interfaces ("Claude Records") between January 13, 2026 and March 24, 2026 (the "2-month Window") and (2) records from within the 2-month Window of Claude Records that contain the terms "song!," "lyric!," "verse!," or "chorus!,"—the Publishers' proposed search terms. In the alternative, if the Court concludes that additional preservation beyond that which Anthropic proposed is warranted, Anthropic requests the opportunity to present additional information regarding the costs of any additional preservation and propose a cost-sharing order.

Publishers propose that Anthropic either (1) preserve those Claude records containing the terms "song!," "lyric!," "verse!," or "chorus!" (without limiting that preservation to Anthropic's arbitrary two-month window); or (2) produce a sample of 1 million Claude records so the Parties can evaluate more specific search terms to narrow preservation. Alternatively, if Anthropic wants to limit preservation to two sample sets of records from a two-month window, and not preserve any post-March 24, 2026 records, Publishers propose those sets must be ***true samples***: the 500-million-record random sample should be drawn equally from the pre- and post-suit periods, and both the 500-million-record sample and search-term sample must be deemed representative of the broader universe of Claude records from January 13, 2026 forward, so the Parties can extrapolate the findings from the samples across that broader Claude dataset. While not yet before the Court, Publishers intend to oppose any request by Anthropic for cost-shifting as premature and meritless.

**I.      Anthropic's Position: Anthropic's Preservation Proposal Should Be Adopted**

    **A.      Anthropic Has Preserved An Extraordinary Volume Of Claude Records**

Anthropic takes seriously its obligation to preserve relevant electronic evidence and has taken significant steps as early as possible to preserve prompt and output data. But that duty is not unlimited. The Federal Rules guide the scope of preservation, balancing relevance and burden. *See* Fed. R. Civ. P. 26(b)(1). The District's ESI Guidelines are consistent, advising that "[t]he proportionality standard set forth in Fed. R. Civ. P. 26(b)(1) should be applied" for ESI. N.D. Cal. ESI Guidelines § 1.03. While the Court "expects cooperation," "[i]f the parties are unable to resolve a preservation issue, then the issue should be raised promptly with the Court." *Id.* §§ 1.02, 2.01. Rule 26(c) permits the Court to circumscribe discovery to protect a party from "undue burden or expense" upon a showing of good cause, *Al Otro Lado, Inc. v. Nielsen*, 328 F.R.D. 408, 415 (S.D. Cal. 2018), and depends on the impact on an entity "to maintain the evidence sought to be preserved[,]" including "the physical, spatial and financial burdens" associated with preservation. *Id.* at 416. After Publishers filed suit on January 18, 2026, Anthropic immediately began preserving prompt and output records and contacted Publishers to negotiate a reasonable scope of preservation for its Claude.ai and first party Claude API interfaces ("Claude Records"). Currently, Anthropic is preserving (and continues to do so on a ~14-day cadence until the Court rules) snapshots of Claude Records from the previous 28-day period (its retention window).

Anthropic seeks the Court's assistance because the size of those snapshots is unworkable. The 2-month Window (from January 13 to March 24) comprises over ███████████, ████████████████████████████████.[1] This is nearly ██ times the unique data that was preserved and sampled in *Concord 1* across a six-month period. The compute and retrieval costs associated with taking those snapshots was ~$1.7 million, with an additional ~$233,300 per month to store the data. *See* Mot. for Leave to File, Ex. 1 ¶ 5 ("Rodriguez Decl."). Claude usage is increasing rapidly. If required to snapshot and preserve records on an ongoing basis, the costs will grow exponentially. Storage costs only account for the raw preserved data that is itself inaccessible and unusable in litigation without necessary processing for actual use.

---

[1] Anthropic consistently explained the extraordinary size and cost of preservation and has appropriately refined its estimates given the challenges of calculating costs for data of this scale.

The cost to process just the data in the 2-month Window will be over $2,000,000. *Id.* ¶ 6.

Publishers propose that Anthropic *indefinitely* preserve records hitting on certain search terms. That is also unworkable. To do so, Anthropic must process all of the data before running those search terms. If required to capture and process snapshots of prompt and output data for even *six* additional months, the projected cost for those six months would be approximately $72 million, accounting for the observed monthly growth in Claude usage. *Id.* ¶ 7. That does not include the storage costs of the records that ultimately hit on the search terms. While search terms could reduce the overall volume of data that ultimately has to be stored, the processing costs to run the search terms is enormous, imposing a burden far out of proportion to the supposed benefit. Publishers' "alternative" proposal, producing 1 million records now to negotiate different search terms, does not address the fundamental issue: that running any search terms requires Anthropic to process ▌ of records each month—and ignores that Publishers had *Concord I* to work out search terms, revealing the proposal's true purpose is unnecessary delay and costs.

Courts reject requests for the wholesale or indefinite preservation of voluminous data on proportionality grounds. In *Rodriguez v. Google LLC*, plaintiffs sought an order preventing Google from deleting app data after 56 days, Google's data retention policy. 2021 WL 8085492, at *1 (N.D. Cal. Dec. 1, 2021). There, a day's worth of data, on average, consisted of 135 billion entries and required 27 petabytes of storage. *Id.* The court refused to order suspension of Google's deletion policy, finding the millions of dollars in storage it would incur went "above and beyond ordinary litigation costs" and that it was not proportional to require "Google to start saving petabytes of data per day, indefinitely," absent a "compelling showing of need." *Id.* at *2.

Given the extraordinary burden of data preservation at this scale, Anthropic requests that the Court limit preservation to (1) a random sample of 500 million records taken from the ▌ ▌ records captured in the 2-month Window and (2) Claude Records from within the 2-month Window that contain the terms "song!," "lyric!," "verse!," or "chorus!,"—the Publishers' proposed search terms. This proposal balances Rule 26(b)'s interests (and still comes at an enormous cost to Anthropic—over $4 million). A random sample of 500 million records is statistically valid and reliable for purposes of discovery; it provides both sides the data they and

their experts need—as in *Concord I*, Anthropic could create subsamples (like the 5 million record sample). Courts have endorsed sampling where the utility of additional data is negligible compared to the cost. *See id.* at *1 (approving sampling as "more direct and far less burdensome" than storing petabytes of data). Anthropic cannot continue to preserve prompt and output records indefinitely without "incurring substantial [financial] burden", so good cause exists for an order limiting the records Anthropic is required to preserve. *See Al Otro Lado, Inc.*, 328 F.R.D. at 422.

### B.     Publishers Cannot Justify Their Demands For Additional Preservation

Publishers claim they are entitled to indefinite preservation because they want to search for supposedly infringing outputs. That would not justify the burden and expense of the massive preservation effort they demand in any case. *See Rodriguez*, 2021 WL 8085492, at *1 (refusing indefinite preservation where plaintiffs failed to explain their need for additional data). But it is especially disproportionate here. The parties and the Court ***already know*** infringing outputs are exceedingly unlikely to exist. *Concord I* demonstrates that Anthropic's guardrails essentially eliminate verbatim output of Publishers' lyrics. As Publishers concede, (Dkt. 75 ¶¶ 116-118), those guardrails have only improved since *Concord I* was filed. And after the guardrails were bolstered, ***unrebutted*** empirical testing shows that when Claude is prompted for lyrics, it does not return them. *See Concord I*, Dkt. 686-14 at ¶¶ 178, 191 & Table 11. Likewise, in stark contrast to *Concord I*, the *Concord II* complaints have not alleged a ***single*** example of any allegedly infringing outputs. Dkt. 93. Parties need not preserve data beyond what is truly "needed … to prosecute th[e] case." *FTC v. DirecTV, Inc.*, 2016 WL 7386133, at *5 (N.D. Cal. Dec. 21, 2016).

Unable to offer a cogent explanation for their supposed need for additional data, Publishers attempt to recast Anthropic's request for reasonable preservation limitations as malfeasance. But the cases they cite condemning data deletion arise in the context of spoliation sanctions, not good-faith efforts to secure reasonable preservation agreements, and thus are inapplicable. *See Ritchie v. United States*, 451 F.3d 1019 (9th Cir. 2006); *Pettit v. Smith*, 45 F. Supp. 3d 1099 (D. Ariz. 2014). Other cases they rely on to support their campaign against reasonable preservation limits are equally unavailing. For example, in *Impact Engine, Inc. v. Google LLC*, the court declined to grant the requested protective order on procedural grounds.

2020 WL 1939023, at *2 (S.D. Cal. Apr. 21, 2020). In *Al Otro Lado, Inc.*, the court **granted** in part defendant's motion for a protective order to limit the surveillance data it was required to preserve based on burden. 328 F.R.D. at 422. And *Pettit* did not involve a preservation order but rather spoliation. 45 F. Supp. 3d at 1102.

Publishers also suggest that Anthropic should agree, in the context of preservation, that the records be "deemed representative of the broader universe of Claude records from January 13, 2026 forward." It is premature—and improper—for the Publishers to attempt to extract in this preservation dispute a concession that certain records are "representative" for **all of time** going forward. Rather, as in *Concord I*, the Parties can negotiate an appropriate size of a representative sample for production in discovery. Once that production sample size and scope is determined, the parties and the Court will be able to make a determination as to what extrapolations can fairly be made from it. *See, e.g.*, *Concord I*, Dkt. 318 (order on contesting representativeness).

### C.    Publishers Ignored Anthropic's Cost-Sharing Offer

Anthropic raised these preservation issues early and proactively and has tried to negotiate in good-faith for over three months. On April 16, Anthropic sought to make progress with a proposed stipulation for a 2-month preservation window. Publishers rejected the stipulation on April 24, *see* N. Hailey Email (Apr. 24, 2026), instead proposing that Anthropic preserve all Claude Records through the present, and then preserve additional wholesale 28-day snapshots of Claude Records every third month going forward, without an end-date, *id.* Anthropic explained the enormous costs associated with each snapshot, but offered to consider Publishers' proposal to take new snapshots every three months if they assumed a reasonable portion of the costs, an offer Publishers ignored. In their portion of this statement, Publishers suggest Anthropic's cost-sharing proposal is improper because the enormous costs are a function of Anthropic's success, so they are not undue. But it cannot be that a plaintiff is entitled to demand one-sided payment for unreasonable data preservation just by electing to bring a lawsuit against a fast-growing company.

The District's ESI guidelines specifically contemplate "sharing expenses" "in cases where the discovery of ESI is likely to be a significant cost or burden," as here. N.D. Cal. ESI Guidelines § 2.02(f). Any other rule creates misaligned incentives and allows Publishers (and other AI-

plaintiffs) to use the imposition of massive preservation costs as a cudgel to extract unjustified litigation concessions or create settlement leverage. Publishers attempted to do just that here, leveraging the burdens of preservation to try to extract a litigation concession: Publishers suggested that Anthropic need not preserve any outputs if it stipulates that its Claude models did (and continue to) output copies of each of Publishers' more than 20,000 works in suit. Allowing Publishers to thumb the scale this way is particularly inappropriate where Publishers have failed to identify even a single allegedly infringing output in *Concord II*.

Anthropic requests that the Court limit its preservation obligations to only a deduplicated random sample of 500 million Claude Records and records hitting on the four search terms from the 2-month Window, appropriately balancing Rule 26(b)'s interests. Given the volume of records, small changes in preservation can have enormous effects on cost. If the Court is inclined to grant additional preservation, Anthropic requests an opportunity to present additional cost details and/or a proposed cost-sharing order for the Court's consideration.

II.    <u>Publishers' Position</u>: **Anthropic cannot destroy critically relevant Claude records.**

Anthropic seeks to immunize itself from liability by destroying the evidence of its infringement. Anthropic plans to dispute (as it did in *Concord I*) that its Claude AI models generate output copying Publishers' copyrighted song lyrics. But it wants to vaporize the vast majority of Claude prompt-output records necessary to prove (as those records proved in *Concord I*) the extent to which Claude generates such infringing output. Anthropic cannot have it both ways. Its attempt to stack the deck by destroying critical evidence before discovery even begins should be rejected.

Publishers have offered numerous proposals that balance the need to preserve these critical Claude records against the burden of doing so. Specifically, Publishers propose that Anthropic either (1) preserve those Claude records that hit on the search terms "song!," "lyric!," "verse!," or "chorus!", or (2) produce a pre-sample of 1 million Claude records (half pre-suit, half post-suit) so the Parties can evaluate whether applying more specific search terms can narrow Anthropic's preservation obligations. Anthropic fails to show why these reasonable proposals are not feasible.

Instead, Anthropic wants to indiscriminately destroy 99.9% of the Claude records it has currently preserved, fail to preserve ***any*** new Claude records going forward, and prevent the Parties

from drawing any broader conclusions from the 00.1% of Claude records it does keep. Anthropic cloaks this extraordinary request as a preservation dispute, but it seeks potentially case-dispositive relief: if Anthropic destroys these records and fails to preserve any future records, Publishers will have no way of proving the extent of Anthropic's infringement of their lyrics in its AI output.

Anthropic cannot justify this extraordinary demand by invoking exaggerated and unsubstantiated costs. It vastly overinflates its burden by pointing to the claimed cost of preserving **all** Claude records—ignoring it can preserve its **relevant** lyric- and song-related Claude records at a fraction of the cost. Its planned evidence destruction would flout its obligations under the Federal Rules and severely prejudice Publishers. "Parties should not be able to escape liability by destroying evidence of their own wrong-doing." *Ritchie v. United States*, 451 F.3d 1019, 1024 (9th Cir. 2006). Anthropic cites no authority to justify its demand that the Court bless its spoliation, or its attempt to improperly saddle Publishers with the cost of its own document preservation.

### A.    Anthropic must preserve its relevant Claude prompt-output records.

Anthropic's lyric- and song-related Claude records are critically relevant to Publishers' claims. Those records are the only evidence of Anthropic's users prompting Claude for Publishers' lyrics and other song-related requests and of Claude generating output copying Publishers' lyrics in violation of Publishers' rights. In *Concord I*, Anthropic's Claude records provided critical support for Publishers' motion for summary judgment on direct infringement and fair use.

Publishers anticipate pursuing the same discovery of Claude records in *Concord II* that the Parties agreed to and the Court ordered in *Concord I*. First, to confirm the extent to which Anthropic's Claude models generated output infringing the *Concord II* works, Publishers will seek targeted discovery of Claude records containing the lyrics to those works, based on lyric- and song-related search terms, consistent with *Concord I*. ECF No. 318 at 3. Second, so that the Parties can analyze Claude usage more broadly, Publishers plan to request that Anthropic produce a random sample of Claude records from the time period at issue in *Concord II*, like in *Concord I*. *Id.* at 2.

Anthropic's planned record destruction would thwart this crucial discovery.

### B.    Publishers' proposal ensures proportional preservation of Claude records.

Anthropic's motion proceeds from the false premise that it must preserve all Claude

records, regardless of relevance. But Publishers have proposed multiple ways in which Anthropic could tailor its preservation to the lyric- and song-related Claude records relevant to this case, allowing Anthropic to comply with its preservation duty at a fraction of the cost.[2] First, Publishers have proposed that Anthropic preserve its Claude records containing the terms "song!," "lyric!," "verse!," or "chorus!" (without limiting that preservation to an arbitrary two-month window). Anthropic cannot stonewall this proposal based on unsubstantiated feasibility claims. If Anthropic does not believe it can leverage its technological expertise to efficiently run these searches, then it can agree that the searches across the two-month sample period be deemed representative of broader Claude usage. Alternatively, if Anthropic produces a random pre-sample of 1 million records (half pre-suit, half post-suit), the Parties can evaluate whether more specific search terms can further narrow Anthropic's preservation obligations. Evaluating a pre-sample in this manner accords with other cases. *E.g.*, *In re Tiktok*, 2025 WL 3628595, at *7–8 (C.D. Cal. Nov. 10, 2025).

### C.      Anthropic's proposal to broadly destroy relevant records should be rejected.

Anthropic instead seeks to destroy 99.9% of Claude records it has preserved from January 13, 2026 to March 24, 2026,[3] fail to preserve even a ***single*** later-created Claude record, and prevent the Parties from drawing any conclusions from the tiny fraction of Claude records it does maintain.

As the party "asking the Court to grant a protective order" relieving it of its preservation obligations, Anthropic "bears the burden" of "articulat[ing] 'a clearly defined, specific and serious injury' that will result in the absence of the order," which must then be balanced against Publishers' interests. *Impact Engine, Inc. v. Google LLC*, 2020 WL 1939023, at *1 (S.D. Cal. Apr. 21, 2020).

Anthropic comes nowhere close to such a showing. Its sole rationale for this extraordinary relief is the claimed cost of preservation. But its shifting claims regarding those costs are highly suspect. Anthropic initially represented in this dispute statement that it was preserving ███████ ████████████████████████████ for the two-month period at a cost of $850,000/month, and the cost for processing that data would be $4 million. But when pressed to provide a declaration to support those representations, Anthropic changed its story and now claims to be preserving ███████

---

[2] As discussed above, Anthropic should also preserve a limited random sample of Claude records (half pre-suit, half post-suit), of a sufficient size to be statistically significant, such that the Parties can evaluate Claude usage more broadly, consistent with *Concord I*.

[3] Publishers reserve all rights regarding Anthropic's failure to preserve its earlier Claude records.

█████████████████████ at a cost of $233,300/month, for which the processing cost would be $2 million. Anthropic does not explain these inconsistencies. Nor does it offer any conceivable rationale for how these costs could skyrocket to $72 million for just six additional months of data.

In any event, Anthropic's unilateral assessment vastly overinflates its preservation costs, in multiple respects. Anthropic now faces nearly a ***dozen*** lawsuits alleging copyright infringement, many of which cover the same time periods as this case. Nowhere does Anthropic explain why its "purported costs are solely attributable to this litigation," as opposed to "litigation holds in other lawsuits." *Pippins v. KPMG LLP*, 2011 WL 4701849, at *1 (S.D.N.Y. Oct. 7, 2011). Anthropic also cites the costs of preserving ***all*** Claude records—not the fraction of records actually relevant to this case. Where Anthropic has refused to engage with Publishers to preserve the subset of lyric- and song-related Claude records relevant here, its purported "burden is self-inflicted." *Id.* at *9.

Anthropic's myopic focus on burden cannot justify its far-reaching demand to be relieved of its preservation duty. Any increase in Anthropic's preservation costs compared to *Concord I* is simply a function of increased Claude usage. More usage means more infringement, and also more financial windfall for Anthropic: in the last year, it raised a staggering $111 billion in investment funding, increased its run rate revenue to $47 billion, and increased its valuation to $965 billion[4]—resources that dwarf Publishers'. Anthropic also ignores the other Rule 26 proportionality considerations—the critical importance of the issues, the over $3 billion in controversy, Anthropic's sole access to these records, and the necessity of the discovery in resolving the claims. All these factors underscore the need to preserve these records. Anthropic's failure to show data inaccessibility and undue burden likewise precludes its improper demand for cost-shifting. *See, e.g.*, *Io Grp., Inc. v. Veoh Networks, Inc.*, 2007 WL 1113800, at *7 (N.D. Cal. Apr. 13, 2007).

Further, Anthropic offers no plan for how the Parties will evaluate Claude usage ***after*** March 24, 2026. Its failure to address this problem is especially troubling in that, while it proposes preserving a "sample of 500 million records" from January 13, 2026 to March 24, 2026, it refuses to agree to deem this sample representative of the broader universe of Claude records from January 13, 2026 forward or that the findings can be extrapolated across that broader time period. If

---

[4] *See, e.g.*, *Anthropic raises $65B in Series H funding at $965B post-money valuation,* ANTHROPIC (May 28, 2026), https://www.anthropic.com/news/series-h.

Anthropic objects to the costs of preserving all records, it should agree to these sampling safeguards. Absent such guarantees, its "sample" proposal is nothing more than a subterfuge to destroy 99.9% of its Claude records and evade any discovery into Claude usage going forward.

*Pippins v. KPMG* is instructive. 2011 WL 4701849 (S.D.N.Y. Oct. 7, 2011), *aff'd* 279 F.R.D. 245 (S.D.N.Y. 2012). There, the defendant sought to avoid preserving over 7,500 hard drives, arguing disproportionate costs, and instead moved "to preserve only a random sample of 100 hard drives." *Id.* at *2. The magistrate judge denied the request because the defendant failed to "establish conclusively" that "the hard drives [were] of only marginal relevance and that it would be unduly burdensome to continue its current preservation efforts." *Id.* at *8–10. While "preserving the hard drives was expensive," the magistrate judge "concluded that it would be premature to permit the destruction of any hard drives before discovery." 279 F.R.D. at 252. The district judge agreed that the defendant "cannot simultaneously demand that the Court analyze [facts supporting the plaintiff's claims] and also ask the Court to sanction the destruction of what is probably the single best source of that information." *Id.* at 256; *see also, e.g.*, *Impact*, 2020 WL 1939023, at *1 (citing *Pippins* in rejecting defendant's argument); *Al Otro Lado, Inc. v. Nielsen*, 328 F.R.D. 408, 415–21 (S.D. Cal. 2018) (defendants who sought "judicial permission to destroy potentially relevant documents and information" had "failed to recognize their preservation obligations"); *Pettit v. Smith*, 45 F. Supp. 3d 1099, 1107–08 (D. Ariz. 2014) (a party cannot "immunize itself from liability by destroying the very evidence needed to prove its liability").

By contrast, Anthropic fails to cite a single case supporting its extraordinary demand.

**D.      Anthropic's merits arguments are premature, irrelevant, and baseless.**

Anthropic wastes much ink arguing the merits of *Concord I* and what discovery will show in *Concord II*. These premature contentions have no bearing on preservation. Arguing an unfiled motion to dismiss here puts the cart before the horse. These arguments also evoke Anthropic's misrepresentation to the Court early *in Concord I* that "Claude customers are not using Claude to generate song lyrics," Hr'g Tr. 49:22 (Nov. 25, 2024), which Claude records subsequently proved false—further underscoring the importance of the Claude records Anthropic here seeks to destroy.

Date: July 6, 2026

By:  /s/ Nicholas C. Hailey

**OPPENHEIM + ZEBRAK, LLP**

Matthew J. Oppenheim
Nicholas C. Hailey
Corey Miller
(admitted pro hac vice)
4530 Wisconsin Ave., NW, 5th Floor
Washington, DC 20016
Telephone: (202) 480-2999
matt@oandzlaw.com
nick@oandzlaw.com
corey@oandzlaw.com

Jennifer Pariser
Andrew Guerra
Bret Matera
Timothy Chung
Michelle Gomez-Reichman
(admitted pro hac vice)
461 5th Avenue, 19th Floor
New York, NY 10017
Telephone: (212) 951-1156
jpariser@oandzlaw.com
andrew@oandzlaw.com
bmatera@oandzlaw.com
tchung@oandzlaw.com
mgomez-reichman@oandzlaw.com

**COBLENTZ PATCH DUFFY & BASS LLP**

Jeffrey G. Knowles (SBN 129754)
Thomas A. Harvey (SBN 235342)
Bina G. Patel (SBN 315352)
One Montgomery Street, Suite 3000
San Francisco, CA 94104
Telephone: (415) 772-5795
ef-jgk@cpdb.com
ef-tah@cpdb.com
ef-bgp@cpdb.com

**COWAN, LIEBOWITZ & LATMAN, P.C.**

Richard S. Mandel
Jonathan Z. King
Richard Dannay
(admitted pro hac vice)
114 West 47th Street
New York, NY 10036-1525

Respectfully submitted,

By:  /s/ Sonal N. Mehta

**WILMER CUTLER PICKERING
HALE AND DORR LLP**

SONAL N. MEHTA (SBN 222086)
sonal.mehta@wilmerhale.com
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6000

LOUIS W. TOMPROS (*pro hac vice*)
Louis.Tompros@wilmerhale.com
60 State Street
Boston, MA 02109
Telephone: (617) 526-6220

ARI HOLTZBLATT (SBN 354361)
ari.holtzblatt@wilmerhale.com
ROBIN C. BURRELL (*pro hac vice*)
robin.burrell@wilmerhale.com
2100 Pennsylvania Ave, NW
Washington, DC 20037
Telephone: (202) 663-6000

*Attorneys for Defendant*
**ANTHROPIC PBC**

Telephone: (212) 790-9200
rsm@cll.com
jzk@cll.com
rxd@cll.com

*Attorneys for Plaintiffs*

**SIGNATURE ATTESTATION PURSUANT TO CIVIL L.R. 5-1(i)(3)**

Pursuant to Civil L.R. 5-1(i)(3), I hereby attest that concurrence in the filing of the document was obtained from the document's signatories. I declare under penalty of perjury that the foregoing is true and correct.


Dated: July 6, 2026                    /s/ *Sonal N. Mehta*
                                       Sonal N. Mehta