**OPPENHEIM + ZEBRAK, LLP**
Matthew J. Oppenheim
Nicholas C. Hailey
Corey Miller
(admitted *pro hac vice*)
4530 Wisconsin Ave., NW, 5th Floor
Washington, DC 20016
Telephone: (202) 480-2999
matt@oandzlaw.com
nick@oandzlaw.com
jeff@oandzlaw.com
corey@oandzlaw.com

Jennifer Pariser
Andrew Guerra
Bret Matera
Timothy Chung
Michelle Gomez-Reichman
(admitted *pro hac vice*)
461 5th Avenue, 19th Floor
New York, NY 10017
Telephone: (212) 951-1156
jpariser@oandzlaw.com
andrew@oandzlaw.com
bmatera@oandzlaw.com
tchung@oandzlaw.com
mgomez-reichman@oandzlaw.com

**COBLENTZ PATCH DUFFY & BASS LLP**
Jeffrey G. Knowles (SBN 129754)
One Montgomery Street, Suite 3000
San Francisco, CA 94104
Telephone: (415) 391-4800
ef-jgk@cpdb.com

**COWAN, LIEBOWITZ & LATMAN, P.C.**
Richard S. Mandel
Jonathan Z. King
Richard Dannay
(admitted *pro hac vice*)
114 West 47th Street
New York, NY 10036-1525
Telephone: (212) 790-9200
rsm@cll.com
jzk@cll.com
rxd@cll.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

CONCORD MUSIC GROUP, INC., ET AL.,

Plaintiffs,

v.

ANTHROPIC PBC, DARIO AMODEI, AND BENJAMIN MANN

Defendants.

Case Number: 5:26-cv-00880-EKL-SVK

**PLAINTIFFS' OPPOSITION TO DEFENDANT ANTHROPIC'S MOTION FOR PARTIAL DISMISSAL**

Judge Eumi K. Lee
Magistrate Judge Susan van Keulen

Hearing Date: November 4, 2026
Time: 10:00 AM PT
Courtroom: 7

## TABLE OF CONTENTS


INTRODUCTION ... 1

BACKGROUND ... 1

LEGAL STANDARD ... 4

ARGUMENT ... 4

I. Publishers plausibly allege Anthropic's infringement of their lyrics in Claude output. ... 4

A. Publishers' detailed allegations of how Claude generates infringing output of the Works in Suit give Anthropic fair notice of the claims against it. ... 4

B. Publishers' allegations are not equally consistent with noninfringement. ... 8

C. Publishers need not identify specific infringing output examples at the pleading stage. ... 10

D. Publishers allege the specific works Anthropic infringed in its Claude output. ... 17

II. Publishers adequately allege that Anthropic violated 17 U.S.C. § 1202(b). ... 18

A. Publishers allege Anthropic removed CMI from their works as a whole. ... 19

B. Publishers need not cite specific infringing outputs to state a § 1202(b)(3) claim. ... 21

III. In the alternative, Publishers should be permitted to amend their Complaint. ... 23

CONCLUSION ... 24

# TABLE OF AUTHORITIES

**Cases**

*Adavco, Inc. v. Deertrail Dev., LLC*,
2024 WL 4120908 (E.D. Cal. Sept. 9, 2024) ... 11

*Advanta-STAR Auto. Research Corp. of Am. v. Search Optics, LLC*,
672 F. Supp. 3d 1035 (S.D. Cal. 2023) ... 14

*Andersen v. Stability AI Ltd.*,
744 F. Supp. 3d 956 (N.D. Cal. 2024) ... passim

*APL Microscopic, LLC v. Steenblock*,
2022 WL 4830687 (9th Cir. Oct. 3, 2022) ... 4, 10

*Arista Records, LLC v. Doe 3*,
604 F.3d 110 (2d Cir. 2010) ... 13

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ... 4

*Baker v. Cuomo*,
58 F.3d 814 (2d Cir. 1995) ... 4

*Becton, Dickinson & Co. v. Cytek Biosciences Inc.*,
2020 WL 1877707 (N.D. Cal. Apr. 15, 2020) ... 17

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ... 4, 9, 13

*Blizzard Ent., Inc. v. Lilith Games (Shanghai) Co.*,
149 F. Supp. 3d 1167 (N.D. Cal. 2015) ... 17

*Clifton v. Houghton Mifflin Harcourt Publ'g Co.*,
152 F. Supp. 3d 1221 (N.D. Cal. 2015) ... 14, 15, 17

*Clifton v. Pearson Educ.*,
2012 WL 1565236 (N.D. Cal. May 2, 2012) ... 14

*Concord Music Grp., Inc. v. Anthropic PBC*,
2025 WL 1487988 (N.D. Cal. Mar. 26, 2025) ... 23

*Creech v. Tewalt*,
84 F.4th 777 (9th Cir. 2023) ... 23

*Doe v. GitHub, Inc.*,
No. 24-7700 (9th Cir. argued Feb. 11, 2026) ... 21

*Dolls Kill, Inc. v. Zoetop Bus. Co*,
2022 WL 16961477 (C.D. Cal. Aug. 25, 2022) ... 20

*Elec. Constr. & Maint. Co., Inc. v. Maeda Pac. Corp.*,
764 F.2d 619 (9th Cir. 1985) ... 4

*Energy Intelligence Grp., Inc. v. Bank of Am., N.A.*,
2018 WL 3303166 (S.D. Tex. July 5, 2018) ... 14

*Falkner v. General Motors LLC*,
393 F. Supp. 3d 927 (C.D. Cal. 2018) ... 20

*Fisher v. Dees*,
794 F.2d 432 (9th Cir. 1986) .......... 9

*Hanagami v. Epic Games, Inc.*,
85 F.4th 931 (9th Cir. 2023) .......... 5

*ICONICS, Inc. v. Massaro*,
192 F. Supp. 3d 254 (D. Mass. 2016) .......... 19

*Imperial v. Ramsey*,
2010 WL 2765540 (N.D. Cal. July 13, 2010) .......... 23

*In re Century Aluminum Co. Sec. Litig.*,
729 F.3d 1104 (9th Cir. 2013) .......... 8

*Jangle Vision, LLC v. Alexander Wang, Inc.*,
2023 WL 7042518 (9th Cir. Oct. 26, 2023) .......... 10

*Justice v. Suno, Inc.*,
2026 WL 2445362 (D. Mass. Aug. 20, 2026) .......... passim

*Justice v. Uncharted Labs Inc.*,
2026 WL 1430232 (S.D.N.Y. May 21, 2026) .......... 17

*Kante v. Lipa*,
2024 WL 4720798 (C.D. Cal. Sept. 10, 2024) .......... 8, 14

*Leadsinger, Inc. v. BMG Music Publ'g*,
512 F.3d 522 (9th Cir. 2008) .......... 23

*Lopez v. Smith*,
203 F.3d 1122 (9th Cir. 2000) .......... 23

*Manzarek v. St. Paul Fire & Marine Ins. Co.*,
519 F.3d 1025 (9th Cir. 2008) .......... 4, 10

*McCoy v. McCormick & Co., Inc.*,
2025 WL 1918546 (E.D. Cal. July 11, 2025), *report and recommendation adopted*, 2025 WL 2315457 (E.D. Cal. Aug. 12, 2025) .......... 23

*McGary v. City of Portland*,
386 F.3d 1259 (9th Cir. 2004) .......... 4

*Newton v. Diamond*,
388 F.3d 1189 (9th Cir. 2004) .......... 9

*Real World Media v. Daily Caller, Inc.*,
744 F. Supp. 3d 24 (D.D.C. 2024) .......... 19, 22

*Rivas v. Kijakazi*,
2023 WL 8006846 (N.D. Cal. Nov. 17, 2023) .......... 23

*Robinson v. Binello*,
771 F. Supp. 3d 1114 (N.D. Cal. 2025) .......... 5

*Salameh v. Tarsadia Hotel*,
726 F.3d 1124 (9th Cir. 2013) .......... 23

*Satco Prods., Inc. v. Seoul Semiconductor Co.*,
551 F. Supp. 3d 1329 (N.D. Ga. 2021) .......... 14

*Scilex Pharms. Inc., v. Sanofi-Aventis U.S. LLC*,
2021 WL 11593043 (N.D. Cal. Aug. 16, 2021) .......... 23

*Soo Park v. Thompson*,
851 F.3d 910 (9th Cir. 2017) .......... 13

*Stevens v. Corelogic, Inc.*,
899 F.3d 666 (9th Cir. 2018) .......... 19

*Strike 3 Holdings, LLC v. Meta Platforms, Inc.*,
2026 WL 1697633 (N.D. Cal. June 11, 2026) .......... 9

*Tremblay v. OpenAI, Inc.*,
716 F. Supp. 3d 772 (N.D. Cal. 2024) .......... 10

**Statutes**

17 U.S.C. § 101 .......... 20

17 U.S.C. § 1202(b) .......... passim

**Other Authorities**

*Anthropic raises $65B in Series H funding at $965B post-money valuation*, ANTHROPIC (May 29, 2026), https://www.anthropic.com/news/series-h .......... 2

Jon Markman, *Anthropic Eyes $2 Trillion In October IPO, A Record-Breaking Debut*, FORBES (Aug. 13, 2026), https://www.forbes.com/sites/jonmarkman/2026/08/13/anthropic-eyes-2-trillion-in-october-ipo-a-record-breaking-debut .......... 3

**Rules**

Fed. R. Civ. P. 12(b)(6) .......... 8

Fed. R. Civ. P. 8(a)(2) .......... 5

**Treatises**

NIMMER ON COPYRIGHT § 12A.10 .......... 22

## INTRODUCTION

Anthropic's thin challenges to Publishers' infringing output and CMI removal claims mischaracterize the law and disregard Publishers' extensive allegations supporting those claims.

First, where Publishers allege in detail how Anthropic's Claude AI models generate output infringing Publishers' copyrighted song lyrics, there is no requirement that Publishers' Complaint also identify specific examples of that infringing output. Publishers describe how Anthropic copied the lyrics to their 20,517 works in suit as AI training input—allegations that Anthropic does not challenge here. Publishers then explain how Anthropic designed, trained, and finetuned Claude to memorize those same lyrics and output copies of those lyrics to users. Finally, Publishers describe how, as the result of Anthropic's training, Claude ultimately generated output copying those lyrics verbatim and near-verbatim in response to a range of third-party user requests. Those allegations are more than sufficient to plausibly allege a claim.

Contrary to Anthropic's contention, Publishers need not—on top of that—also identify and cite to specific infringing Claude output to state a claim. Courts have rejected similar arguments that copyright owners must identify specific instances of infringing output at the pleading stage. *See, e.g.*, *Justice v. Suno, Inc.*, 2026 WL 2445362, at *2–3 (D. Mass. Aug. 20, 2026); *Andersen v. Stability AI Ltd.*, 744 F. Supp. 3d 956, 974–75 (N.D. Cal. 2024). Anthropic also ignores that the infringing output evidence it claims Publishers must identify lies solely within Anthropic's control. The gist of Anthropic's motion is that it seeks to dispute, as a factual matter, that Claude generates such infringing output. But that is precisely the kind of factual dispute that cannot be resolved at the pleading stage. That level of proof must await discovery and summary judgment.

Second, with respect to Publishers' CMI removal claim, Anthropic attempts to sharply curtail the scope of 17 U.S.C. § 1202(b) based on the most tenuous of textual hooks and without any endorsement in the case law. Anthropic's novel legal arguments are contrary to the law, and, in any event, Publishers' CMI removal allegations satisfy even Anthropic's inappropriately narrow reading of § 1202(b). Accordingly, Anthropic's Motion to Dismiss should be denied in full.

## BACKGROUND

Publishers are among the world's leading music publishing companies, who represent and

advocate for thousands of talented and creative songwriters. Second Am. Compl. ("SAC") ¶¶ 46–48, ECF No. 93. Publishers develop and promote these lyricists and composers, administer the copyrights in their musical compositions, license those compositions for authorized use in a variety of contexts, and collect and distribute the resulting royalties. *Id.* ¶¶ 47–51.

Publishers own or control the exclusive rights to millions of valuable musical compositions, including the 20,517 compositions identified in Exhibit B to the Complaint, each of which has been duly registered with the U.S. Copyright Office. *Id.* ¶¶ 54–55, Ex. B.

Publishers embrace technological innovation to create new means of providing their valuable musical compositions to the public and work tirelessly to develop new licensing opportunities and business models. *Id.* ¶¶ 49–52. Publishers disseminate their copyrighted lyrics to the public via a range of licensed uses, including "licensed print and digital books containing sheet music and lyrics," as well as "licensed lyrics aggregators, lyrics websites, social media platforms, and a host of other online platforms." *Id.* ¶ 50. "Through these and other licensed uses, Publishers ensure that consumers can access and appreciate genuine, authorized copies of the music and lyrics to their favorite songs." *Id.*

Publishers require licensees to properly credit songwriters and rightsholders by including song title, songwriter name(s), and other important copyright management information ("CMI") alongside their lyrics. *Id.* ¶¶ 53, 78. That CMI is "vital to consumers, who want to know the authors of these musical compositions, and to songwriters and Publishers, who correspondingly want to ensure that the creative minds behind these works and the owners of those works are properly credited, and that the public is informed that these works are protected by copyright." *Id.* ¶ 53.

Anthropic, meanwhile, "is in the business of developing, operating, selling, and licensing access to AI programs." *Id.* ¶ 56. Founded in 2021, Anthropic's AI business is "valued at $380 billion or more." *Id.*[1] Its core product is a series of commercial AI models called "Claude." *Id.* ¶ 57.

---

[1] Shortly after Publishers filed their Second Amended Complaint, Anthropic announced that its valuation had tripled to $965 billion; today, Anthropic is reportedly valued at $2 trillion or more. *See Anthropic raises $65B in Series H funding at $965B post-money valuation*, ANTHROPIC (May 29, 2026), https://www.anthropic.com/news/series-h; Jon Markman, *Anthropic Eyes $2 Trillion In October IPO, A Record-Breaking Debut*, FORBES (Aug. 13, 2026),

Anthropic builds its Claude AI models by copying massive amounts of copyrighted content—including the lyrics to Publishers' 20,517 works in suit in this case—without permission. Among other things, Anthropic "scrap[es] data from sources on the internet, cop[ies] the contents of physical books, and exploit[s] other datasets containing unauthorized copies of Publishers' works" to develop and train Claude. *Id.* ¶ 10. Anthropic then trains and finetunes Claude to respond to specific requests for Publishers' lyrics by outputting copies of those same lyrics, and it separately monitors and analyzes Claude's delivery of copies of lyrics to real-world users. *See id.* ¶¶ 111–14. "Because Anthropic trains its AI models to memorize Publishers' works, those models generate output copying Publishers' works in a variety of ways," including regurgitating "verbatim and near-verbatim" copies, as well as "copying the 'heart' of those works." *Id.* ¶¶ 10, 109. Anthropic's Claude has generated output copying the lyrics to Publishers' 20,517 works in suit, verbatim and near-verbatim, in response to a range of third-party user requests. *See id.* ¶¶ 109, 120–21, 148.

Additionally, during the training process, Anthropic deliberately removes Publishers' CMI from their lyrics in order to prevent Claude from outputting that CMI alongside copies of those lyrics. *Id.* ¶¶ 103–07, 166–67. Anthropic employs "extraction algorithms to deliberately strip [Publishers'] lyrics of their [CMI] to curate its own training datasets, including to train its latest Claude models." *Id.* ¶ 106. In fact, Anthropic tested multiple extraction tools and ultimately settled on the "Newspaper" tool because it removed CMI most effectively. *Id.* ¶ 105. Anthropic also trains Claude utilizing third-party datasets containing Publishes' lyrics, such as the Pile, from which it knows CMI has been systematically stripped. *Id.* ¶ 103.

As a result of Anthropic's removal of Publishers' CMI during training, "Anthropic's AI models regurgitate Publishers' lyrics as output to users, unaccompanied by the corresponding copyright notice, song title, songwriter, or other critical [CMI], consistent with Anthropic's training and design." *Id.* ¶ 121. Anthropic "distributes that [Claude] output knowing that Publishers' [CMI] has been removed, because Anthropic itself removed that information during training, likewise trained on third-party datasets from which it knew such information had been removed, and

---

https://www.forbes.com/sites/jonmarkman/2026/08/13/anthropic-eyes-2-trillion-in-october-ipo-a-record-breaking-debut.

accordingly omitted that information when generating output copying Publishers' lyrics." *Id.* ¶ 123. Anthropic intended for Claude to "reproduce Publishers' lyrics' expressive content" in output, while removing the vital CMI that it dismisses as "useless junk." *Id.*

Anthropic has "never sought or secured Publishers' permission to use their valuable copyrighted works" as input to train its AI models or in the output those models generate. *Id.* ¶ 92.

## LEGAL STANDARD

To withstand a Rule 12(b)(6) motion to dismiss for failure to state a claim, a complaint need only "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When applying this plausibility standard, courts "do not require heightened fact pleading of specifics" or "detailed factual allegations." *Twombly*, 550 U.S. at 555, 570. Likewise, "evidence is not required at the motion to dismiss stage." *APL Microscopic, LLC v. Steenblock*, 2022 WL 4830687, at *1 (9th Cir. Oct. 3, 2022).

Rather, courts "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). Unless allegations fail to "raise a right to relief above the speculative level," dismissal is improper. *Twombly*, 550 U.S. at 555.

Further, "Rule 12(b)(6) dismissals 'are especially disfavored in cases where the complaint sets forth a novel legal theory that can best be assessed after factual development.'" *McGary v. City of Portland*, 386 F.3d 1259, 1270 (9th Cir. 2004) (quoting *Baker v. Cuomo*, 58 F.3d 814, 818–19 (2d Cir. 1995)). That is because "it is important that new legal theories be explored and assayed in the light of actual facts rather than a pleader's suppositions.'" *McGary*, 386 F.3d at 1270 (quoting *Elec. Constr. & Maint. Co., Inc. v. Maeda Pac. Corp.*, 764 F.2d 619, 623 (9th Cir. 1985)).

## ARGUMENT

### I. Publishers plausibly allege Anthropic's infringement of their lyrics in Claude output.

#### A. Publishers' detailed allegations of how Claude generates infringing output of the Works in Suit give Anthropic fair notice of the claims against it.

Publishers' factual allegations detailing Anthropic's infringement of their lyrics in its

Claude AI output are more than sufficient to state a claim for direct copyright infringement.

To plead a direct copyright infringement claim, Publishers must allege (1) ownership of a valid copyright, and (2) copying of protected aspects of the copyrighted work. *Hanagami v. Epic Games, Inc.*, 85 F.4th 931, 940 (9th Cir. 2023). Because Publishers' allegations do not sound in fraud, Publishers need only plead "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *see Robinson v. Binello*, 771 F. Supp. 3d 1114, 1120–24 (N.D. Cal. 2025) (applying Rule 8(a)(2) to deny motion to dismiss direct infringement claim).

Here, Publishers plainly state a claim for Anthropic's direct infringement of their copyrighted lyrics in Anthropic's AI output. Anthropic does not challenge the first element, Publishers' ownership of valid copyrights. In any event, Publishers allege they "own or control the copyrights to millions of the most well-known and beloved musical compositions," SAC ¶ 46, including specifically the 20,517 Publishers' works Anthropic infringed in the "output of its AI models," *id.* ¶ 10, each of which has been registered with the U.S. Copyright Office and is individually identified in Exhibit B to the Complaint. *Id.* ¶ 55, Ex. B.

As for the copying element, Publishers allege in detail how Anthropic copied their copyrighted song lyrics in its Claude AI output, including by "generat[ing] verbatim copies of Publishers' lyrics" and "regurgitat[ing] Publishers' lyrics as output to users." *Id.* ¶¶ 120–21.

At the outset, Publishers describe how Anthropic initially copied their lyrics without authorization (including, in particular, the lyrics to the 20,517 works identified in Exhibit B) from a variety of sources used as AI training input, including by directly scraping copies of Publishers' lyrics from licensed lyrics websites and elsewhere on the internet, *id.* ¶¶ 10, 94; copying preexisting datasets like the Common Crawl, The Pile, Books3, and YouTube Subtitles known to include those lyrics, *id.* ¶¶ 95–96; and destructively scanning what Anthropic identified as "music" books that contain those lyrics. *Id.* ¶ 97. Anthropic does not challenge the sufficiency of these allegations regarding its unauthorized copying of Publishers' lyrics during AI training. That silence is critical, because Anthropic's copying of Publishers' lyrics as training input is what "resulted in the unauthorized encoding of those lyrics in the Claude models themselves" and causes "the unauthorized copying of Publishers' lyrics in Claude outputs in response to a wide range of third-

party prompts, even those not specifically requesting lyrics." *Id.* ¶ 120.

Publishers then describe how, after initially copying and encoding Publishers' lyrics into its Claude models, Anthropic further trained and finetuned Claude specifically to generate output copying those same lyrics verbatim and near-verbatim in response to a range of user prompts. *Id.* ¶¶ 109–11. Publishers detail how Anthropic "trains its AI models to memorize Publishers' works, [so] those models generate output copying Publishers' works in a variety of ways." *Id.* ¶ 10. Publishers describe "Claude's known tendency to memorize and regurgitate copyrighted content," including Publishers' lyrics, and quote Anthropic documents recognizing that large language models like Claude "memorize A LOT, like a LOT" and discussing how Claude "learned from the training set with a high degree of memorization" and "reconstructs (copyrighted) training data with little prompting effort." *Id.* ¶¶ 109–10. Anthropic's training efforts included hiring temporary workers to "finetune" Claude by "repeatedly prompt[ing] the AI model[] for Publishers' lyrics." *Id.* ¶ 111; *see also id.* ¶ 99(c). Likewise, when "developing, testing, and using Claude models," Anthropic's own employees "frequently prompted Claude for song lyrics and derivatives of lyrics, including for copyrighted works owned by Publishers." *Id.* ¶ 112. That includes "Anthropic's founder and chief compute officer Tom Brown quer[ying], '@Claude what are the lyrics to desolation row by [Bob] Dylan?', another Anthropic employee prompt[ing] the model to 'write a coherent poem made up of fragments' of 'lyrics from the Beatles, Bob Dylan, and other classics from the 60s/70s,' and another employee ask[ing] Claude, 'What are the lyrics to we found love by Calvin Harris?'" *Id.* These pre-launch efforts by Anthropic ensured Claude would respond to similar third-party prompts by generating output of verbatim and near-verbatim copies of Publishers' lyrics. *Id.* ¶¶ 109, 113 120.

Publishers also detail the specific ways in which Claude has generated output copying their lyrics in response to such third-party user requests, in exactly the way Anthropic designed and trained it to do. "As Anthropic intended and expected, after Anthropic released its AI models to the general public, third-party users have made and continue to make similar requests for Publishers' lyrics, and Claude has generated and continues to generate responses reproducing those lyrics." *Id.* ¶ 113. Publishers allege those outputs include Claude's "generat[ing] verbatim copies

of Publishers' lyrics" and "regurgitat[ing] Publishers' lyrics as output to users." *Id.* ¶¶ 120–21. Publishers further allege that Claude generates such output in response to direct "request[s] [for] lyrics to Publishers' works," *id.* ¶ 114; *see also id.* ¶ 112, as well as a range of other requests. *See, e.g.*, *id.* ¶ 114 (requests to "[h]elp me find, analyze, or modify song lyrics," "[t]ranslate songs or lyrics between languages," and "[h]elp me identify or find songs with specific characteristics"); *id.* ¶ 112 (request to "write a coherent poem made up of fragments" of "lyrics" from various artists and songs); *id.* ¶ 111 (requests to "suggest[] songs based on your favorite music" or "re-write text with style, content, and formatting changes or requests"); *id.* ¶ 121 (requests to "generate purportedly 'new' or 'original' lyrics in the style of an existing song or songwriter," to which the model responds by "generat[ing] output copying existing lyrics"); *see also id.* ¶ 118 (Claude's "generat[ing] output containing Publishers' lyrics even when not specifically requested").

In short, to Anthropic, its models' "regurgitations" of Publishers' lyrics in AI output "are a feature—not a bug." *Id.* ¶ 110. "Claude users specifically seek Publishers' lyrics and derivatives of those lyrics, and [Anthropic] developed and trained Claude to respond to precisely those types of requests." *Id.* Anthropic's own analysis of real-world Claude usage confirms users are prompting Claude for song lyrics in the ways Anthropic intended, including requests to "[h]elp me find" existing lyrics. *Id.* ¶ 114. And "[t]he scientific literature confirms that Claude will still deliver large amounts of copyrighted content as output, such as Publishers' lyrics." *Id.* ¶ 119; *see id.* ¶ 12.

Publishers also explain how Anthropic specifically declined to implement so-called "guardrails" to prevent output of Publishers' lyrics at issue in this case, further supporting their allegations that Claude outputted copies of Publishers Works in Suit here. After Publishers filed suit in *Concord Music Grp., Inc., et al. v. Anthropic PBC*, 5:24-cv-03811-EKL-SVK (N.D. Cal., filed Oct. 18, 2023) ("*Concord I*"), Anthropic added certain after-the-fact "guardrails" aimed at suppressing output of the specific Publishers' lyrics at issue in that litigation. *Id.* ¶ 118. But "Anthropic deliberately chose to include lyrics for only a limited number of specific songs as part its guardrails," while ignoring "the much broader universe of copyrighted songs" owned by Publishers that Anthropic continued to copy during training and in output, including works subject to the present case. *Id.* As a result, Anthropic's guardrails "will not comprehensively prevent output

copying" Publishers' (and others') lyrics "beyond that limited set chosen by Anthropic"—leading to Anthropic's infringing output of Publishers' lyrics at issue in this case. *Id.*

Ultimately, "[t]he question at the pleading stage" comes down to "whether Defendant has received fair notice of the allegations against it." *Kante v. Lipa*, 2024 WL 4720798, at *3 (C.D. Cal. Sept. 10, 2024). Anthropic is "plainly on notice" here. *Id.* Publishers' allegations specify (1) "the type of infringing conduct"—Claude's output of verbatim and near-verbatim copies of lyrics to Publishers' 20,517 works in suit; (2) "the source of the claims"—Publishers' federally registered copyrights in those works; and (3) "where the infringement can generally be found"—in Anthropic's Claude output records. *Id.* These detailed and specific allegations are far from mere conclusory recitations of the elements of the claim. Anthropic's apparent suggestion that it does not have notice of the nature of Publishers' infringing output claims against it, after "years" of litigation, Mot. 2, is simply not credible.

None of Anthropic's three arguments justify dismissing Publishers' infringing output claim.

**B. Publishers' allegations are not equally consistent with noninfringement.**

In arguing that Publishers' claims are "equally consistent with noninfringement," Mot. 8–10, Anthropic turns the motion to dismiss standard on its head and ignores Publishers' detailed allegations. At this stage, Publishers need not prove that noninfringement is impossible; they must only allege that infringement is plausible. "If there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, ***both of which are plausible***, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)." *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013) (emphasis in original) (quotation omitted).

Here, even the most cursory reading of the Complaint makes clear that Publishers have plausibly alleged infringement, and that those allegations are not equally consistent with noninfringement. Publishers describe the ways in which Claude "regurgitates the lyrics to Publishers' works" in its outputs, including "verbatim and near-verbatim copies of Publishers' lyrics," as well as detailing the types of prompts that seek such outputs. SAC ¶¶ 109–121. Publishers also explain how Anthropic designed and trained Claude to output copies of their lyrics in this manner. *See supra* at 5–7. These allegations plausibly allege infringement and are obviously

not consistent with noninfringement. *See, e.g.*, *Strike 3 Holdings, LLC v. Meta Platforms, Inc.*, 2026 WL 1697633, at *6 (N.D. Cal. June 11, 2026) (Lee, J.) (denying motion to dismiss direct infringement claims where "circumstantial facts create[d] a reasonable inference" that defendant, not others, infringed via torrenting). Because Publishers have clearly "alleged 'something more' than the 'bare allegation'" that Anthropic copied their works, Anthropic's argument fails. *Id.*

Anthropic is also wrong to claim that Publishers' allegation that "Claude 'deliver[s] ***large amounts*** of copyrighted ***content***'" is the type of "vague allegation" that "says nothing about whether Claude delivers any aspect of ***Publishers'*** works (or even lyrics generally) as opposed to other forms of content." Mot. 9 (quoting SAC ¶ 119) (emphasis in Mot., not in original). Rather, Anthropic manufactures the "vagueness" about which it complains by selectively quoting Publishers' Complaint. Anthropic inexplicably omits the very next words in that sentence in the Complaint, which identify Claude's output of Publishers' lyrics specifically: "The scientific literature confirms that Claude will still deliver large amounts of copyrighted content as output, ***such as Publishers' lyrics***." SAC ¶ 119 (emphasis added).

Nor is there any basis for Anthropic's suggestion that the "large amounts of copyrighted content" that "[t]he scientific literature confirms" Claude outputs, including "Publishers' lyrics," SAC ¶ 119, might not be infringing because those reproductions could be *de minimis*. The Ninth Circuit has explained that "[a] taking is considered *de minimis* only if it is so meager and fragmentary that the average audience would not recognize the appropriation." *Newton v. Diamond*, 388 F.3d 1189, 1193 (9th Cir. 2004) (*quoting Fisher v. Dees*, 794 F.2d 432, 434 n.2 (9th Cir. 1986)). Publishers' allegations clearly convey that Claude's verbatim regurgitations of Publishers' lyrics are far beyond *de minimis* copying. SAC ¶¶ 109, 120.

The *Twombly* plausibility standard "does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" supporting the allegation. *Twombly*, 550 U.S. at 556. Here, Publishers' allegations easily clear that bar. Anthropic's arguments also ignore the well-established law that, on a motion to dismiss, a court must "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party"—not grasp for corner-case

hypotheticals to excuse the defendant's infringement. *Manzarek*, 519 F.3d at 1031.

None of the cases Anthropic cites require dismissal here. In *Tremblay v. OpenAI, Inc.*, the court emphasized that the plaintiffs had "not alleged that the ChatGPT outputs contain direct copies of the copyrighted books." 716 F. Supp. 3d 772, 778 (N.D. Cal. 2024). Here, by contrast, Publishers do allege direct copying: Anthropic copies their 20,517 lyrics in training and then outputs "verbatim" copies of those same lyrics. SAC ¶¶ 109, 120. Meanwhile, in *Jangle Vision, LLC v. Alexander Wang, Inc.*, the plaintiff alleged that the defendant had infringed two copyrighted cartoon characters. 2023 WL 7042518, at *1 (9th Cir. Oct. 26, 2023). The Ninth Circuit affirmed dismissal, finding that, once unprotectable elements were removed, the plaintiff's and defendant's characters were "more dissimilar than similar." *Id.* at *1–2. Here, again, Publishers allege that Anthropic outputs "verbatim and near-verbatim" copies of their lyrics, SAC ¶ 109, and nowhere does Anthropic dispute its underlying copying in training or suggest those lyrics are unprotectable.

### C. Publishers need not identify specific infringing output examples at the pleading stage.

There is no basis for Anthropic's demand that Publishers must further reinforce their already-detailed allegations by identifying specific examples of infringing Claude output in their Complaint. Mot. 5–7. Courts have rejected that argument in similar cases. *See Justice v. Suno*, 2026 WL 2445362 at *2–3; *Andersen*, 744 F. Supp. 3d at 974–75. Indeed, Publishers obviously cannot cite or quote Claude output copying their lyrics in response to third-party user prompts, because those records are solely in Anthropic's possession and control. Likewise, Anthropic's contention that Publishers must subject themselves to attacks on their protected pre-suit investigation by disclosing prompts and output from that investigation has no basis in the law.

#### 1. Courts have rejected any categorical requirement that a plaintiff must cite specific infringing output examples in a complaint.

Where Publishers have alleged Anthropic's infringement of their lyrics in Claude's output in detail, as described above, Publishers need not additionally cite and quote specific Claude outputs copying those lyrics. The Ninth Circuit has emphasized that "evidence is not required at the motion to dismiss stage." *APL Microscopic*, 2022 WL 4830687, at *1. "Though [Plaintiffs]

could have done so," they were "no[t] required to attach 'an allegedly infringing copy'" to their Complaint. *Adavco, Inc. v. Deertrail Dev., LLC*, 2024 WL 4120908, at *6 (E.D. Cal. Sept. 9, 2024).

Courts recognize that plaintiffs in AI copyright infringement cases need not include "express identification of [AI] outputs that are 'substantially similar' to plaintiffs' copyrighted works" in their complaints, where they otherwise plausibly allege infringement. *Andersen*, 744 F. Supp. 3d at 974–75; *see also Justice v. Suno*, 2026 WL 2445362 at *2–3.

*Justice v. Suno*, another AI copyright infringement case, rejected the same argument Anthropic makes here. 2026 WL 2445362 at *1–3. That court ruled just a few weeks ago that plaintiffs who had "not specifically identified [infringing] outputs" in their complaint nevertheless "pleaded sufficient factual allegations to survive a motion to dismiss." *Id.* at *3.

The *Justice v. Suno* court's reasoning is instructive. The plaintiff recording artists in that case alleged that the defendant AI company Suno "download[ed] their songs from YouTube, cop[ied] them to train its AI model, and generat[ed] AI music that is the same or substantially similar to protected expressive elements of their songs." *Id.* at *1. The recording artists did "not identify any Suno output that allegedly infringes plaintiffs' songs," but instead alleged, similar to Publishers, that "some Suno-generated outputs are infringing works, verbatim or near-verbatim reproductions of plaintiffs' songs (in part or in whole)," and that "evidence exists that Suno's AI model(s) has generated exact or nearly exact versions of plaintiffs' songs." *Id.* at *2 (cleaned up).

The *Justice v. Suno* court concluded that "there is no categorical requirement that a plaintiff must produce the [alleged infringing] work at the motion to dismiss stage." *Id.* at *2. The court analyzed many of the same cases Anthropic relies on here and held that "those cases do not suggest that the only way to allege substantial similarity at the pleading stage is to identify specific infringing works." *Id.* at *3. Rather, the court emphasized that "[t]he question is whether the complaint alleges sufficient, non-conclusory, non-speculative facts to support a plausible inference that Suno outputs are substantially similar to plaintiffs' copyrighted works." *Id.* at *2. The recording artists alleged, among other things, that Suno "structured its AI model to generate AI music designed to mirror the very songs it trains on," *id.* at * 3, consistent with Publishers' allegation here that Anthropic "trains its AI models to memorize Publishers' works, [so] those

models generate output copying Publishers' works in a variety of ways," SAC ¶ 10. In light of those well-pled allegations, the court concluded that the recording artists need not also "specifically identif[y] outputs substantially similar to their songs." *Justice v. Suno*, 2026 WL 2445362, at *3.

*Justice v. Suno* discusses another recent decision in this District, *Andersen v. Stability AI*, further highlighting the defects in Anthropic's argument here. *See id.* at *3 (discussing *Andersen*, 744 F. Supp. 3d at 974–75). In *Andersen*, the plaintiff copyright owners asserted direct infringement claims against the defendant AI company Runway, which claims "depend[ed] on whether plaintiffs' protected works are contained, in some manner, in [the AI product] as distributed and operated." 744 F. Supp. 3d at 974.

The *Andersen* court denied Runway's motion to dismiss, rejecting Runway's argument that, "absent express identification [in the complaint] of outputs that are 'substantially similar' to plaintiffs' copyrighted works," the plaintiffs failed to state a direct infringement claim. *Id.* at 974–75. The Court held sufficient plaintiffs' allegations regarding Runway's use of their copyrighted works in training, including "comments from [co-defendant AI company] Stability's CEO regarding the contents of the model and their ability to reproduce works," "academic papers indicating that the [AI] models are capable of producing very similar if not identical works to at least some training images," and "use of [plaintiffs'] names as prompts in the Runway products to create outputs mimicking aspects of plaintiffs' protected works"—but that did not identify specific infringing outputs. *Id.* at 974. Here, Publishers' Complaint includes similar allegations, among other detailed infringing output allegations. *See, e.g.*, SAC ¶¶ 88–100 (alleging Anthropic's use of Publishers' lyrics in training and finetuning); *id.* ¶ 109 (citing statements by Anthropic CEO Dario Amodei and other Anthropic founders regarding Claude's known tendency to "memorize" and "regurgitate" its training data); *id.* ¶ 12 (alleging that Claude "models still generate output infringing Publishers' works and are also easily jailbroken to output Publishers' and other copyrighted content, as has been reported in the scientific literature"); *id.* ¶¶ 99(c), 111–12 (detailing Anthropic's finetuning and pre-deployment training prompts seeking output of Publishers' lyrics).

When the *Andersen* court denied the defendant AI company's argument that such allegations "d[id] not support assertions of direct copyright infringement absent express identification of outputs that are 'substantially similar' to plaintiffs' copyrighted works," 744 F. Supp. 3d at 974–75, the court recognized:

> [D]efendants' repeated reliance on "run of the mill" copyright cases where a showing of substantial similarity between works is required when determining whether an inference of copying can be supported or liability imposed are unhelpful in this case where the copyrighted works themselves are alleged to have not only been used to train the AI models but also invoked in their operation. Whether that use is "substantial enough" either in operation or output of images to qualify for the fair use defense will be tested on summary judgment.

*Id.* at 974 n.15 (citations omitted); *see also Justice v. Suno*, 2026 WL 2445362, at * 3 ("Those cases [cited by defendant AI company] do not suggest that the only way to allege substantial similarity at the pleading stage is to identify specific infringing works. The subsequent history of *Andersen* in fact suggests the opposite."). Ultimately, *Andersen* held that such questions must be "addressed at summary judgment"—not on the pleadings. 744 F. Supp. 3d at 975.

For the same reasons as explained in *Justice v. Suno* and *Andersen*, Publishers were not required to identify specific infringing outputs, and Anthropic's motion to dismiss should be denied.

**2. Publishers can allege infringing Claude outputs to third-party users on information and belief because Anthropic solely possesses that evidence.**

Publishers need not identify specific infringing Claude outputs to third-party users for a separate important reason: Publishers ***cannot*** identify such infringing outputs at the pleading stage because Anthropic exclusively possesses those records. In such cases, the Ninth Circuit has made clear that "[t]he *Twombly* plausibility standard . . . does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible." *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017) (quoting *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010)) (alteration in *Soo Park*).

That is precisely what Publishers have done here—plead facts regarding Anthropic's infringing Claude output to third-party users upon information and belief, given that the evidence of those infringing outputs is exclusively within Anthropic's control, while alleging detailed

supporting facts about how and why Anthropic generates that infringing output. Contrary to Anthropic's contention, Publishers are "not required at this stage to conduct a forensic analysis of" that infringing output, to which Publishers "do[] not have access." *Kante*, 2024 WL 4720798, at *3. Requiring Publishers to cite records to which they do not have access to state a claim would set an impossibly high bar that would make Anthropic "immune from liability." *See Clifton v. Pearson Educ.*, 2012 WL 1565236, at *4 (N.D. Cal. May 2, 2012).

Numerous courts in this Circuit and elsewhere have denied motions to dismiss where plaintiffs have alleged copyright infringement on information and belief in similar circumstances. *See, e.g.*, *Advanta-STAR Auto. Research Corp. of Am. v. Search Optics, LLC*, 672 F. Supp. 3d 1035, 1045–46 (S.D. Cal. 2023) (rejecting defendant's argument that plaintiff's information and belief allegations were insufficient when they were "robust[ly] support[ed]" by other allegations); *Clifton v. Houghton Mifflin Harcourt Publ'g Co.*, 152 F. Supp. 3d 1221, 1225 (N.D. Cal. 2015) (denying motion to dismiss copyright infringement claim where plaintiff had "alleged what he can, based on the information he has" and "additional facts needed to substantiate his 'information and belief' allegations are 'peculiarly within the possession and control' of [defendant]"); *Pearson Educ.*, 2012 WL 1565236, at *5 (denying motion to dismiss where plaintiff "alleged sufficient facts to support his claim for copyright infringement, and because the only source of additional information appears to be in [d]efendant's possession and control"); *see also, e.g., Energy Intelligence Grp., Inc. v. Bank of Am., N.A.*, 2018 WL 3303166, at *7 (S.D. Tex. July 5, 2018) ("[W]hen discoverable information is in the control and possession of a defendant . . . the plaintiff may allege facts upon information and belief." (quotation omitted)).

Indeed, making allegations "upon information and belief" "is a perfectly proper and well-accepted practice" done "[e]very day in pleadings filed across the country." *Satco Prods., Inc. v. Seoul Semiconductor Co.*, 551 F. Supp. 3d 1329, 1335 (N.D. Ga. 2021).

The history from the *Concord I* case further undermines Anthropic's insistence that the Complaint must identify particular infringements. Prior to fact discovery in *Concord I*, Anthropic repeatedly denied to the Court that Claude had generated any output infringing Publishers' lyrics in response to third-party user prompts. Anthropic represented that "[t]ypical Anthropic users do

not request song lyrics from Claude," *Concord I*, ECF No. 285 at 3, "Claude customers are not using Claude to generate song lyrics," *Concord I*, Nov. 25, 2024 Hr'g Tr. 49:21–50:2, and "[e]xisting song lyrics are not among the outputs that typical Anthropic users request from Claude." *Concord I*, ECF No. 67 at 4. But, after Anthropic produced its internal Claude records, the actual evidence proved the opposite. Contrary to Anthropic's initial denials, those records "reveal[ed] hundreds of instances in which third-party users—plus [Anthropic's] own employees—requested and received copies of Publishers' lyrics in output." *Concord I*, ECF No. 756 at 6 (detailing such infringing output).[2] That included Anthropic's own founder specifically prompting Claude to output Publishers' lyrics during pre-deployment testing. *See Concord I*, ECF No. 483 (Answer) ¶¶ 11, 113. Given this *Concord I* history, where discovery disproved Anthropic's protests that Claude did not generate infringing outputs to third parties, Anthropic is ill-situated to insist that Publishers must cite specific infringing outputs before discovery in this case.

**3. Publishers need not disclose any protected legal investigation details.**

Separately, Anthropic cannot demand that Publishers must subject themselves to a privilege-waiver attack by disclosing "infringing outputs from [Publishers'] own testing" based on "prompts that their own investigators and agents submitted to Claude" as part of their Complaint. Mot. 7. Contrary to Anthropic's contention, Publishers are under no obligation to disclose any protected legal investigation details in order to satisfy Rule 8. *See, e.g.*, *Houghton Mifflin*, 152 F. Supp. 3d at 1225 (rejecting defendant's argument that plaintiff "should have investigated [the infringement] himself" and denying motion to dismiss where additional facts were "peculiarly within the possession and control" of defendant); *Concord I*, ECF No. 545 at 3 (Magistrate Judge

[2] Because Anthropic had already begun producing Claude records in *Concord I* at the time Publishers amended their complaint following the Court's first motion to dismiss ruling (*Concord I*, ECF No. 322), Publishers were able to specifically cite and quote a number of infringing Claude outputs in response to third-party prompts in their amended complaint in *Concord I*—and Anthropic admitted to those outputs in its answer. *See, e.g.*, *Concord I*, ECF No. 337 (First Amended Complaint) at ¶¶ 87–89; *Concord I*, ECF No. 483 (Answer) at ¶¶ 87–89. However, Publishers were not required to include those specific examples in their complaint to plausibly allege Anthropic's direct infringement based on infringing output.

van Keulen's order ruling that "the prompts and related settings used by Publishers in their investigations are attorney work-product" (internal quotation marks omitted)).

The *Justice v. Suno* decision is again instructive. In denying defendant's motion to dismiss, that court rejected the same argument Anthropic makes here that the plaintiffs should have cited evidence from their own investigation, holding that, "whether plaintiffs can now use the AI tool to generate infringing outputs is a separate issue from whether the AI tool has ever been used by Suno to generate infringing outputs." 2026 WL 2445362, at *3 n.1.

The history from *Concord I* again underscores why Anthropic's position here should be rejected. Publishers' *Concord I* complaint included specific examples of Claude output Publishers collected as part of their pre-suit legal investigation, on which Anthropic relies to contend now that Publishers should have done the same in this case. *See* Mot. 7. But, in *Concord I*, Anthropic assailed these examples of infringing output from Publishers' investigation—dismissing that evidence as "*per se* non-infringing," *Concord I*, ECF No. 205 at 6, disparaging those outputs as the result of Publishers' alleged "jailbreaking" efforts, *Concord I*, ECF No. 693 at 7, and blaming such outputs on "third-party applications." *Id.* Anthropic also repeatedly sought to pierce Publishers' work-product protection over their legal investigation by arguing that Publishers' reliance in the Complaint on these examples from their legal investigation necessarily put Publishers' broader investigation at issue and waived work-product protection over that investigation. Anthropic pointed the finger at Publishers, arguing that Publishers made a "strategic decision . . . to put their investigation, which they say was heavily directed by counsel, at issue in this case by relying on it. . . . ***They did not have to put these things at issue***." *Concord I*, Dec. 17, 2025 Hr'g Tr. 30:1–17 (emphasis added); *Concord I*, Oct. 10, 2025 Hr'g Tr. at 114:13–14 (Anthropic's counsel: "[Publishers] are the ones that chose to put this at issue by relying on these results."). Now that Publishers have chosen ***not*** "to put these things at issue" in their Complaint in this case, Anthropic cannot turn around and demand that Publishers must do so.

There is no basis for Anthropic's claim that, in order to plausibly allege infringing Claude output, Publishers must reveal—and correspondingly combat privilege-waiver arguments over—legal investigation details. The law does not force Publishers into such an impossible dilemma.

*See, e.g.*, *Houghton Mifflin*, 152 F. Supp. 3d at 1225; *Justice v. Suno*, 2026 WL 2445362, at *3.

* * *

None of the cases on which Anthropic relies require otherwise. In *Becton* and *Blizzard*, for instance, the plaintiffs pleaded only general and conclusory allegations concerning substantial similarity, such that the courts could not meaningfully evaluate the plausibility of the plaintiffs' allegations. *See Becton, Dickinson & Co. v. Cytek Biosciences Inc.*, 2020 WL 1877707, at *6 (N.D. Cal. Apr. 15, 2020) (describing plaintiff's "formulaic" and "conclusory" allegations); *Blizzard Ent., Inc. v. Lilith Games (Shanghai) Co.*, 149 F. Supp. 3d 1167, 1175 (N.D. Cal. 2015) ("[Plaintiffs] make only general allegations . . . ."); *see also Justice v. Suno*, 2026 WL 2445362, at *3 (distinguishing cases). Here, Publishers specifically allege, among other things, that Anthropic generated AI output copying the lyrics to their 20,517 works verbatim and near-verbatim, and detail how and why Anthropic generated that infringing output. *See supra* at 5–7.

Likewise, Anthropic's reliance on *Justice v. Uncharted Labs Inc.*, 2026 WL 1430232, at *2 (S.D.N.Y. May 21, 2026), is misplaced. Mot. 7. Anthropic ignores that *Justice v. Suno* and *Andersen* reached the opposite conclusion, in well-reasoned and thorough opinions. *See* 2026 WL 2445362, at *1–3; 744 F. Supp. 3d at 974–75; *see supra* at 11–13. Further, the *Justice v. Uncharted* decision relied on an earlier decision in the *Andersen* case, which granted the defendants' prior motion to dismiss, but did not address the more recent *Andersen* ruling, 744 F. Supp. 3d at 974–75, denying the defendants' motion to dismiss and rejecting an argument similar to Anthropic's here. *See Justice v. Uncharted*, 2026 WL 1430232, at *2. In any event, there is no reason to disregard *Justice v. Suno* and *Andersen* and instead rely solely on *Justice v. Uncharted* as a basis for dismissing Publishers' infringing output claims at this stage.

### D. Publishers allege the specific works Anthropic infringed in its Claude output.

Anthropic's argument that Publishers do not identify the works that Anthropic infringed via Claude outputs is simply incorrect. Publishers identify those works explicitly. Publishers specify that Anthropic infringed their copyrights in the "output of its AI models . . . with respect to the 20,517 works identified in Exhibit B." SAC ¶ 10; *see also, e.g.*, *id.* ¶ 148 (alleging Anthropic's infringement in "the output those [Claude] models generate" of Publishers' works

"listed in Exhibit B"), Ex. B (identifying Publishers' 20,517 copyrighted works by work title, Publisher copyright owner, and copyright registration number).

Anthropic is wrong to suggest that Publishers cannot allege infringement of the same works in AI training and AI output. Indeed, Publishers allege that Anthropic copies their lyrics to train Claude precisely ***because*** it intends for Claude to memorize and regurgitate those same lyrics in output. *See, e.g.*, *id.* ¶¶ 10, 109–10, 120. Given that Publishers' factual allegations are accepted as true at the motion to dismiss stage, and particularly where Anthropic has not challenged Publishers' underlying claim that Anthropic copied their 20,517 works in suit to train Claude, there is no basis to question Publishers' allegations that Claude generated output copying those same 20,517 works.

* * *

Additionally, Anthropic mischaracterizes Publishers' allegations regarding Anthropic's AI output of "new" or "original" AI song lyrics and lyrics "in the style of" existing songs or artists. Mot. 10. First, Publishers allege that Claude in certain instances responds to "prompt[s] to generate purportedly 'new' or 'original' lyrics in the style of an existing song or songwriter" by generating "output ***copying existing lyrics***," which constitutes infringement of those lyrics. SAC ¶ 121 (emphasis added). This type of infringing output is yet another example of how Anthropic's copying of Publishers' lyrics in AI training "inevitably result[s] in the unauthorized copying of Publishers' lyrics in Claude outputs in response to a wide range of third-party prompts, even those not specifically requesting lyrics." *Id.* ¶ 120. Separately, where Claude generates output of "new" AI song lyrics or lyrics in the style of an existing song or songwriter, but that output does not directly copy Publishers' lyrics or reflect substantial similarity, that output still causes market harm arising from Anthropic's underlying infringement of Publishers' lyrics during AI training. In other words, Anthropic's argument misunderstands Publishers' allegations and conflates actionable infringement with cognizable market harm germane to the fair use analysis.

## II. Publishers adequately allege that Anthropic violated 17 U.S.C. § 1202(b).

Publishers also plausibly allege Anthropic' removal or alteration of their CMI in violation of 17 U.S.C. § 1202(b)(1) and (3). CMI refers to "the title, the author, the copyright owner, the terms and conditions for use of the work, and other identifying information set forth in a copyright

notice or conveyed in connection with the work." *Stevens v. Corelogic, Inc.*, 899 F.3d 666, 671 (9th Cir. 2018). CMI is particularly vital in this case because it identifies Publishers' copyrighted lyrics, ensures that Publishers' songwriters receive credit and goodwill for their artistic creations, and protects Publishers' works against unauthorized exploitation and misuse. SAC ¶ 53.

Rather than challenge Publishers' CMI removal allegations more broadly, Anthropic instead seeks to escape CMI liability based on two untenable readings of § 1202(b). But even if Anthropic's arguments were legally sound (which they are not), Publishers still adequately plead their CMI claim.

**A. Publishers allege Anthropic removed CMI from their works as a whole.**

First, Anthropic is mistaken that 17 U.S.C. § 1202(b) "only prohibits removal of CMI from copyrighted works as a whole." Mot. 10. Regardless, Publishers do allege that Anthropic possessed "whole" copies of Publishers' works and removed their CMI from those works.

As a legal matter, § 1202(b)'s prohibition on CMI removal is not limited to "works as a whole." Mot. 10. Courts have rejected attempts to limit the DMCA's protection in this manner.

For example, in *ICONICS, Inc. v. Massaro*, the plaintiff sued the defendant for removing the plaintiff's CMI, in the form of "'copyright headers' included in a variety of [the plaintiff's] source code files," in violation of § 1202(b). 192 F. Supp. 3d 254, 272 (D. Mass. 2016). The court recognized that these "[t]hese copyright headers are paradigmatic CMI." *Id.* Like Anthropic does here, the *ICONICS* defendant "question[ed] whether headers on individual files can be CMI when the copyright at issue covers the full versions of programs, not individual files." *Id.* But the *ICONICS* court rejected that argument, emphasizing that "the definition of CMI neither states nor implies that CMI can only exist with regard to the full version of a work." *Id.*

Similarly, in *Real World Media v. Daily Caller, Inc.*, the court "reject[ed]" the same "categorical argument that exact copies of portions of a [work] can never support a DMCA claim" under § 1202(b). 744 F. Supp. 3d 24, 40–41 (D.D.C. 2024). Like Anthropic does here, the *Real World* defendant argued that the plaintiff could not assert a CMI claim where the defendant was "only alleged to have copied 'portions' of [plaintiff's works]." *Id.* at 40. The court rejected that argument and confirmed that "an ***exact copy*** of ***portions*** of an original work can" "support a

DMCA claim," reasoning that "nothing in § 1202(b) requires precise equivalence between the work from which CMI is removed and the allegedly infringing work," "[n]or does the Copyright Act's definition of 'copy' confine the sweep of that term to a copy in full as opposed to in part." *Id.* (citing 17 U.S.C. § 101) (emphasis in original). Additionally, the court emphasized a related "practical point: it would be odd if a defendant could evade DMCA liability by removing or altering CMI in a copied work but only disseminating 99% rather than 100% of that work." *Id.* Anthropic cannot invoke a similar theory to "evade DMCA liability" here. *See id.*

Meanwhile, Anthropic fails to cite any authority that actually supports its argument to the contrary. Notably, when Anthropic claims that "[c]ourts evaluating DMCA claims therefore ask whether CMI was removed from a plaintiff's ***complete*** 'product or original work,'" Mot. 11 (emphasis added), Anthropic itself inserts the critical word "complete"—that requirement does not appear in any of Anthropic's cited cases. None of those cases stand for that proposition. *Falkner v. General Motors LLC* addressed whether a defendant who had taken a photograph with the plaintiff's copyrighted mural in the background had removed CMI in violation of § 1202 by "framing a photograph in a manner that exclude[d]" the plaintiff's signature. 393 F. Supp. 3d 927, 938 (C.D. Cal. 2018). The court granted the defendant summary judgment because the court found that he had not "*removed* or *altered* [p]laintiff's signature from the photograph" "merely by the framing of the scene, rather than by any editing or cropping." *Id.* at 938 (emphasis original). In other words, the issue was not that the defendant did not have access to the "work[] as a whole," as Anthropic argues, Mot. 10, but rather that the defendant never possessed the CMI or knew it had been removed or altered in the first place. *Falkner*, 393 F. Supp. 3d at 938–39. Meanwhile, *Dolls Kill, Inc. v. Zoetop Bus. Co* found simply that "merely omitting CMI" from "knockoff products" did not necessarily constitute "removal or alteration of CMI" from a copyrighted work—not that § 1202(b) bars removal of CMI only from copyrighted works as a whole. 2022 WL 16961477, at *3–4 (C.D. Cal. Aug. 25, 2022). Finally, *Andersen v. Stability* did not speak to whether the DMCA prohibits only removal of CMI from copyrighted works as a whole. Rather, *Andersen* addressed a different issue—whether the DMCA includes an "identicality" requirement—which remains "unsettled," 744 F. Supp. 3d at 971, and is the subject of a pending

appeal to the Ninth Circuit. *See Doe v. GitHub, Inc.*, No. 24-7700 (9th Cir. argued Feb. 11, 2026).

In any event, Publishers plainly ***do*** allege that Anthropic "possessed [Publishers'] complete work." Mot. 11. In other words, the Court need not even reach Anthropic's mistaken legal argument that § 1202(b) applies only to works as a whole, because Publishers' allegations are sufficient regardless. Specifically, Publishers describe how they license their musical compositions to sheet music publishers such as Hal Leonard and Alfred Music, and those licensees publish books of Publishers' sheet music and lyrics, both in print and digitally. SAC ¶¶ 6, 50. Thus, under Anthropic's theory, these books contain Publishers' "complete" works. Mot. 11. Publishers also require their licensees to include CMI with Publishers' works in these books. SAC ¶ 53. Anthropic copied Publishers' works from a variety of sources, including by scanning and digitizing copies of these same books containing Publishers' sheet music and lyrics, *id.* ¶ 97; by illegally torrenting copies of these books containing Publishers' sheet music and lyrics, *id.* ¶¶ 60, 78–81, and by "scrap[ing] the internet on a massive scale," *id.* ¶ 94. By scanning and digitizing, torrenting, and scraping Publishers' songbooks and sheet music in this manner, Anthropic copies Publishers' entire musical compositions—not just the lyrics. And when Anthropic knowingly utilizes extractor algorithms to strip CMI from these copies of Publishers' musical compositions to train its AI models, *id.* ¶¶ 99, 104–07, it is removing CMI from the "complete" works. Mot. 11.

**B. Publishers need not cite specific infringing outputs to state a § 1202(b)(3) claim.**

Second, just as Anthropic is wrong to argue that Publishers must identify specific infringing Claude outputs to plausibly allege a claim for direct infringement, *see supra* section I.C, it is also wrong that Publishers must identify specific Claude output to plausibly allege a § 1202(b)(3) claim.

Publishers specifically allege how Anthropic "distributed Publishers' works and copies of those works knowing that [CMI] has been removed or altered," SAC ¶ 167, by "copying Publishers' lyrics from websites containing those lyrics, including the websites of Publishers' licensees, and applying algorithms known to remove copyright notices and other [CMI] from that copied text," *id.* ¶ 166; *see also id.* ¶¶ 104–06; by "copying [third-party] training datasets," such as the Pile, "that contain Publishers' copyrighted lyrics and to which algorithms known to remove [CMI] had been applied," *id.* ¶ 167; *see also id.* ¶¶ 101–03; and by then "knowingly using [these] copies of

Publishers' lyrics from which CMI had been removed to train its models, while knowing that those models would 'memorize' and regurgitate copies of those works without their [CMI] in the models' outputs," *id.* ¶ 167.

Anthropic takes these steps to remove Publishers' CMI because it "wants to train its Claude AI models" to "reproduce [the] expressive content" of Publishers' lyrics, "rather than copyright notices or other [CMI] accompanying those lyrics." *Id.* ¶ 167. Anthropic understands that "Claude's output of Publishers' lyrics are likely to contain [CMI] unless Anthropic engages in a process to remove that information." *Id.* Consequently, it "deliberately extracts [CMI] from its training data in order to prevent the models from overweighting and displaying such information alongside Publishers' lyrics in outputs, thereby concealing Anthropic's infringement from Anthropic's users, Publishers, and other copyright owners." *Id.*

These allegations are more than sufficient to support Publishers' § 1202(b)(3) claim. There is no need for Publishers to further supplement these allegations by citing to specific infringing outputs—particularly where those outputs are in the exclusive possession of Anthropic.

Further, Anthropic is also wrong that § 1202(b)(3) requires that "material reproduced without CMI must be 'identical to a plaintiff's work.'" Mot. 12. While certain courts have endorsed this so-called "identicality" requirement, the question remains "unsettled," *Andersen*, 744 F. Supp. 3d at 971, and is the subject of a "nascent district-court split," *Real World*, 744 F. Supp. 3d at 40 (collecting cases). The leading copyright treatise advocates against the identicality requirement, explaining that "[t]he authority supposedly requiring identity fails to withstand scrutiny." NIMMER ON COPYRIGHT § 12A.10 (arguing the copy need only be substantially similar).

But again, even if "identicality" were required to sustain a claim under § 1202(b)(3), Plaintiffs' allegations satisfy that standard. Publishers allege that Anthropic's Claude outputs "verbatim"—*i.e.*, identical—copies of Publishers' lyrics, SAC ¶ 109, and that Anthropic intentionally removes Publishers' CMI when it distributes those verbatim outputs, *id.* ¶ 121. Those allegations satisfy Anthropic's purported identicality requirement.

**III. In the alternative, Publishers should be permitted to amend their Complaint.**

Finally, if the Court finds Publishers' allegations insufficient, Publishers request leave to amend. As this Court has recognized, "[i]f dismissal is warranted, the court should grant leave to amend 'unless it determines that the pleading could not possibly be cured by the allegation of other facts.'" *Concord Music Grp., Inc. v. Anthropic PBC*, 2025 WL 1487988, at *3 (N.D. Cal. Mar. 26, 2025) (quoting *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000)); *see also Creech v. Tewalt*, 84 F.4th 777, 787 (9th Cir. 2023) ("[D]ismissal without leave to amend is improper unless it is clear, upon de novo review, that the complaint could not be saved by any amendment." (citation omitted)). Absent "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, [or] undue prejudice to the opposing party," courts allow amendment whenever a complaint's deficiencies can conceivably be cured. *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532 (9th Cir. 2008) (citation omitted); *see, e.g., Rivas v. Kijakazi*, 2023 WL 8006846, at *2 (N.D. Cal. Nov. 17, 2023).

Here, Anthropic attempts to characterize Publishers as having repeatedly failed to cure the alleged deficiencies in their allegations simply because ***Anthropic*** claims to have put Publishers "on notice" of these deficiencies. Mot. 12. But adopting such a rule would deprive a plaintiff of the opportunity to cure its pleadings after having a ***court*** weigh in on the validity of a defendant's arguments. *See, e.g.*, *McCoy v. McCormick & Co., Inc.*, 2025 WL 1918546, at *11 (E.D. Cal. July 11, 2025), *report and recommendation adopted*, 2025 WL 2315457 (E.D. Cal. Aug. 12, 2025) (rejecting defendant's argument that plaintiff should not be granted leave to amend for "simply disagreeing with Defendant's position during [meet and confers]"). Indeed, none of the cases Anthropic cites dismissed a claim with prejudice without first affording the plaintiff an opportunity to amend following a court order. *See Salameh v. Tarsadia Hotel*, 726 F.3d 1124, 1133 (9th Cir. 2013) ("[T]he district court gave [p]laintiffs specific instructions on how to amend the complaint, and [p]laintiffs did not comply."); *Imperial v. Ramsey*, 2010 WL 2765540, at *1 (N.D. Cal. July 13, 2010) (noting that plaintiff claimed to have "amended his complaint in compliance with the [court's prior order]"); *Scilex Pharms. Inc., v. Sanofi-Aventis U.S. LLC*, 2021 WL 11593043 (N.D. Cal. Aug. 16, 2021) (granting motion to dismiss in part, with leave to amend).

Accordingly, if the Court dismisses any of Publishers' claims, Publishers request that the Court do so without prejudice and allow Publishers to amend their Complaint.

## CONCLUSION

Publishers respectfully request that the Court deny Anthropic's Motion to Dismiss in full.

Dated: August 31, 2026

Respectfully submitted,

*/s/ Nicholas C. Hailey*

**OPPENHEIM + ZEBRAK, LLP**
Matthew J. Oppenheim
Nicholas C. Hailey
Corey Miller
(admitted *pro hac vice*)
4530 Wisconsin Ave., NW, 5th Floor
Washington, DC 20016
Telephone: (202) 480-2999
matt@oandzlaw.com
nick@oandzlaw.com
corey@oandzlaw.com

Jennifer Pariser
Andrew Guerra
Bret Matera
Timothy Chung
Michelle Gomez-Reichman
(admitted *pro hac vice*)
461 5th Avenue, 19th Floor
New York, NY 10017
Telephone: (212) 951-1156
jpariser@oandzlaw.com
andrew@oandzlaw.com
bmatera@oandzlaw.com
tchung@oandzlaw.com
mgomez-reichman@oandzlaw.com

**COBLENTZ PATCH DUFFY & BASS LLP**
Jeffrey G. Knowles (SBN 129754)
One Montgomery Street, Suite 3000
San Francisco, CA 94104
Telephone: (415) 391-4800
ef-jgk@cpdb.com

**COWAN, LIEBOWITZ & LATMAN, P.C.**
Richard S. Mandel
Jonathan Z. King
Richard Dannay
(admitted *pro hac vice*)
114 West 47th Street
New York, NY 10036-1525
Telephone: (212) 790-9200
rsm@cll.com
jzk@cll.com
rxd@cll.com

*Attorneys for Plaintiffs*